UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| MICROSOFT CORP., ET AL. | § | |
| | § | |
| | § | |
| VS. | § | Case No. 6:06-CV-549 (LED) |
| | § | |
| COMMONWEALTH SCIENTIFIC AND | § | |
| INDUSTRIAL RESEARCH | § | |
| ORGANISATION | § | |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| COMMONWEALTH SCIENTIFIC AND | § | |
| INDUSTRIAL RESEARCH | § | |
| ORGANISATION, | § | |
| | § | |
| VS. | § | Case No. 6:06-CV-550 (LED) |
| | § | |
| TOSHIBA AMERICA INFORMATION | § | |
| SYSTEMS, INC., ET AL., | § | |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| INTEL CORPORATION, ET AL. | § | |
| | § | |
| VS. | § | Case No. 6:06-CV-551 (LED) |
| | § | |
| COMMONWEALTH SCIENTIFIC AND | § | |
| INDUSTRIAL RESEARCH | § | |
| ORGANISATION | § | |
| | § | |

# DEFENDANT 3COM CORPORATION'S FIRST AMENDED ANSWER TO PLAINTIFF CSIRO'S CORRECTED FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND

Defendant 3Com Corporation ("3Com") hereby answers Plaintiff Commonwealth Scientific and Industrial Research Organization's ("CSIRO") Corrected First Amended Complaint for Patent Infringement and Jury Demand ("FAC") as follows:

## THE PARTIES

1.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 1 of CSIRO's FAC, and therefore, denies them.

2.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 2 of CSIRO's FAC, and therefore, denies them.

3.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 3 of CSIRO's FAC, and therefore, denies them.

4.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 4 of CSIRO's FAC, and therefore, denies them.

5.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 5 of CSIRO's FAC, and therefore, denies them.

6.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 6 of CSIRO's FAC, and therefore, denies them.

7.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 7 of CSIRO's FAC, and therefore, denies them.

8.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 8 of CSIRO's FAC, and therefore, denies them.

9.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 9 of CSIRO's FAC, and therefore, denies them.

10.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 10 of CSIRO's FAC, and therefore, denies them.

11.     3Com admits that it is a Delaware corporation having its principal place of business at 350 Campus Drive, Marlborough, Massachusetts, 01752.

## JURISDICTION AND VENUE

12.     3Com admits that the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).  3Com admits that venue is proper and that it has done business in this district.  3Com denies that it has committed or continues to commit acts of infringement.  3Com is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in Paragraph 12 of CSIRO's FAC, and therefore, denies them.

## INFRINGEMENT OF U.S. PATENT NO. 5,487,069

13.     3Com admits that United States Patent No. 5,487,069 (the "'069 patent") was issued on January 23, 1996 and is titled "WIRELESS LAN."  3Com denies that the '069 patent was duly and legally issued.  3Com is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in Paragraph 13 of CSIRO's FAC, and therefore, denies them.

14.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 14 of CSIRO's FAC, and therefore, denies them.

15.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 15 of CSIRO's FAC, and therefore, denies them.

16.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 16 of CSIRO's FAC, and therefore, denies them.

17.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 17 of CSIRO's FAC, and therefore, denies them.

18.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 18 of CSIRO's FAC, and therefore, denies them.

19.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 19 of CSIRO's FAC, and therefore, denies them.

20.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 20 of CSIRO's FAC, and therefore, denies them.

21.     3Com is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 21 of CSIRO's FAC, and therefore, denies them.

22.     3Com denies the averments in Paragraph 22 of CSIRO's FAC.

23.     With respect to 3Com, 3Com denies the averments in Paragraph 23 of CSIRO's FAC.  3Com is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in Paragraph 23 of CSIRO's FAC, and therefore, denies them.

24.     With respect to 3Com, 3Com denies the averments in Paragraph 24 of CSIRO's FAC.  3Com is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in Paragraph 24 of CSIRO's FAC, and therefore, denies them.

### JURY DEMAND

25.     CSIRO is not entitled to a jury trial on equitable issues raised by this action.

### PRAYER FOR RELIEF

26.     3Com denies that CSIRO is entitled to any relief whatsoever.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE:  NONINFRINGEMENT

27.      3Com has not directly or indirectly infringed, contributed to, or induced the infringement of any valid claim of the '069 patent.

### SECOND AFFIRMATIVE DEFENSE:  INVALIDITY

28.      Each claim of the '069 patent is invalid, void, or unenforceable for failure to comply with the statutory provisions for patentability specified in 35 U.S.C. §§ 1 *et seq.*

### THIRD AFFIRMATIVE DEFENSE:  EQUITABLE ESTOPPEL

29.      CSIRO is estopped from alleging that wireless LAN components compliant with the a, g, or draft n amendments to the IEEE 802.11 standard infringe any claims of the '069 patent, based on, but not limited to, statements made and actions taken before the U.S. Patent and Trademark Office by the '069 applicants and their attorneys to obtain issuance of the '069 patent.

30.      Further, CSIRO is estopped from seeking damages in this case that would be any royalties as a result of their inequitable conduct, but in the event the Court finds CSIRO is entitled to royalties, damages should not exceed the rate for which it has licensed the '069 patent to several other companies because of CSIRO's commitments to the Institute of Electrical and Electronics Engineers (IEEE) to license the patent on reasonable and non-discriminatory terms during the IEEE's consideration of the wireless standard at issue.

31.      IEEE participants have a duty to inform the IEEE of potentially essential patent claims that they or their employer own that may practice a standard.  The IEEE-SA Standards Board Bylaws on Patents in Standards describes this duty stating: "Participants have a duty to

tell the IEEE if they know (based on personal awareness) of potentially Essential Patent Claims they or their employer own."[1]

32.     When a participant in IEEE proceedings identifies a patent that it believes to be potentially essential to standards under consideration, the IEEE requires the participant to commit to a reasonable and non-discriminatory, or "RAND", licensing program for such patent. The IEEE-SA Standards Board Bylaws on Patents in Standards describes this duty stating:

- "Terms of assurance shall be either:

  - Reasonable and nondiscriminatory, with or without monetary compensation; or

  - A statement of non-assertion of patent rights."[2]

33.     On October 26, 1998, Vic Hayes, Chair of the IEEE P802.11 group, sent CSIRO a letter requesting that, if CSIRO contended that the '069 patent was needed to implement the 802.11a amendment, CSIRO give its assurance that it would offer a license on reasonable and nondiscriminatory ("RAND") terms and conditions to all applicants.

34.     CSIRO sent the IEEE such a letter of assurance ("LOA") on December 4, 1998, confirming CSIRO's position that the '069 patent may be needed to implement 802.11a and committing that it would grant a nonexclusive license on a "non discriminatory basis and on reasonable terms and conditions including its then-current royalty rates."

35.     CSIRO then confirmed to members of the IEEE and others that its LOA applied to other amendments of the 802.11 standard.

36.     Under IEEE patent policy, these assurances and promises are expressly irrevocable.

---

[1] Available at:  http://grouper.ieee.org/groups/802/11/ieee_p802_banner_v6.htm

[2] Available at:  http://grouper.ieee.org/groups/802/11/ieee_p802_banner_v6.htm

37.     CSIRO's actions caused the IEEE and its members/participants (including companies with respect to which CSIRO is now alleging claims of infringement under the '069 patent) to reasonably rely upon the representation by CSIRO that it (like other IEEE participants) would license on RAND terms.  In reliance on the IEEE process, these IEEE members and participants have invested substantial resources in product research, design, manufacturing, sales, marketing and customer support.  Had the IEEE members and participants known that CSIRO would demand a royalty rate in the range it now seeks from defendants in this action, the IEEE members and participants would have rejected 802.11a in its current form, and instead would have adopted an amendment to 802.11 that did not potentially implicate the '069 patent.

38.     CSIRO has licensed the '069 Patent on several occasions.  On each of those occasions, the licenses required the respective licensee to pay an amount equal to a small fraction of the total cost of the wireless chipset allegedly practicing the '069 patent.  The license rate obtained by CSIRO on these licenses is consistent with the value of the patent as assessed by CSIRO's own financial consultants, hired to value the '069 patent.

39.     After granting several licenses on RAND terms, CSIRO has flatly refused to license the '069 Patent on RAND terms to any other party except at rates representing a several thousand percent increase over rates paid on volume sales under the original licenses granted.

40.     Indeed, the rates now demanded by CSIRO in effect would equate to nearly a 100% royalty on wireless chips compliant with the relevant 802.11 amendments.

41.     Further, CSIRO's current monopolistic royalty demands are not only wildly inconsistent with its historical licensing practices, and its own independent consultant's report, but also **(1)** far exceed the royalty rates offered by other patentees who claim to own other essential 802.11 patents**, (2)** do not account for royalty stacking in the 802.11 standard, **(3)** are

divorced from the economic realities of the wireless LAN industry, **(4)** discriminate in favor of current licensees, and **(5)** are unsupported by any legal test.

42. IEEE participants, including 3Com and 3Com's customers, are and have been materially prejudiced by CSIRO in refusing to license at RAND rates.

43. CSIRO should be estopped from seeking damages that would be any royalties as a result of their inequitable conduct, but in the event the Court finds CSIRO is entitled to royalties, it should not be anything more than the RAND terms to which it committed in the IEEE proceedings.

## FOURTH AFFIRMATIVE DEFENSE: LACHES

44. CSIRO's claims for relief are barred, in whole or in part, by the equitable doctrine of laches.

## FIFTH AFFIRMATIVE DEFENSE: COSTS

45. CSIRO may not recover any costs associated with this action, pursuant to 35 U.S.C. § 288.

## SIXTH AFFIRMATIVE DEFENSE: PATENT MARKING

46. On information and belief, CSIRO has failed to comply with the patent marking and notice requirements of 35 U.S.C. § 287, which limits CSIRO's recovery of damages for alleged infringement of the '069 patent.

## SEVENTH AFFIRMATIVE DEFENSE: LIMITATION ON DAMAGES

47. CSIRO may not recover money damages for any alleged infringement committed more than six years prior to the filing of its Complaint, pursuant to 35 U.S.C. § 286.

## EIGHTH AFFIRMATIVE DEFENSE:  NO INJUNCTION

48.    CSIRO is not entitled to an injunction because CSIRO is not likely to prevail on the merits, has not suffered and will not suffer irreparable harm because of 3Com's conduct, and has an adequate remedy at law.  Moreover, CSIRO has publicly and legally committed to license the '069 patent on reasonable, non-discriminatory, and non-exclusive terms.  Thus, even if CSIRO should prevail on the issues of infringement, enforceability, and validity, CSIRO has waived any right to an injunction with respect to that patent.

## NINTH AFFIRMATIVE DEFENSE:  INEQUITABLE CONDUCT

49.    Upon information and belief, the '069 patent is unenforceable due to inequitable conduct committed during its prosecution.

50.    On information and belief, the named CSIRO inventors, as described below, and/or others substantively involved in the prosecution of the application leading to the '069 patent were aware of information material to the patentability of the claims of the '069 patent, and they withheld that information from the U.S. Patent and Trademark Office ("USPTO") with the intent to deceive the USPTO.

51.    The withholding of material prior art with the intent to deceive the USPTO is a violation of the duty of disclosure under 37 C.F.R. § 1.56 and constitutes inequitable conduct.

52.    On January 10, 1994, CSIRO filed with the USPTO a declaration signed by  all of the named inventors on the '069 patent—including Dr. Terence Percival ("Dr. Percival"), Mr. Graham Daniels ("Mr. Daniels"), and Dr. John O'Sullivan ("Dr. O'Sullivan").

53.    In such declaration, the inventors acknowledged their duty under 37 C.F.R. § 1.56 to disclose to the USPTO all information known to them to be material to patentability.

54. The duty to disclose was a continuing one, continuing until and through the date of issuance of the '069 Patent.

55. On February 3, 1995, CSIRO filed with the USPTO an Information Disclosure Statement ("IDS") "in compliance with the duty of disclosure set forth in 37 C.F.R. 1.56."

56. Upon information and belief, the following are specific items of prior art that CSIRO and the named inventors identified below intentionally withheld from the USPTO.

**The Percival Paper**

57. While this IDS disclosed certain prior art publications to the USPTO, it did not disclose a publication entitled "Wireless Systems at High Bit Rates – Technical Challenges" ("the Percival paper").

58. The Percival paper was authored by two of the CSIRO researchers named as inventors in the '069 patent, Dr. Terence Percival and Dr. John O'Sullivan, and Alan Young, a third CSIRO author.

59. On information and belief, CSIRO published, distributed, and presented the Percival Paper to members of the public on November 12, 1992 at the First International Workshop on Mobile and Personal Communications Systems held at the University of South Australia in Adelaide, Australia.

60. The Percival paper was a product of the CSIRO wireless LAN research that resulted in the '069 patent. Every page of the paper bears the words "CSIRO Division of Radiophysics," and the "Acknowledgments" section of the paper states:

> The work presented here is a summary of the barriers and solutions to providing a
> high-speed WLAN system. The work is a result of the discussions held over the

last twelve months with a large number of colleagues in the CSIRO Institute of Information Science and Engineering and Macquarie University.

61.     Because the Percival paper was published more than one year prior to the actual filing date of the U.S. application leading to the '069 patent (i.e., November 23, 1993) (hereafter "The Application"), it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

62.     The Percival paper discloses all of the elements of several of the issued and originally-filed claims of the '069 patent, and it discloses most, if not all, of the elements of the remaining issued and originally-filed claims.

63.     Furthermore, no reference considered by the USPTO examiner during the prosecution of the '069 patent discloses as many of the elements of the issued and originally-filed claims as the Percival paper discloses.

64.     For at least these reasons, the Percival paper is highly material to the patentability of both the issued and the originally-filed claims of '069 patent.

65.     The Percival paper was relevant to The Application as it publicly described and publicly conveyed the invention allegedly embodied in the '069 Patent.

66.     The Percival paper deserved to be considered by the examiner(s) in making decisions regarding patentability of The Application.

67.     At least two of the named inventors, as described above, were aware of the Percival paper at, before, and during the filing of the IDS and the The Application.

68.     At least two of the named inventors, as described above, intentionally did not disclose the Percival paper to the USPTO and/or intentionally acted in such a way to ensure that the Percival paper was not disclosed to the USPTO.

69.    At least two of the named inventors, as described above, intentionally did not disclose the Percival paper to the USPTO with the intention of misleading the PTO as the disclosure would have had a significant and material impact on the patentability of The Application.

**The Barry Paper**

70.    The IDS also did not disclose a publication entitled "High-Speed Nondirective Optical Communications for Wireless Networks" ("the Barry paper").

71.    John R. Barry, Joseph M. Kahn, Edward A. Lee, and David G. Messerschmitt authored the Barry Paper.

72.    The Barry paper was known to at least two of the '069 patent inventors, Dr. Terence Percival and Dr. John O'Sullivan, because it was cited in the Percival paper.

73.    The Barry paper disclosed a wireless LAN using multicarrier modulation and was published in the November 1991 issue of IEEE Network Magazine, a printed publication widely disseminated to persons of ordinary skill in the relevant art.

74.    Because the Barry paper was published more than one year prior to the actual filing date of The Application, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

75.    The Barry paper was relevant to The Application as it publicly described and publicly conveyed the invention allegedly embodied in the'069 Patent.

76.    The Barry paper deserved to be considered by the examiner(s) in making decisions regarding patentability of The Application.

77.    At least two of the named inventors, as described above, were aware of the Barry paper at, before, and during the filing of the IDS and The Application.

78. At least two of the named inventors, as described above, intentionally did not disclose the Barry paper to the USPTO and/or intentionally acted to ensure that the Barry paper was not disclosed to the USPTO.

79. At least two of the named inventors, as described above, intentionally did not disclose the Barry paper to the USPTO with the intention of misleading the USPTO as the disclosure would have had a significant and material impact on the patentability of The Application.

**The Rault Paper**

80. The IDS also did not disclose a publication entitled "The Coded Orthogonal Frequency Division Multiplexing (COFDM) Technique, and its Application to Digital Radio Broadcasting Towards Mobile Receivers" by J.C. Rault, D. Castelain, and B. Le Floch ("the Rault paper"), published, distributed, and presented to members of the public in 1989.

81. The Rault paper was relevant to The Application as it publicly described and publicly conveyed the invention allegedly embodied in the '069 Patent.

82. The abstract of such publication states:[3]

> Abstract
>
> The broadcasting channel towards mobile receivers, especially in a dense urban area, is particularly hostile, which makes the transmission of high bit rate very challenging.
>
> The conjunction of an Orthogonal Frequency Division Multiplexing (OFDM) technique and a convolutional coding scheme (associated to a Viterbi decoding algorithm) is a promising solution (COFDM) studied at CCETT, that is suitable to cope with such a channel.
>
> In the first part of the paper, the theoretical principles of the system are detailed. The second part concerns the realization of a complete

---

[3] CH2682 – 3/89/0000-0428, © 1989 IEEE, CSI0061454.

COFDM system, designed within the framework of the DAB (Digital Audio Broadcasting) EUREKA 147 project, which is able to broadcast 5.6Mbit/s in a bandwidth of 7MHz. For the time being, this rate corresponds to 16 high quality stereophonic programs. Finally, network aspects are pointed out as far as the introduction of a new radio broadcasting service is concerned.

83. Because the Rault paper was published more than one year prior to the actual filing date of The Application, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

84. The Rault paper deserved to be considered by the examiner(s) in making decisions regarding patentability of The Application.

85. At least one of the named inventors, Dr. Percival, was aware of the Rault paper before the issuance of the '069 patent.

86. At least one of the named inventors, Dr. Percival, intentionally did not disclose the Rault paper to the USPTO and/or intentionally acted in such a way to ensure that the Rault paper was not disclosed to the USPTO.

87. At least one of the named inventors, Dr. Percival, intentionally did not disclose the Rault paper to the PTO with the intention of misleading the PTO as the disclosure would have had a significant and material impact on the patentability of The Application.

**The Le Floch Paper**

88. The IDS also did not disclose a publication entitled "Digital Sound Broadcasting to Mobile Receivers" by Bernard Le Floch, Roselyne Halbert-Lassalle, and Damien Castelain ("the Le Floch paper"), published, distributed, and presented to members of the public in 1989.

89. The Le Floch paper was relevant to The Application as it publicly described and publicly conveyed the invention allegedly embodied in the '069 Patent.

90.     The Le Floch paper's "system" is outlined as follows:[4]

> The system described in this article, combining spectrum and
> power efficiency, is mainly based on the conjunction of the
> Orthogonal Frequency Division Multiplexing technique (already
> proposed for HF data transmission in an ionospheric channel or for
> transmissions through telephone networks [3] [4]), and a coding
> strategy associated with diversity in the frequency domain.

91.     Because the Le Floch paper was published more than one year prior to the actual

filing date of The Application, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or

103(a).

92.     The Le Floch paper deserved to be considered by the examiner(s) in making

decisions regarding patentability of The Application.

93.     At least one of the named inventors, Dr. Percival, was aware of the Le Floch

paper before the issuance of the '069 Patent.

94.     At least one of the named inventors, Dr. Percival, intentionally did not disclose

the Le Floch paper to the USPTO and/or intentionally acted to ensure that the Le Floch paper

was not disclosed to the USPTO.

95.     At least one of the named inventors, Dr. Percival, intentionally did not disclose

the Le Floch paper to the USPTO with the intention of misleading the USPTO as the disclosure

would have had a significant and material impact on the patentability of The Application.

**The Bingham Paper**

96.     The IDS also did not disclose a publication entitled "Multicarrier Modulation for

Data Transmission:  An Idea Whose Time Has Come" by John A. C. Bingham ("the Bingham

paper"), published, distributed, and presented to members of the public in 1990.

---

[4] 0098 3063/89/0200 0493501, © 1989 IEEE, CSI0042438.

97.    The Bingham paper was relevant to The Application as it publicly described and publicly conveyed the invention allegedly embodied in the '069 Patent.

98.    Because the Bingham paper was published more than one year prior to the actual filing date of The Application, it is prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

99.    The Bingham paper deserved to be considered by the examiner(s) in making decisions regarding patentability of The Application.

100.    At least one of the named inventors, Dr. Percival, was aware of the Bingham paper before the issuance of the '069 Patent.

101.    At least one of the named inventors, Dr. Percival, intentionally did not disclose the Bingham paper to the USPTO and/or intentionally acted to ensure that the Bingham paper was not disclosed to the USPTO.

102.    At least one of the named inventors, Dr. Percival, intentionally did not disclose the Bingham paper to the USPTO with the intention of misleading the USPTO as the disclosure would have had a significant and material impact on the patentability of The Application.

**HF Radios and Modems**

103.    The IDS also did not disclose the existence of high-frequency modems and high-frequency radios ("HF radios and modems").

104.    HF radios and modems have been in existence since as early as the 1960's. Examples of HF radios and modems include an HF radio system called "Piccolo," the KATHRYN system, and marine HF radio.

105. Because HF radios and modems were offered for sale, sold, made, and used more than one year prior to the actual filing date of The Application, they are prior art to the '069 patent under 35 U.S.C. §§ 102(b) and/or 103(a).

106. HF radios and modems were relevant to The Application as they used, in the public domain, the invention allegedly embodied in the'069 Patent.

107. HF radios and modems were material to The Application and they deserved to be considered by the examiner(s) in making decisions regarding patentability The Application.

108. At least two of the named inventors, Graham Daniels and John O'Sullivan, were aware of HF radios and modems at, before, and during the filing of the IDS and The Application.

109. At least two of the named inventors, as described above, intentionally did not disclose HF radios and modems to the USPTO and/or intentionally acted to ensure that these items were not disclosed to the USPTO.

110. At least two of the named inventors, as described above, intentionally did not disclose HF radios and modems to the USPTO with the intention of misleading the USPTO as the disclosure would have had a significant and material impact on the patentability of The Application.

111. In sum, the above described papers and HF radios and modems, either alone or in obvious combination, disclosed all the elements of multiple claims in the originally-filed '069 application. Thus, the named CSIRO inventors, as described above, and/or others substantively involved in the prosecution of the '069 patent knew or reasonably should have known that the above described papers and HF radios and modems would have been important to and carefully considered by the examiner in deciding whether to allow the claims.

112. Despite the high materiality of the above described papers and HF radios and modems and the written acknowledgment by the inventors and CSIRO of their duty to disclose material prior art, none of this prior art was disclosed to the USPTO during the prosecution.

**Arguments For Patentability**

113. In response to a prior art rejection the USPTO examiner entered against the originally-filed claims, CSIRO canceled the originally-filed claims and added new claims in an Amendment filed on June 30, 1995.

114. In arguing for the patentability of the new claims, CSIRO asserted that the prior art cited by the USPTO examiner did not disclose several specific elements of the new claims.

115. However, all of the specific elements relied upon by CSIRO for its patentability arguments are disclosed in the aforementioned prior art, which was concealed from the USPTO.

116. Thus, the named CSIRO inventors, as identified above, and/or others substantively involved in the prosecution of the '069 patent knew or reasonably should have known that the above described papers and HF radios and modems would have been important and materially relevant to the examiner in deciding whether to allow the claims.

117. The named CSIRO inventors, as identified above, and/or others substantively involved in the prosecution of the '069 patent acted with culpable intent to mislead or deceive the USPTO by withholding known prior art and by making arguments for patentability which could not have been made had the art been disclosed.

118. In fact, the only prior art that the named inventors disclosed to the USPTO consisted of four references that the European Patent Office brought to the inventors' attention during the prosecution of their corresponding European patent application. As stated in their lone Information Disclosure Statement dated February 3, 1995: "Such prior art has come to the

applicants' attention by being cited in a Search Report issued October 11, 1994 on the corresponding European application ...." The named inventors did not disclose any of the prior art that they were independently aware of to the USPTO.

119. Upon information and belief, the failure by the named CSIRO inventors, as described above, and/or others substantively involved in the prosecution of the '069 patent to disclose the HF Radios and Modems and the Percival, Barry, Rault, and Bingham papers to the USPTO examiner during the prosecution of the '069 patent was done with an intent to deceive the USPTO and constitutes a violation of the duty of disclosure under 37 C.F.R § 1.56, thereby rendering the '069 patent unenforceable due to inequitable conduct.

### TENTH AFFIRMATIVE DEFENSE: PATENT MISUSE

120. The '069 patent is unenforceable due to patent misuse, including but not limited to the facts set forth in the preceding affirmative defense and the Third Affirmative Defense for Equitable Estoppel, and 3Com further incorporates by reference paragraphs 29 through 43 herein.

### ELEVENTH AFFIRMATIVE DEFENSE: RESERVATION OF ADDITIONAL DEFENSES

121. 3Com reserves the right to assert additional affirmative defenses that may be developed through discovery in this action.

### PRAYER FOR RELIEF

WHEREFORE, 3Com prays for judgment as follows:

a) that CSIRO's claims be dismissed, with prejudice, and that CSIRO take nothing by its claims;

b)      that judgment be entered declaring that the '069 patent is invalid, void, and

unenforceable, and has not been infringed by 3Com;

c)      that 3Com be awarded its costs and attorneys' fees in this matter; and

d)      for such other and further relief as the Court deems just and proper.

Dated: April 9, 2008                              Respectfully submitted,

                                                  WILSON, SHEEHY, KNOWLES,
                                                   ROBERTSON & CORNELIUS, P.C.
                                                  P.O. Box 7339
                                                  Tyler, Texas 75711-7339
                                                  Telephone: 903/509-5000
                                                  Facsimile: 903/509-5091
                                                  wc@wilsonlawfirm.com


                                                  By:___/s/ William Cornelius_____

                                                       WILLIAM CORNELIUS
                                                       State Bar No. 04834700

                                                  ATTORNEYS FOR DEFENDANT 3COM CORPORATION

OF COUNSEL:

Richard C. Vasquez
RVasquez@mmblaw.com
Jeffrey T. Lindgren
JLindgren@mmblaw.com
Craig E. Davis
CDavis@mmblaw.com
Stephen C. Steinberg
SSteinberg@mmblaw.com
MORGAN MILLER BLAIR
1331 N. California Blvd., Suite 200
Walnut Creek, CA  94596-4544
Telephone:  925/937-3600
Facsimile: 925/274-7544

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this **DEFENDANT 3COM CORPORATION'S FIRST AMENDED ANSWER TO PLAINTIFF CSIRO'S CORRECTED FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND** via the Court's CM/ECF system per Local Rule CV-5(a)(3) on April 9, 2008.


/s/ *Tonia Torres*
Tonia Torres