```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                      TYLER DIVISION

 3   COMMONWEALTH SCIENTIFIC AND  )
     INDUSTRIAL RESEARCH          )
 4   ORGANISATION, INC.           )   DOCKET NO. 6:06cv324
                                  )
 5       -vs-                     )
                                  )   Tyler, Texas
 6   BUFFALO TECHNOLOGY, INC.,    )   March 26, 2009
     ET AL                        )   9:00 a.m.
 7
     MICROSOFT CORPORATION, ET AL )
 8                                )   DOCKET NO. 6:06cv549
         -vs-                     )
 9                                )
     COMMONWEALTH SCIENTIFIC AND  )
10   INDUSTRIAL RESEARCH          )
     ORGANISATION, INC.           )
11
     COMMONWEALTH SCIENTIFIC AND  )
12   INDUSTRIAL RESEARCH          )
     ORGANISATION, INC.           )   DOCKET NO. 6:06cv550
13                                )
         -vs-                     )
14                                )
     TOSHIBA AMERICA, ET AL       )
15
     INTEL CORPORATION, ET AL     )
16                                )   DOCKET NO. 6:06cv551
         -vs-                     )
17                                )
     COMMONWEALTH SCIENTIFIC AND  )
18   INDUSTRIAL RESEARCH          )
     ORGANISATION, INC.           )
19
                 TRANSCRIPT OF PRETRIAL CONFERENCE
20            BEFORE THE HONORABLE LEONARD DAVIS,
                 UNITED STATES DISTRICT JUDGE
21
                     A P P E A R A N C E S
22          (SIGN-IN SHEETS DOCKETED IN EACH CASE)

23   COURT REPORTER:      MS. SHEA SLOAN
                          211 West Ferguson
24                        Tyler, Texas  75702
     Proceedings taken by Machine Stenotype; transcript was
25   produced by a Computer.
```

2

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              All right.  Ms. Ferguson, if you will call the case,

4         please.

5              THE CLERK:  Court calls Case No. 6:06cv324, CSIRO v.

6         Buffalo; 6:06cv549, Microsoft, et al v. CSIRO; 6:06cv550,

7         CSIRO v. Toshiba, et al; 6:06cv551, Intel, et al v. CSIRO.

8              THE COURT:  Announcements.

9              MR. CAPSHAW:  Your Honor, for the Plaintiff CSIRO,

10        Calvin Capshaw, Dan Furniss, Greg Gilchrist, John Lord, Gary

11        Ritchey, and Jordan Jones for CSIRO.  We have some other

12        people here, but these will be the speakers.

13             THE COURT:  Very good.  Thank you.

14             MR. VAN NEST:  Good morning, Your Honor.  Bob Van

15        Nest from Kecker & Van Nest for Defendant Intel.  I am here

16        with my partners, Christa Anderson and Leo Lam; and with Mike

17        Jones from the Potter Minton Firm and John Bufe.

18             MR. KELLY:  Thank you, Your Honor.  Richard Kelly.

19        With me is my partner Robert Mattson on behalf of Buffalo,

20        Inc.  Also, John Bufe and Mike Jones from Potter Minton.

21             THE COURT:  Thank you.

22             MR. CORDELL:  Good morning, Your Honor.  Ruffin

23        Cordell from Fish & Richardson on behalf of Microsoft.  With

24        me is Barry Shelton and Conor Civins.  Jennifer Ainsworth, is

25        here as well; and our client Robert Lytle from Microsoft is

1    here.

2              THE COURT:  Okay.  Thank you.

3              Is that it?

4              MR. CORNELIUS:  Your Honor, Bill Cornelius along

5    with Rich Vasquez for Accton, 3Com, SMC and D-Link.

6              THE COURT:  Okay.

7              MR. WILCOX:  Melvin Wilcox, Your Honor, on behalf of

8    Toshiba.  I would like to introduce Mr. Irfan Lateef and Mr.

9    Craig Summers are also here.  Also, I am standing in for Mr.

10   Yarbrough -- he sends his regrets -- on behalf of Belkin and

11   Mr. Craig Dawes -- Kris Dawes.

12             THE COURT:  Thank you.

13             MR. ALBRITTON:  Eric Albritton, Scott Stevens, and

14   Pat Benedicto for ASUS.  We are ready.

15             MR. JACKSON:  Tom Jackson and Dan Conrad from Jones

16   Day on behalf of D-Link, Your Honor.

17             MR. FINDLAY:  Eric Findlay on behalf of Nintendo.

18   Also with me is Tom Friel and Matt Brigham from the Cooley

19   Firm.

20             MR. BRIGHAM:  Good morning.

21             THE COURT:  Good morning.

22             Is that it?

23             MR. SMITH:  Ryan Smith on behalf of NetGear.

24             THE COURT:  Okay.  Anyone else?

25             All right.  Let's -- Ms. Ferguson, if you will, go

4

1    ahead and call the second case.

2           THE CLERK:  Case No. 2:07cv546, Rebecca Perdue, et

3    al v. Nissan Motor Company.

4           MR. TRACY:  Todd Tracy and Melissa Smith on behalf

5    of the plaintiffs.  Ready to proceed, Your Honor.

6           MR. PATTERSON:  Jeff Patterson for Nissan, Your

7    Honor.

8           THE COURT:  All right.  Very well.  All right.  Just

9    to explain on both of these cases, the second case is set in

10   Marshall.  This case is set in Tyler.  The CSIRO case is the

11   earlier case and will take precedence.  I believe we are

12   picking a jury in it on April 6th; is that correct?

13          MR. CAPSHAW:  Yes, Your Honor.

14          THE COURT:  Then in the Nissan case on April 7th; is

15   that correct?

16          MR. TRACY:  Yes, Your Honor, it is.

17          THE COURT:  Then we are going to start the evidence

18   in the CSIRO case here in Tyler on I believe April 13th; is

19   that right?

20          MR. CAPSHAW:  Yes, sir.

21          THE COURT:  And then the Nissan case will trail

22   whenever that is over, and I am in just a moment going to go

23   through the time estimates with the people, so you may want to

24   remain here for that.  I don't know how long this pretrial

25   will take.  I anticipate it could take an hour or so, so you

1    are welcome to wander in and out if you like to, the attorneys

2    in the Nissan case; but you might want to sit in for the first

3    part or you are welcome to sit in for all of it.

4              Let me go now to the pretrial in the CSIRO case.

5    Are there any settlements to be announced?

6              MR. FURNISS:  Yes, Your Honor.  Settlements have

7    been reached with defendants Hewlett-Packard and Fujitsu.

8              THE COURT:  All right.

9              MR. TINDEL:  Andy Tindel, Your Honor.  I am here on

10   behalf of Fujitsu, and that is correct.

11             THE COURT:  Do you need anything put of record?

12             MR. FURNISS:  The request for dismissal in HP was

13   filed yesterday, Your Honor.

14             THE COURT:  All right.

15             MR. FURNISS:  No, nothing else on the record.

16             THE COURT:  That is granted.

17             MR. TINDEL:  Your Honor, I think all of our

18   paperwork is going to be finished, and our dismissal papers

19   will be filed on April 6th.

20             THE COURT:  All right.  Very well.

21             All right.  Let me just inquire before we get into

22   the pretrial as to the status of mediation.

23             MR. FURNISS:  Your Honor, Judge Faulkner has been

24   working hard --

25             THE COURT:  He always does.  He is a good mediator.

1          MR. FURNISS:  Yes.  There are ongoing discussions

2    with a number of parties.  There are a couple of parties who

3    have not responded at all.  And I think that -- Mr. Capshaw

4    and I talked to Judge Faulkner yesterday, and there are

5    ongoing discussions, as I said, with at least three or four

6    parties.

7          THE COURT:  All right.  Defendants?

8          MR. VAN NEST:  Yes, Your Honor.  I don't have

9    anything to add.  I'm not sure when he says a couple of

10   parties that haven't responded at all.  I do know that Judge

11   Faulkner has been working hard with all of us.  A number of us

12   have been through more than one mediation.  A fair number

13   of -- progress is being made.

14         THE COURT:  Okay.  Do you wish to add any

15   clarification, or do you want to talk with him about that

16   later?

17         MR. FURNISS:  Well, just without naming them, I will

18   say there are two parties who have just absolutely refused --

19         THE COURT:  Why don't y'all get together and discuss

20   that.  It sounds like you are on different pages.

21         MR. FURNISS:  Not Mr. Van Nest's client, Your Honor.

22   We have had discussions with them.

23         THE COURT:  Other counsel for defendants wish to

24   chime in?

25         Mr. Cordell.

1          MR. CORDELL:  I will just add to that, Your Honor,

2     we have had good discussions.  Judge Faulkner has been a lot

3     of help, and we remain hopeful.  I can't promise anything.

4          MR. CORNELIUS:  Your Honor, on behalf of my clients

5     we have had similar experience.  We are working well and

6     making progress.

7          THE COURT:  Good.  Okay.  Anyone else?  Let me just

8     inquire first of the defendants, do you believe that you have

9     the parties there from CSIRO which you need in order for

10    mediation to be meaningful?  In other words, do you feel like

11    you have the decision-makers available to you?  And then I am

12    going to ask the same question of plaintiff, but I will go to

13    defendants first.

14         MR. VAN NEST:  Based on what mediation experience we

15    have had, the answer is, yes, Your Honor.  I think they have

16    brought people here that can make decisions.  As you know,

17    they have reached a couple of mediation settlements.

18         THE COURT:  Okay.  Very good.

19         MR. FURNISS:  Only in some cases, Your Honor, have

20    decision-makers been present.  Again, without going into

21    names, there have been a number of parties who have not sent

22    people that appear to have any authority whatsoever other than

23    Counsel.  But Judge Faulkner is aware of that.  Mr. Van Nest

24    is right, the decision-maker from CSIRO was in California to

25    meet with Judge Faulkner on Monday.  I think it is his third

```
 1   trip, and he will be here whenever Judge Faulkner asks him to
 2   to be here.
 3           THE COURT:  He is coming from Australia, right?
 4           MR. FURNISS:  Right.  He has come three times to
 5   participate --
 6           THE COURT:  I have made that flight.  It is not an
 7   easy one.
 8           MR. FURNISS:  It is a long way.
 9           THE COURT:  I would encourage him to be present and
10   available at Judge Faulkner's request.  I would also say --
11   again, I don't know who the parties are that Mr. Furniss feels
12   like that have, perhaps, not had decision-makers; but in order
13   for there to be good-faith negotiations on both sides, you all
14   know that needs to happen.
15           So, Mr. Furniss, I will ask you to communicate to
16   Judge Faulkner who you believe those parties are.  And I am
17   going to be asking Judge Faulkner to contact those defendants
18   and get the people there -- I mean, y'all can look at the
19   amount of money and time and resources that is being put into
20   this.  And it is just unacceptable for there not to be
21   decision-makers with authority there.  And it doesn't sound
22   like that is the main players in the case; but, perhaps, some
23   of the other defendants.  I don't know who those are.  But
24   let's be sure we get the right people at the table.
25   Then y'all keep working on it.  I would encourage you -- I
```

1   mean this case is going to be extremely difficult to try.   It

2   is going to be very long.   It has already gone on for many

3   years.   We have been to the Fed Circuit once.   We will

4   undoubtedly go back again if we try it, from one side or the

5   other.   And you all know what -- should know by now what your

6   risks are, be able to advise your client, and whether you are

7   willing to take those risks or not.   Be reasonable.   Try to

8   compromise.   There is nothing that ends the litigation like a

9   settlement.   The ones that don't settle, they just go on and

10  on and on and somebody gets hurt.   I don't know who that will

11  be.

12          While you have got control over your own destiny, I

13  just encourage you to work at it the next couple of weeks

14  because we are going to be picking a jury, we are going to be

15  trying this case, and we are going to get a verdict.   So, you

16  know, and once that happens it is a whole new ballgame.

17          So with that let's talk now about the trial

18  structure.   And I want to take up first defendants' motion to

19  modify the trial structure, which in Case No. 324 is Docket

20  No. 350, 549 is 512, in 550 it is 584, and in 551 it is 465.

21  Who would like to be heard on that?   Mr. Van Nest?

22          MR. VAN NEST:   I would, Your Honor.   Speaking this

23  morning not only for Intel, but all of the Defense Group in

24  those list of cases.   We have proposed a plan that has really

25  three goals.   As you just said, this is going to be a

1    difficult, lengthy trial.  We are trying to take advantage of

2    the fact that Your Honor has bifurcated it to focus the Phase

3    I trial on the truly common issues of infringement and

4    invalidity without overburdening the jury with a lot of

5    individualized defendant decisions.  And at the same time we

6    recognize while there may be some overlap no matter what we

7    do, we want to try to minimize presenting duplicative,

8    overlapping evidence.

9            And really the third goal is to alleviate some

10   evidence problems that arise from having Buffalo consolidated

11   with our case and having the damages bifurcated out.  So let

12   me focus on two issues.  I think reading the parties'

13   positions on trial structure, there really are only two

14   issues.  One is how and when to try the RAND defenses, Phase I

15   or Phase II.  And second is how and when to try willfulness,

16   Phase I or Phase II.  Let me talk about RAND first because we

17   have quite a bit of agreement on RAND.

18           Both parties agree that the RAND defenses should not

19   be presented to the jury in Phase I.  CSIRO's position is that

20   it is an equitable issue.  It is a Court decision.  It is a

21   bench trial.  And presenting evidence of RAND to the jury in

22   Phase I would be confusing because it doesn't have anything to

23   do with the rest of Phase I.

24           THE COURT:  Do you agree with that?

25           MR. VAN NEST:  I do.

1             THE COURT:  Are you speaking on behalf of all

2    defendants?

3             MR. VAN NEST:  Yes.  With respect to our position,

4    our position is that it is an equitable issue, it is tried to

5    the Court, it has no part in Phase I because it is unrelated

6    to Phase I.  But it should be tried as part of Phase II.  And

7    the reason for that, Your Honor, is that there is almost a

8    complete overlap of evidence.

9             Our RAND theory, as Your Honor knows, is essentially

10   that if CSIRO made a commitment back when the IEEE was

11   considering the standard to license at a reasonable

12   nondiscriminatory rate.  At that time they had a license at

13   pennies on the chip with Radiata.  They renewed that license a

14   couple of times after that at pennies on the chip.  And now

15   that we come to our case they are demanding four dollars, five

16   dollars and in some cases nine dollars a chip.

17            And our position is under RAND that that is a

18   violation of their commitment.  It is not reasonable.  It is

19   discriminatory.  That is really the same issue that the jury

20   is going to have to grapple with on damages.  What is a

21   reasonable royalty?  Is nine dollars reasonable?  Is five

22   dollars reasonable?  Is fifteen cents reasonable?  And the

23   experts recognize this overlap.  All of the experts that are

24   applying the Georgia-Pacific analysis, whether you talk about

25   the hypothetical negotiation or you talk about a licensing

1    practice or history or you talk about established rates as a

2    result of these several different licenses, all of these are

3    factors in the Georgia-Pacific analysis.

4           So the way we look at it, if the choice is between

5    having a separate bench trial after Phase I or as part of

6    Phase I and trying it as part of Phase II, there is no reason

7    to have a separate trial to the bench.  All of the same

8    evidence is going to be presented.  And what we are proposing

9    is simply in the Phase II trials since the evidence is the

10   same, Your Honor would hear along with the jury -- the jury

11   could issue an advisory verdict if Your Honor found that was

12   helpful.  The jury, in any event, will be deliberating over

13   many of these related issues as part of its job in determining

14   damages.

15          So, again, I think both parties are agreed it

16   shouldn't be a jury presentation in Phase I.  The disagreement

17   is about how and when to try it, and I think our proposal,

18   frankly, saves a lot of time and energy.  We don't have to

19   have a separate bench trial on it.  We could try it as part of

20   Phase II.

21          THE COURT:  In your proposal and if it went to Phase

22   II along with the damage trial, would it be presented to the

23   jury, the RAND defenses and testimony and arguments?

24          MR. VAN NEST:  They would, Your Honor, but only to

25   this extent:  If it went to Phase II what we have said is to

1    streamline it and simplify it, we would present the RAND

2    defense only as a limitation on damages not an absolute bar.

3    So, in other words, the defenses of unclean hands and

4    equitable estoppel that are complete defenses we would

5    withdraw those in favor of trying the RAND defense as a

6    limitation, so the evidence would be presented and we would

7    ask Your Honor to seek an advisory verdict from the jury on

8    the RAND limitation issue.  But the ultimate decision on RAND

9    would be made by Your Honor, by the Court.

10           THE COURT:  But you are saying you would withdraw

11   your equitable defenses if the RAND issue goes to the damage

12   trial?

13           MR. VAN NEST:  That's right, Your Honor, except

14   for --

15           THE COURT:  What would there be left to present to

16   the jury if you withdraw your defenses?

17           MR. VAN NEST:  We would not withdraw all RAND

18   defenses, but the only RAND equitable defense we would present

19   is that the RAND obligation places a limit on the damages.  So

20   that would be an equitable defense that could be presented to

21   the jury for an advisory verdict followed by a verdict from

22   the Court.  Obviously, the jury is going --

23           THE COURT:  I don't normally submit equitable issues

24   to the jury for an advisory opinion.  Why should I do it in

25   that case?

1      MR. VAN NEST:  I don't think it costs you anything,

2   Your Honor, because the evidence is all going to be the same

3   anyway.  The RAND evidence goes to what commitments they made,

4   what licenses they had, what their licensing practice was.

5   Those are all items of evidence that the jury will be hearing

6   in Phase II anyway on the question of what is the reasonable

7   royalty?  So the reason to do it is simply that it doesn't

8   cost us anything.  We have all that evidence before the jury.

9   Your Honor will have to make the ultimate call on it.  It is

10   not going to be a defense that bars damages.

11      THE COURT:  Wait a minute.  I will have to make the

12   ultimate call on what, if you are withdrawing all of your

13   equitable defenses?  What would there be left for me to

14   decide?

15      MR. VAN NEST:  We are not withdrawing all equitable

16   defenses, Your Honor.  We have a RAND affirmative defense that

17   says that based on the commitment they made, they are not

18   entitled to damages beyond what was already in place back in

19   1998, 1999.

20      THE COURT:  Is that a legal or equitable defense?

21      MR. VAN NEST:  We think that is an equitable

22   defense, Your Honor.  But obviously the facts that address

23   that defense also go to the damages issue, which is a legal

24   issue.  So I guess better put, we are withdrawing a form of

25   relief rather than withdrawing all of the equitable defenses.

1    As I said we still have a RAND defense, but we are not seeking

2    to bar damages.  We would be seeking only to limit them to

3    what was in place and reasonable at the time the commitment

4    was made.

5            THE COURT:  So you would be wanting me to decide

6    that as a matter of equity but at the same time wanting the

7    jury to decide it from a legal standpoint.

8            MR. VAN NEST:  What the jury would decide, Your

9    Honor, as any jury would, is what is a reasonable royalty

10   based on all of the Georgia-Pacific factors.

11           THE COURT:  They are going to be deciding that

12   anyway, right?

13           MR. VAN NEST:  They are going to be deciding that

14   anyway.  What Your Honor would be deciding is whether or not,

15   apart from what the jury decides, there is a limit on damages

16   based on the RAND commitment.  That is what the affirmative

17   defense would be.  It is a defense that they are not entitled,

18   they have given up the right, they are equitably estopped from

19   claiming damages --

20           THE COURT:  Well, now wait a minute.  You are going

21   back into equitable estoppel.  I thought you were waiving that

22   one.

23           MR. VAN NEST:  We are waiving the form of relief,

24   Your Honor, that says they are equitably estopped from any

25   damages.  We are not waiving the defense itself.  The defense

1   would be limited to they are estopped from claiming damages

2   above what was in place at the time they made the commitment.

3   So it is a limitation on damages, not an absolute bar.  So the

4   way it would work is the jury would reach a verdict on what is

5   reasonable; and if what they awarded was consistent with the

6   Radiata license, there would probably be nothing for Your

7   Honor to do.  It is only if the jury awards a damage amount

8   that is far in excess of what CSIRO had been licensing the

9   patent for back in '98 and '99 with Radiata.  Then Your Honor

10   would have the decision are they equitably estopped from

11   claiming damages above a certain level?  In other words, is

12   this so inconsistent with their RAND commitment that it has to

13   be reduced?

14           THE COURT:  Thank you.

15           Response?

16           MR. CAPSHAW:  Your Honor, what is really happening

17   here is the defendants want to get in such issues in front of

18   the jury in an advisory way as, did CSIRO mislead the

19   defendants?  If you look at some of their advisory jury

20   questions, that one of them is, "Was CSIRO's commitment in

21   1998 to license the '069 patent at a reasonable and

22   nondiscriminatory rate and/or its subsequent communications

23   and conduct misleading?"  And they want other questions like,

24   "Was CSIRO's conduct unconscionable?"  Those are the advisory

25   kind of questions they want to ask to the jury.  This is an

1   equitable defense, if it is a defense at all.  The RAND issue

2   is very confusing to a jury because --

3          THE COURT:  It is a bit confusing to me, too.

4          MR. CAPSHAW:  As I heard it explained, I was

5   confused because the RAND letter that CSIRO sent -- let's

6   start with this -- was for 802.11a.  Most of the products in

7   this case are 802.11g, and CSIRO expressly refused to send

8   such a letter because they saw how the defendants want to used

9   the first RAND letter in the 802.11a.  And so there is a big

10  dispute among the experts whether a RAND letter on the 802.11a

11  can somehow act as a limit on Georgia-Pacific.  And they don't

12  cite a case that says that is a recognized legal theory.

13         They have an equitable theory, and that should be to

14  the Court.  It is going to confuse the jury if they present

15  these kinds of defenses, would the 802.11a letter somehow bind

16  or limit our reasonable royalty under Georgia-Pacific?  That

17  will be confusing.

18         We think it is an equitable defense, and it ought to

19  remain with the Court.  You can hear that.  You can decide

20  does the 802.11a letter somehow transmogrify onto the 802.11g

21  and make it somehow CSIRO bound forevermore to an 802.11

22  reasonable standard rather than Georgia-Pacific?  You can

23  decide that issue.

24         We will also have four advisory jury trials on this

25  RAND equitable issue.  So we don't think the Court ought to

1   move it.  We think it is an equitable issue.  You can decide

2   it.  And we have a strong disagreement about how much evidence

3   on RAND ever gets to the jury.  So for that reason --

4           THE COURT:  That is what I wanted to ask you to

5   respond to was Mr. Van Nest's argument that much of the

6   evidence that I would be hearing on the equitable defenses

7   related to RAND would have to be replayed under

8   Georgia-Pacific to the -- during the Phase II damage part.

9           MR. CAPSHAW:  Your Honor, I think very little.  I

10  think you are going to have to decide as far as the 802.11a

11  letter.  As a matter of contract law, does a commitment to

12  offer a reasonable and nondiscriminatory royalty to whoever

13  asks you for one, is that some kind of legal commitment that

14  sets some kind of rate at pennies?  Do you take extrinsic

15  evidence?  How do you interpret the reasonable part in the

16  802.11a letter?

17          THE COURT:  There is not much authority on this

18  question, is there?

19          MR. CAPSHAW;  We could find no authority that there

20  somehow is a binding amount in a RAND letter.  In fact, if you

21  look at the motion for summary judgment, the IEEE says that

22  "reasonable" is meaningless.  And they don't try to set an

23  amount because it differs from party to party and patent to

24  patent.  So we think that these are legal issues and contract

25  construction issues that you are going to decide.  And if you

1  look at the motion for summary judgment -- well, you probably

2  already have, you will see all of the disputes about whether

3  extrinsic evidence comes in to interpret that 802.11a letter.

4  Can it even apply to an 802.11g standard?  When CSIRO was

5  asked to send in a RAND letter on 802.11g we refused.  So what

6  is all the legal construction of those contracts?  We don't

7  think that comes in at all in the Georgia-Pacific and don't

8  see how it could.  It goes back to the equitable nature of

9  this dispute.

10          THE COURT:  Thank you.

11          Response?

12          MR. VAN NEST:  Your Honor, just one fact point

13  without getting too deeply into it.  Every single defendant in

14  this room was told in writing by CSIRO that they had made a

15  commitment to license at RAND on the "g" standard.  Everyone

16  received the letter except, perhaps, Intel.  All of the

17  customers by CSIRO were told we have made a commitment to

18  license at reasonable nondiscriminatory rates on "g" and we

19  want you to pay based on your "g" products.  One thing I

20  didn't hear Mr. Capshaw say is there isn't a lot of overlap.

21          Obviously, under Georgia-Pacific the experts are

22  looking at what would the hypothetical negotiation have

23  produced?  If at the time of that negotiation CSIRO had made a

24  commitment to the whole group to license at a reasonable

25  nondiscriminatory rate, obviously that is something -- that is

1    just a fact that we have to live with it --

2           THE COURT:  Are there a lot of legal issues, though,

3    tied up in interpreting what this RAND defense is and how it

4    applies?  Or has this been done and this is black letter law

5    and everybody knows what it means and there are cases that you

6    can cite me to?

7           MR. VAN NEST:  I don't think it is black letter law,

8    Your Honor.

9           THE COURT:  My review of it is this is sort of a

10   case of first impression dealing with the RAND defenses.

11          MR. VAN NEST:  I think that is a fair point.  There

12   are obviously cases that talk commitment and enforcing it in

13   various contexts, and we have cited those to Your Honor.  But

14   fundamentally it is a question of did they make the

15   commitment?  What was the nature of it?  And have they lived

16   up to it?  Those are intensely fact questions.

17          The only sort of contract interpretation issue is,

18   you know, what is the word "reasonable"?  What does the word

19   "nondiscriminatory" mean?  But that is really no different

20   than any other sort of contract or promissory estoppel case.

21   It is very fact-bound.  And, again, all of this goes to this

22   hypothetical negotiation anyway.

23          So our point is very simple, if the two choices are

24   have a separate stand-alone bench trial where we review all of

25   this evidence in front of Your Honor only?  Or try it as part

1   of the damages trials, which we already have set up and

2   already have going and will already include all of this

3   evidence?  Obviously, it makes more sense to do the latter.

4   And Your Honor can control what verdict questions we ask for,

5   if any.

6          Obviously, we are at a very preliminary stage and

7   that would require a little more refinement, but certainly in

8   terms of saving ourselves time and effort and money, it is

9   better to try that issue in trials where we already have to

10  hear all of the evidence anyway.

11         If Your Honor finds that an advisory verdict doesn't

12  help you, sobeit.

13         THE COURT:  Well, I think this is -- let me ask you

14  this one final question:  If I go ahead and hear the equitable

15  RAND defenses as part of this trial as originally planned, and

16  if you prevailed on one of those defenses, then it would not

17  be necessary to even have the damage trials, would it?

18         MR. VAN NEST:  Well, I guess that is right, Your

19  Honor, because in that instance we are asserting the RAND

20  defense as an affirmative defense that bars damages, and that

21  is right.  If you ruled in an equitable bench trial as part of

22  Phase I that they were equitably estopped from seeking damages

23  based on what they have done vis-a-vis RAND, that's right,

24  that obviates the damage trials.

25         THE COURT:  Or if I ruled as a matter of law that it

1    set a limitation on what a reasonable royalty would be, that

2    too would negate the need for a second trial, would it not?

3    Or would you still have issues to litigate?

4              MR. VAN NEST:  I think that would depend on the

5    cap.  I mean, if you set a cap then the jury would presumably

6    still have to decide where within that cap the damages fell.

7    Obviously, if you set a cap it gives a lot of us guidance on

8    how we might resolve the case.  But I'm not sure it would

9    obviate the Phase II trials.  It would set a limit on what the

10   juries in those trials could award, but they would still have

11   to be a determination of what is a reasonable royalty within

12   the cap.

13             So, again, I think everyone is in agreement we are

14   not going to present it to the jury in Phase I.  What we need

15   to know from Your Honor is how and when you want to do it.

16             THE COURT:  All right.  I believe I will stick with

17   the original plan, and we will go ahead and hear it as part of

18   this case.  And so defendants' motion to modify is denied.

19             MR. VAN NEST:  Your Honor, just one point of

20   clarification.  So when that evidence will be presented to

21   Your Honor outside the presence of the jury, would we be able

22   to have some hiatus between the jury trial and that bench

23   trial so that we know what we are doing in terms of planning?

24             THE COURT:  Well, that leads right into my next

25   question, and that is your trial estimates.  You are

1    estimating 31.5 hours.  Does that include your inequitable

2    conduct evidence as well?

3           MR. VAN NEST:  No, it doesn't, Your Honor.

4           THE COURT:  It doesn't?

5           MR. VAN NEST:  It does not.  There is a second issue

6    that we presented in our trial structure motion.  That has to

7    do with willfulness.  Willfulness is a separate issue that, if

8    Your Honor please, I would like to address briefly now?

9           THE COURT:  All right.

10          MR. VAN NEST:  There is really two reasons to try

11   willfulness as part of Phase II.  One is to avoid the need in

12   Phase I to get 12 separate determinations, individual findings

13   on willfulness.  As we are set up now with 12 defendants

14   remaining, the jury has to deliberate 12 separate willfulness

15   verdicts based on individual factors for each defendant.  And

16   the second reason is to avoid this evidentiary problem that

17   arises from Buffalo.

18          Let me address each of these issues.  Under Seagate

19   there are two things the plaintiff has to prove on

20   willfulness.  First, they have to prove that it would have

21   been objectively reckless to proceed.  That is a common issue

22   that is based on our liability defenses, and we recognize that

23   is common really to all defendants.  But even if they prove

24   that, they have to prove a knowledge element.  They have to

25   prove that it was either known or so obvious it should have

1    been known to each individual defendant that it was

2    objectively reckless to proceed.  And that gets into the

3    knowledge of each individual defendant and would require proof

4    in the case of each of the 12 of what their companies knew,

5    how they proceeded, what decisions they made, why they

6    produced a product?  Whether they knew a patent or didn't know

7    of it?  What demands have been made on them by CSIRO?  And

8    some of us no demands had been made and so on.

9           So that individual issue, we think, is much more

10   efficiently tried in Phase II when we are looking at smaller

11   groups of defendants anyway.  Now, we have these four trials

12   set up with three and four defendants each.

13          THE COURT:  Under Seagate and the Seventh Amendment

14   doesn't it require it be tried with the liability phase of

15   case?

16          MR. VAN NEST:  Well, we argued that the Seventh

17   Amendment prevented splitting all of this, Your Honor; and

18   Your Honor has decided to split it up.  And so we recognize

19   that we have a split trial and we are willing under that

20   structure to try the willfulness in Phase II.  I don't think

21   it is required to be tried in Phase I if we have bifurcated

22   liability and damages now.

23          It makes a lot more sense for a second reason is

24   that the Buffalo Federal Circuit opinion on validity is

25   something the defendants have a right to rely on.  It goes to

1    objective recklessness.  The Federal Circuit, as Your Honor

2    knows, has said that the question of obviousness is a close

3    one that should be tried to a jury.  There are disputed

4    questions of fact on both sides of that.  We would like to put

5    that in in a willfulness trial.

6            On the other hand, the infringement findings by the

7    Federal Circuit are not binding on any defendant here other

8    than Buffalo.  What CSIRO is arguing if we get to put in the

9    validity determinations by the Federal Circuit, they want to

10   put in the infringement determination.  Well, that would be

11   highly prejudicial to the defendants other than Buffalo,

12   perhaps, who are not bound by that determination, who didn't

13   create that record, who are presenting an entirely different

14   set of facts to this jury as you will hear shortly, I think.

15           So that problem is solved by moving the willfulness

16   determinations to Phase II where, as I said, Your Honor will

17   have smaller groups of defendants trying their damages cases

18   separately where this issue can be more efficiently tried as

19   part of that case than it can in the first case.  Our

20   estimate, Your Honor, was based on having not to try the

21   equitable defenses to the jury because we understood that was

22   agreed between the parties.  But it is made with the

23   understanding that we would have to try willfulness.  That is

24   what the estimate was based on, that willfulness would be part

25   of Phase I.

1          THE COURT:  It was my understanding when I asked for

2    the time estimates I thought I already entered an order that

3    said that the RAND defenses would be tried as part of this

4    trial.

5          MR. VAN NEST:  You had, Your Honor.  But the

6    parties, as we worked through the pretrial, both came to the

7    agreement that the RAND issues wouldn't be tried to that first

8    jury; that they would be subject to an equitable bench trial

9    either as part of Phase I or as part of Phase II.

10         THE COURT:  Is that plaintiffs' understanding?

11         MR. FURNISS:  Your Honor, it has always been our

12   position that was a legal issue for the Court on the RAND.

13         THE COURT:  Do your trial times include the RAND

14   issues as well?

15         MR. FURNISS:  Yes, Your Honor.  As we think it is a

16   legal question that wouldn't take up -- it is fully briefed on

17   the motion for summary judgment.  Your Honor, we believe that

18   "reasonable" means reasonable.  The only way they can make

19   their RAND claim is they had an expert that testified that it

20   was a standard of usage in the trade; that reasonable and RAND

21   really meant very, very low or zero.  Now, that testimony

22   is -- in the IEEE there is absolutely no support for it.  So I

23   think, frankly, that you can resolve the RAND issue on the

24   summary judgment this morning, Your Honor.  I am prepared to

25   address that in detail.

1          This argument that "reasonable" -- discriminatory

2     may be enforceable in the sense of treating similar parties

3     similarly, but "reasonable" means reasonable.  It is exactly

4     the same word that is in the standard.  235 says a plaintiff

5     is entitled to no less than a reasonable royalty.  So it does

6     include that, and we think it is going to take -- Your Honor

7     reads the briefs.  It is a pure legal issue.  When they say it

8     is a factual issue, there is no question there is no RAND

9     letter on 802.11g.  There is no question but that "reasonable"

10    means reasonable.  The IEEE itself takes no position.

11          So it is the exact same standard that is going to be

12    presented to the jury on a reasonable royalty.  So there is no

13    difference whatsoever.  So our estimate does include it

14    because it is purely a legal issue for the Court and, frankly,

15    it is mostly the time of yourself and your staff to read the

16    issue because we think it is quite clear --

17          THE COURT:  What is your response on the

18    willfulness?

19          MR. CAPSHAW:  I will do that, Your Honor.  I think

20    it is important -- let me start with Buffalo first because I

21    think the defendants confuse what the Court of Appeals did in

22    Buffalo.  Buffalo was a summary judgment appeal.  The Court of

23    Appeals said two things:  One, that in light of KSR, which

24    came out after you decided, your summary judgment analysis was

25    flawed.  And so they reanalyzed the case in light of KSR and

1    sent it back to you.

2            The second thing they did is all they found is that

3    there was a genuine issue of disputed fact on the obviousness

4    question and sent it back for trial.  Now, you think about

5    what the defendants want to do with the Buffalo opinion.  What

6    they are really saying is if any infringement case or validity

7    case ever goes to the jury, you can't get willfulness, and we

8    know that is not the law.  So I think they read too much into

9    the Buffalo opinion.  Neither side should be using the Buffalo

10   opinion, either the statements of this Court in the summary

11   judgment or the Court of Appeals decision.  Neither party can

12   rely on it.  It is just a reversal of a summary judgment

13   finding a disputed issue of fact.

14           Let me go back to willfulness.  And you asked a

15   question about the Seventh Amendment.  I think the Court is

16   exactly right.  After Seagate, courts have been reluctant to

17   split up infringement from willfulness because the issues

18   overlap.  Now, the issue of damages and infringement are

19   different issues, and those issues don't overlap.  They do

20   have some of the common elements.  But if you look at some of

21   the court decisions that have come out, that issue of can you

22   split willfulness after Seagate in light of the Seventh

23   Amendment, has come up and been analyzed.

24           So let's look at the overlap.  On willfulness under

25   the new objective standard some of the questions are going to

1    be common.  Was there a substantial noninfringement case?  The

2    jury has to hear the infringement case.  They have to hear the

3    validity case.  Was there copying?  Copying is a secondary

4    consideration of non-obviousness.  So these objective criteria

5    in Seagate all have to be evaluated in light of infringement

6    and the invalidity case in front of the Court -- in front of

7    the jury.  You can't split those up.  Too much proof

8    overlaps.  So I think that moving the willfulness, it won't

9    work.  You can't split it off from infringement and validity.

10   The jury is going to have to hear the same invention story,

11   the same kind of infringement evidence, they will have to hear

12   copying evidence all over again if you take willfulness out of

13   the case.

14          So two things, I don't think there is an evidentiary

15   quagmire.  It is one of the defendants' own making.  Nobody

16   should be using Buffalo.  We don't think they ought to be able

17   to cherry-pick good pieces out of the opinions of the Court or

18   Court of Appeals and not have to hear the bad side, too; but

19   you cannot split willfulness.  And I think the Court has it

20   exactly right.  There is a Seventh Amendment problem with

21   splitting common-issue defenses.

22          THE COURT:  Okay.  Final word.

23          MR. VAN NEST:  Your Honor, again, we have a lot to

24   accomplish in Phase I now.  As Your Honor knows, we are trying

25   infringement, direct and indirect; we are trying validity; we

1   will have several anticipation references; several obviousness

2   combinations.  To ask a jury in addition to that to make 12

3   individual determinations of willfulness in a two- or

4   three-week trial is putting an enormous burden on people in

5   terms of getting something done.

6          As a matter of fact, most of the willfulness

7   evidence overlaps more closely with the damages case.  In the

8   damages case they are going to have to show that their patent

9   added something to the prior art; was significantly better

10  than the prior art; that the success of products was based on

11  the patented invention; all of the things that are also

12  relevant to validity, be it anticipation or obviousness.

13         So there is going to be some overlap however we try

14  this.  There is going to be overlap whether we try it -- the

15  only trial structure in which there is no overlap is the one

16  we proposed in December; that is, we try everything together.

17  But we are not there now.  We have bifurcated.  So the real

18  question is what is the most efficient way to get verdicts

19  from the jury that are meaningful and based on careful

20  deliberation.

21         And what we are saying is that, given the complexity

22  of Phase I already and given our right to rely on the Buffalo

23  validity opinion, which says there is substantial questions

24  about validity based on what was presented in the prior art,

25  that really can't be done effectively in Phase I.  It has got

1    to be done in Phase II.  So we think that is a more

2    appropriate way to proceed.

3           THE COURT:  All right.  Thank you.  I am going to

4    stick by my earlier ruling that everybody has been operating

5    up until this motion was filed, and we are going to try all of

6    the liability issues, including willfulness and inequitable

7    conduct in the trial that we are about to begin; and that will

8    leave us with only damages to be tried in the four subsequent

9    trials breaking the defendants up based on damages.

10           MR. VAN NEST:  And, Your Honor, excuse me.  Then

11   what does that mean with respect to RAND, for example, and the

12   inequitable conduct, those will be tried to Your Honor as part

13   of Phase I separate --

14           THE COURT:  Just as I always do, all inequitable

15   conduct defenses I will hear whatever testimony that comes in

16   in front of the jury that might relate to those.  During the

17   trial in the evenings or following this trial, I will continue

18   on and hear whatever evidence there is regarding inequitable

19   conduct.

20           MR. VAN NEST:  Fair enough.

21           THE COURT:  I want to come out of this with

22   everything I need to decide all of the liability issues, and

23   then we will move to damages in June.

24           MR. VAN NEST:  Fair enough.

25           THE COURT:  All right.  Let's go next to -- I think

1    this could affect the trial -- well, I guess not.  Let's go on

2    and talk about trial times.  I have your proposed trial

3    times.  I think both sides are fairly within the ballpark on

4    voir dire.  It ranges from 45 minutes to 60 minutes.  I think

5    that is fair; somewhere in there for a case of this size.  I

6    think Buffalo is asking for ten.  I don't think that is

7    unreasonable.  Anyway, I will get within those ranges and give

8    you something fairly close to that for voir dire.

9            Opening, again, I think is fairly reasonable.  Both

10   sides are saying 60 minutes, and Buffalo is asking for ten.  I

11   may tweak that a little bit in my order, but it will be

12   something fairly close to that.  But where the wheels come off

13   on this thing is CSIRO is asking for 18 hours for direct and

14   cross-examination, and the defendant is asking for

15   31-and-a-half, and Buffalo is asking for two.

16           Again, closing argument is fairly close; 60 minutes,

17   90 minutes, and ten minutes.  And somewhere in that ballpark I

18   think we will satisfy everybody.

19           But we have a big disagreement on direct and

20   cross-examination, and I guess I would like to hear some

21   argument on that.

22           MR. FURNISS:  Yes, Your Honor.  There is one patent,

23   and there is standardized products that all operate

24   essentially in exactly the same way.  So even though you have

25   a lot of defendants, there are simply common defenses.  The

1    infringement defenses consists of three, two of which I think

2    are nothing more than rearguing the claim construction.  And

3    there is motions directed to that.  And the products all

4    operate in the same way.

5         So the number of parties is not indicative of the

6    number of individual issues, and I think it is fair to say

7    that all -- they filed common expert reports, and they all

8    raise exactly the same arguments on the TCM encoder, and so we

9    believe that the amount of time allotted is more than

10   sufficient, and we intend to move briskly through our case.

11   And I think the defendants' plan is to put on a lot of issues

12   that are not really relevant, and I don't think we need that

13   much time.

14        So I think the best case I ever put on was when a

15   judge at the ITC gave my partner and I eight hours to put on

16   our infringement defense.  I have to say at the time we were

17   horrified; but it ended up being the best, most focused

18   analysis I have ever done.  She did me a big favor by that --

19        THE COURT:  Well, that has been my experience, and I

20   think there are a lot of lawyers in this room that have voiced

21   that to me that at the time they thought a limitation was

22   burdensome, but it really made them focus.  And I will just

23   say, you know, you can win a case in, you know, nine or ten

24   hours or maybe twelve per side with a jury; but you can sure

25   lose a case with 20 or 25 hours when you start going over to

1     that time with the jury so -- on both sides.  And I have seen

2     it happen.

3               So anyway let me hear from defendants.

4               MR. VAN NEST:  Could I respond?  Let me just say

5     that we have done, I think, an outstanding job on our side of

6     the table trying to coordinate our defenses.

7               THE COURT:  I think you have too.  You should be

8     commended for that.

9               MR. VAN NEST:  We have presented, you know, minimal

10    overlap, we have spoken with one voice; and we intend to do

11    that during the trial.  However, there is a lot of ground to

12    cover.  Let me explain why that is so.

13              We have direct infringement against various of the

14    defendants.  We have indirect infringement inducement against

15    various other of the defendants.  We have very complicated

16    technology that has to be explained carefully to the jury and

17    make sure that everybody is on the same page and aware of it

18    and understands it.

19              We have a variety of different products, and we

20    couldn't, unfortunately, have one expert cover all of them

21    because many of us are competitors.  We have separate experts

22    that will not overlap, but they are going to be talking about

23    each of the defendants' products.  We are going to keep that

24    to a minimum, but it is necessary to do simply because one

25    expert couldn't look at everybody's products.

1           Now, more than that, the other big part of evidence

2      in this case is going to be on the secondary considerations of

3      non-obviousness.  The commercial history of this patent and

4      the IEEE standard and how products were created under that, is

5      important because CSIRO is claiming that their patent has

6      created the wireless revolution.  We are entitled to show that

7      the commercial success that we have enjoyed has nothing to do

8      with their patent, but it has to do with an open standard that

9      we created that we built products based on that CSIRO had

10     nothing to do with; and that the success we have enjoyed is

11     based on how our products work and what they do and not on the

12     '069 patent.

13          That is going to take some time to develop because

14     there is a long history here.  Wireless LAN didn't start with

15     the CSIRO patent.  Wireless LAN started in the late '80s,

16     early '90s and people had them out there.  And with twelve

17     different defendants there is a history to tell.  And on top

18     of that, Your Honor, if we do have to try willfulness as part

19     of Phase I, which Your Honor has ordered we do, each defendant

20     has got to have some time -- and I am hearing it now from my

21     colleagues already -- each defendant has a right to explain to

22     the jury why their company went ahead and made products under

23     these circumstances.

24          I mean, they have to prove CSIRO does -- that it was

25     known or so obvious it should have been known to each

1   individual defendant that it was objectively reckless to

2   proceed to build these products.  And I am going to be hit

3   with requests which are legitimate from each of the defendants

4   sitting in this room that they get some time to put their

5   people on and explain what they did and why.  So I also agree

6   that being short is good, and being expeditious is good and I

7   have tried plenty of cases in the ITC.  And I have tried real

8   hard to narrow this down.

9           Thirty-one hours is essentially five trial days, and

10  I think that is the minimum, absolute minimum that we are

11  going to need to try all of these things that you are asking

12  us to try in Phase I, which includes not only infringement but

13  validity but RAND and willfulness.  That is going to be a

14  really tall order.  And I think to try it -- to give us less

15  than five trial days to present our evidence -- that is what

16  this 31 hours represents -- is going to make it almost

17  impossible to present the jury with the full story of what

18  happened and the full story of what happened for each of the

19  three defendants sitting in this room.

20          MR. FURNISS:  Your Honor, on commercial success they

21  are all using exactly -- that there is just two witnesses for

22  all of these defendants that are going to talk about that

23  issue.  And that in terms of willfulness is going to come in

24  as part of the noninfringement defense.  It is the same

25  evidence.  So when they present their noninfringement defense,

1    that is the basis of the allegation there is not a willfulness

2    conduct.

3           Moreover, the products on all of the defendants have

4    said that they relied upon the IEEE.  So they are saying that

5    they had knowledge of and they all had knowledge of this

6    before infringement began.  So I think it can be done in less

7    than 31-and-a-half hours.  But as I said, there is one patent

8    and a common defense, so -- on everything.

9           THE COURT:  Okay.  Let me do this:  I would like a

10   little more detail from both sides as to how you intend to use

11   your time on direct examination.  I am not so concerned about

12   cross because, you know, if you take more than half the time

13   that the other side took on direct on cross, you are probably

14   losing ground with the jury in most cases.  But I would like

15   to see your estimates.  And what I would like from each side

16   and I would like this filed by noon on Tuesday is break your

17   witnesses down by infringement, invalidity, and willfulness.

18   If you -- or infringement, willfulness, and then invalidity.

19   In the willfulness if you have witnesses that you are going to

20   need to call that you are not calling as part of your

21   infringement case, and then list -- so we have got

22   infringement, willfulness, invalidity, and then equitable

23   defenses; those four categories.

24          Then within each of those categories give the name

25   of the witness, identify who they are, they are a RAND expert

1   or they are a willfulness witness or background witness or

2   whatever they are; and then just a very brief summary, a

3   couple of sentences of what their testimony will cover.  I

4   only want "A" witnesses.  I don't want the "may call" and just

5   listing, but I am talking about who you are going to be

6   putting on in your cases.  I would like to have that by

7   Tuesday.  And I would encourage both sides to spend some time

8   thinking about that, and then I will enter an order hopefully

9   next week giving you your trial times for the case.

10           MR. VAN NEST:  That makes a lot of sense, Your

11   Honor, thank you.

12           THE COURT:  Okay.  Thank you.

13           All right.  With regard to the juror questionnaire,

14   I have reviewed it.  I am not opposed to it.  It will be

15   filled out the morning of trial.  And I do want you to make a

16   couple of modifications to it.  One, in addition to the juror

17   name have a slot for the juror number.  In Question No. 9 when

18   it asks have you ever been accused or convicted of a crime,

19   strike "accused of."  And then there is no need for a

20   declaration of perjury on the end.  Just a place for them to

21   sign.  And I would like that reduced to one page front.  So

22   get your typesetters to shrink it down where we can get it on

23   one page in smaller print, blocks.  Maybe get together, meet

24   and exclude some questions or shorten some questions.  But get

25   it down to just one page front only.  That is what they will

1    fill out.  And get that to me by -- when could you have that

2    to me you think?

3              MR. VAN NEST:  Probably Monday.

4              THE COURT:  Monday.

5              MR. FURNISS:  Yes, Your Honor.

6              THE COURT:  Have that to me by, say, 5:00 o'clock

7    Monday will be fine.

8              MR. FURNISS:  Yes.

9              THE COURT:  And get that to me.  We will get that

10   filled out when the panel is seated, and we will make one copy

11   available to each side.  Now, I know you have all got multiple

12   lawyers and multiple parties.  But it is going to be your

13   responsibility then to get copies made for whoever you want to

14   get them made for.

15             MR. VAN NEST:  Your Honor, we will receive that on

16   the 6th; is that the idea?  They will come in -- the venire

17   will come in that morning and fill it out?

18             THE COURT:  Right.

19             MR. VAN NEST:  Then could we have some time to

20   digest those?  We will need to copy them and make sure

21   everybody in our group has a chance to look at them.

22             THE COURT:  You will have some time, but I think

23   most of your time will be you will have somebody looking at

24   them while the other side is doing voir dire.

25             MR. VAN NEST:  Okay.

1                THE COURT:  Okay.

2                MR. VAN NEST:  We would appreciate anything Your

3      Honor can give us there.

4                THE COURT:  We can maybe give you some time.  Since

5      we won't be starting any evidence with the jury, we can maybe

6      take a little bit longer.  How long do you think you would

7      need from the time you get those to look them over?

8                MR. VAN NEST:  Would we want to have a couple of

9      hours or a morning?  I mean if we can --

10               THE COURT:  I'm not going to keep the jury panel

11     sitting here for a couple of hours.

12               MR. M. JONES:  Anything you can give us, Your Honor.

13     Forty-five minutes, an hour.  It is just distributing it to so

14     many defendants.

15               THE COURT:  I understand.

16               MR. M. JONES:  Anything you could do for us we sure

17     would appreciate it.

18               THE COURT:  We will give you what time we can.  We

19     will see what time we get started and how we are going.  I

20     will try to get the jury coordinator to get it as done as

21     quick as possible and get it to you.

22               Okay.  Finally, just dealing with the trial, there

23     are a couple of motions that I, from my reading of them, they

24     really pertain to damages and not to liability issues, so I

25     see no reason to take those up today.  But if there is a

1   reason, please tell me.  That would be defendants' motion

2   regarding double recovery.  Isn't that strictly a damage

3   issue?

4           MR. VAN NEST:  Yes.

5           THE COURT:  That will be deferred until the damage

6   trial.

7           Then CSIRO's motion to exclude defendants' damage

8   expert Britven.

9           MR. FURNISS:  Yes, Your Honor.

10          THE COURT:  We won't be taking those up then.  What

11  about trial exhibits?  I know Ms. Ferguson has met with your

12  people.  Anybody have any questions on how we are going to do

13  that?

14          MR. FURNISS:  I think we are current on the

15  procedure, Your Honor.

16          THE COURT:  Compliments to Ms. Ferguson.  I think

17  she did a great job in coordinating that and putting it all

18  together.

19          MR. VAN NEST:  We do, too.

20          THE COURT:  With regard to the Court's charge, we

21  need a lot of work on that.  I know you have both presented

22  separate charges, even though that is not what the Docket

23  Control Order said for you to do, so I would like for you to

24  go back and do it as you were instructed to by putting them

25  both together.  I want you to meet and confer.

1    Decision-makers, not low-level people but people that can

2    really call what we are willing to compromise on with regard

3    to the charge.  I don't want two stacks like this

4    (indicating).  I want a stack like this (indicating) that is

5    combined in one copy with the differences spelled out either

6    in bold and regular type or regular type and italics and then

7    footnotes as to what your objections are.  And I would like

8    for you to really put some time into that and get that back to

9    me I'd say -- well, let me ask you how long do you think it

10   will take you to do that?

11              MR. FURNISS:  Well, I think this morning helps us

12   resolve some of that.  I would say Thursday of next week.

13              MR. VAN NEXT:  I was going to say Friday, Your

14   Honor, but we have a lot of other activities underway.

15              THE COURT:  That will be all right, Friday by noon.

16              MR. VAN NEST:  Friday by noon.

17              THE COURT:  Yes.  I have got to have something to

18   read over the weekend.  I'm only kidding.  I hope you know

19   that.

20              MR. VAN NEST:  We can help with that.

21              THE COURT:  Oh, you have already done your part,

22   both sides have.

23              All right.  Let me just discuss the verdict forms

24   with you just for a second.  In reviewing those a question

25   that has come up to my mind -- and I know plaintiffs are

1    taking the position that infringement should be submitted by

2    defendant for all of defendants' accused products.  And

3    defendants seem to be taking the position that it should be

4    submitted -- that all -- each defendants' -- all of their

5    accused products need to be submitted to the jury and answered

6    individually.  Am I correctly reading the positions of the

7    parties or not?

8              MR. FURNISS:  I believe so, Your Honor.  Yes, Your

9    Honor.  That is our position that there are literally

10   hundreds, if not thousands, of products; but they are all

11   compliant with the standard.  And the defense issues are the

12   same as to each of them.  So to have the jury go through

13   product by product, would take forever.  We will have to raise

14   our trial estimate to 60 or 100 hours if we are going to go

15   product by --

16             MR. VAN NEST:  I don't see how you could have a

17   damages trial, Your Honor, without knowing which products have

18   been found to infringe.  I mean it seems to us that they have

19   the burden of proof and they have originally started off

20   accusing far more products than we have now, but you can't go

21   on to Phase II without knowing which products have been found

22   to infringe.  We have tried to create a form that --

23             THE COURT:  I didn't see Appendix A.  Was it

24   attached and --

25             MR. VAN NEST:  Excuse me?

1          THE COURT:  Appendix A to your proposed form which I

2    think is referred to as a matrix or something.  Maybe it just

3    didn't get printed out, but I didn't see it.  How big is it?

4          MR. VAN NEST:  Do we have a copy of that?  I thought

5    we had submitted it to the Court with pretrial.

6          THE COURT:  Well, that is okay.  Go ahead.

7          MR. VAN NEST:  But in any event, the reason to get

8    findings per product we all make a wide range of products,

9    some of which are accused and some of which are not.

10          THE COURT:  But I guess my question is, of the

11   accused products for each defendant, are there differences as

12   related to how they function that would make some of -- some

13   of them infringe and some of them not infringe?

14          MR. VAN NEST:  I don't think so.  I think that

15   infringement defenses that we have apply to all accused

16   products.  I just want to be sure.  Part of this exercise is

17   giving us certainty on what they say is accused and what is

18   not.  I would like to get a finding on it --

19          THE COURT:  You mean certainty as to what CSIRO said

20   is accused?  You don't have certainty on that?

21          MR. VAN NEST:  We don't.  We have been trying to get

22   it.

23          MR. FURNISS:  Your Honor, the allegation is that

24   products that practiced the -- a tiny bit of products that

25   practiced the "a" standard and products that practiced the "g"

1    standard and products that practiced the draft "n" standard

2    infringe.  The defense on all of them is absolutely common as

3    far as I can tell.  I have never heard or seen --

4             THE COURT:  But have you identified --

5             MR. FURNISS:  Oh, yes.

6             THE COURT:  -- each of their products you are

7    accusing in this case?

8             MR. FURNISS:  Oh, yes, Your Honor.

9             THE COURT:  Specifically by product number?

10            MR. FURNISS:  Yes, and we have relied upon their

11   interrogatory answers.  The very first interrogatories that

12   went out said identify your products that are compliant with

13   these standards, and all of the products that have been

14   identified in defendants' interrogatories that practice the

15   standard have been accused.  Ones that don't, have not been.

16            THE COURT:  Well, I think that defendants are

17   entitled to know specifically what products are accused.  But

18   I don't think it is helpful to the jury to have to go through

19   and answer as to 100 accused products of one defendant if

20   there are no differences in how they operate or how they would

21   be infringed.

22            So what I am going to do is order the plaintiff to

23   submit a list by defendant, listing all accused products by a

24   date certain.  And then I want defendants to review that list;

25   and if there is any accused product on that list that would be

1   different than the other accused products as to how they would

2   operate or how they would infringe, then you need to identify

3   that product and how it is different from the others.

4           MR. VAN NEST:  We will do it.

5           THE COURT:  All right.  And then what we will do --

6   hopefully, that will narrow it down.  Hopefully, it will give

7   defendants certainty as to what is accused.  Hopefully, all of

8   the defendants will not -- will agree of the ones accused they

9   all practice the -- or, you know, operate the same way and

10   would infringe the same way if indeed they infringed, and

11   their defense will all be the same.  If that is not the case,

12   the plaintiff will have the burden, and we will submit just

13   those accused products that I identify after you have gone

14   through this exercise as being different from the others.

15   Okay?

16           MR. VAN NEST:  Fair enough.

17           THE COURT:  When can you have that list to them, Mr.

18   Furniss?

19           MR. FURNISS:  We already did it with our

20   infringement contentions, so other than updating it from very

21   recent interrogatories, so we could do it by next Friday or

22   earlier.  Frankly, probably by Wednesday.

23           THE COURT:  Let's have it to them by noon on

24   Wednesday.

25           MR. FURNISS:  Okay.

1          THE COURT:  And, again, I want a simple chart, you

2    know, by defendant, product numbers.

3          MR. FURNISS:  Yes, sir.

4          THE COURT:  When can you have your group respond to

5    that by?

6          MR. VAN NEST:  Could we do that by Friday noon,

7    Colleagues, you think?

8          Friday noon.

9          THE COURT:  Friday noon would be great.  I think

10   that will work well.  Thank you.

11         MR. VAN NEST:  Thank you.

12         THE COURT:  All right.

13         MR. VAN NEST:  Your Honor, can I ask a question

14   about the estimated trial times --

15         THE COURT:  Yes.

16         MR. VAN NEST:  -- we are going to submit.  Do you

17   want us to exchange those, or can those be submitted just to

18   Your Honor?

19         THE COURT:  Would there be a reason why you wouldn't

20   want to exchange them?

21         MR. VAN NEST:  I think at this point we have

22   exchanged witness lists, we have the will-call, may-call; but

23   I think with respect to timing, we prefer just to submit that

24   to Your Honor.  But we will exchange them if the Court wishes.

25         MR. FURNISS:  Your Honor, I think they should be

1   exchanged.  The defendants' witness list is well over a

2   hundred witnesses.  It doesn't seem to be realistic that that

3   is going to happen.  We are very prepared to identify who we

4   are going to call and to tell defendants.  I think it would

5   accelerate and make the trial much more efficient if we know

6   who is coming.

7           THE COURT:  Wouldn't you like to know who is coming

8   and how long --

9           MR. VAN NEST:  Well, I would because their will-call

10  witness is currently 34 witnesses.

11          THE COURT:  Then let's exchange.

12          All right.  What else with regard to trial structure

13  is what I am basically dealing with?

14          MR. FURNISS:  Yes, Your Honor.  I think it would be

15  a good idea -- I think we mentioned it -- but that the parties

16  give advance notice of say 48 hours of the order of witnesses

17  and any demonstratives to be used for those witnesses and for

18  opening statement, they be disclosed ahead of time so there is

19  no problem.

20          MR. VAN NEST:  That is not unreasonable, 48 hours.

21  We can work out the times, but advance notice of graphics and

22  advance notice of witnesses.

23          THE COURT:  All right.  Will be 48 hours unless

24  y'all agree otherwise.

25          MR. FURNISS:  Thank you, Your Honor.

1        THE COURT:  What else dealing with the trial itself?

2   Then we will get into these motions.

3        MR. VAN NEST:  One other trial issue, Your Honor,

4   and that is confidentiality.  There are some documents that

5   are confidential and possibly some testimony.  And I haven't

6   thought through, in light of Your Honor's rulings, how much

7   will affect Phase I.  The confidential documents in Phase I

8   would be things like our source code or information about how

9   to build our products.  I'm not too worried about that.  That,

10  I think, should remain confidential.  We just don't want

11  witnesses in open court describing the details of somebody's

12  source code, but I don't think that is going to happen.

13       If it does, what I would propose is that the jury be

14  given whatever the written material is, we publish it to them,

15  and the witness, you know, be talking at a little higher level

16  of generalities so that we are not talking about specific

17  details of product operation in open court.

18       MR. FURNISS:  It is our view that the source code or

19  the RTL code is not necessary to -- unless defendants were to

20  cross-examine on what do you base your contention, Dr. Monsen,

21  that this product does this?  He would say, well, I've got a

22  report from an expert that required the code; but that would

23  not require to disclose the code, so I don't believe that is

24  going to be a problem.

25       MR. VAN NEST:  The only other area that may come in

1    Phase I is discussion of either sales or revenues.  I mean we

2    have a motion in limine on this.  But none of the defendants

3    want to have individual defense witnesses testifying as to

4    what their product margins are in open court.  Again, if that

5    became an issue in Phase I we would ask that the information

6    which is relevant be published to the jury in written form and

7    the witness be asked to talk in general terms.  We have the

8    margins -- we are only using the margins as set forth on

9    Exhibit A which jurors haven't been provided.  Rather than

10   close the courtroom, we do want to protect information about

11   product margins and that sort of thing.

12           MR. FURNISS:  I don't have a problem with that, Your

13   Honor.

14           THE COURT:  All right.  Sounds like an agreement to

15   me.  Y'all meet and discuss and do that.

16           What about jury notebooks?  Are y'all planning to

17   prepare juror notebooks or not?

18           MR. FURNISS:  I was just going to inquire about

19   that.  We think it would be a good idea for the jurors to have

20   notebooks.  Let me ask you, are you referring where they take

21   notes or notebooks that also have material in them or a

22   glossary?

23           THE COURT:  Oh, no.  I will provide them with

24   notepads to take notes, but something that will have a copy of

25   the patent, the claim construction chart, or other general

1    information that might be helpful to them or not.

2              MR. FURNISS:  We are very much in favor of that,

3    Your Honor.

4              MR. VAN NEST:  We are too, Your Honor.  We would

5    like to -- and we understand we need to meet and confer with

6    Counsel on this, but we think a notebook which has the patent,

7    the claim construction, and possibly the key pieces of prior

8    art would be appropriate.  If the patent and the claim

9    construction are going to be there and we are going to be

10   talking about various prior art references that are more

11   important than others, we would like to include those as well.

12             THE COURT:  Well, y'all meet and confer on that.

13             MR. FURNISS:  Yes, sir.  We don't believe prior art

14   should be in the juror notebook.  That is getting into

15   evidence.

16             THE COURT:  Well, meet and try to agree.  And if you

17   can't, we will either have them or I will decide.

18             Okay.  Let's move on to one more motion, and then we

19   are going to take a brief recess.  And that is defendants'

20   motion to supplement based on reexamination, which is Docket

21   507 in the 549 case, 579 in the 550 case, and 460 in the 551

22   case.

23             MR. VAN NEST:  Your Honor, I don't think there is a

24   lot to be said on it.  The Patent Office has been provided

25   with the reexam.  The Patent Office has issued an order of

1    reexam on the '069.  The case law that we submitted suggests

2    that that issue is relevant to willfulness.  Again, it goes to

3    whether it was objectively reckless or not to believe that the

4    patent was invalid.  We now have affirmation by the Patent

5    Office that there is a reason to reexam and question the

6    patentability.

7            I think the only cases to consider that issue

8    recently post-Seagate have said it is relevant.  And we are

9    asking to supplement if willfulness is going to be tried as

10   part of Phase I, which it will be, we think that evidence

11   ought to be made available.  We obviously presented it as soon

12   as we had it.  The order of reexamination was issued very

13   recently, and we very promptly thereafter brought it to the

14   Court's attention.

15           I think the case that we presented is Lucent v.

16   Gateway on this issue which was decided post-Seagate.  And it

17   indicates that these orders are relevant and probative on the

18   issue of willfulness, particularly the objective recklessness

19   standard.

20           THE COURT:  Response?

21           MR. FURNISS:  Your Honor, first of all, Seagate says

22   that principally you assess willfulness at the time before

23   filing suit, not afterwards.  But, secondly, when Mr. Van Nest

24   says we did this closely as possible, frankly, we think there

25   is some manipulation going on here.  This request for reexam

1   was filed just two months ago with art that the defendants

2   have had for many, many years.

3          But most importantly the Federal Circuit has held in

4   the Hoechst Celanese case that the granting of a request for

5   reexamination has no probative value as to the likelihood of

6   patentability.  The statistics from the Patent Office show

7   that last year out of 577 requests for reexamination, all but

8   17 were granted; and that all it shows is that there has been

9   some art presented to the Patent Office that it hadn't seen

10  before.  It is not a determination in any way, and it would

11  confuse the jury and would be very, very inadmissible evidence

12  and create error in the record.

13         The Federal Circuit has held that there is -- a

14  substantial question of patentability does not establish a

15  likelihood of patent invalidity, so we have to explain to the

16  jury what a reexam is, and they would not understand it.

17  Approximately, again -- according to the Patent Office,

18  approximately 80 to 89 percent of all reexaminations result in

19  some claims being reaffirmed.  So this was timed, Your Honor,

20  so that the only action that would happen before this trial

21  was that a reexam had been opened, but nothing had been done.

22         And, frankly, I think it is manipulation by the

23  defense to do this.  The art they cited in the reexam they had

24  for years.  And we get this reexamination request right before

25  the trial, and we say we are going to tell the jury about it.

1    It would be highly prejudicial to CSIRO and would confuse the

2    jurors even more than can be imaginable and would waste this

3    proceeding with a real problem.

4              MR. VAN NEST:  Your Honor, statistics are

5    misleading.  I think we submitted statistics showing that in

6    75 to 80 percent of these cases the patent either falls or is

7    substantially cut back.  So it may well be many reexams are

8    granted.  Most of them result in one or more claims being

9    found invalid or one or more claims being dramatically

10   modified.  So what Counsel is talking about is relevance or

11   irrelevance to the validity issue.  That is not why we are

12   offering the reexam.  It is being offered on the question of

13   willfulness.  Was it objectively reckless to believe, as all

14   of the defendants do, that this patent was invalid?

15             The fact that the Patent Office has now indicated

16   there is a substantial question of patentability is probative

17   of that.  The cases decided since Seagate all support that.

18   The Lucent case indicates it is highly probative.  The

19   Ultratech case indicates that a plaintiff would not even have

20   a good-faith basis for alleging willful infringement if there

21   had been a reexam and the reexam was pending.

22             So the limited relevance of this is on willfulness.

23   We are more than willing to craft a jury instruction in which

24   the Court indicates that it is relevant to that issue and that

25   issue only, but we think it is highly probative, it is very

1    recent.  And, again, on the willfulness question, we are

2    entitled, I think, to present it to the jury.

3           THE COURT:  What about his argument that defendants

4    have had the prior art for many, many months?

5           MR. VAN NEST:  You have a right to file a reexam

6    whenever you wish to do that, Your Honor.  And this happens in

7    many cases.  It can be filed early, it can be filed late.  You

8    make decisions about what art is appropriate and what isn't.

9    You make decisions about what is happening in the Patent

10   Office itself.  We certainly did not file this, Your Honor,

11   with the idea that we would get a reexam and we would, you

12   know, run into court with it.  That is not the idea.  We have

13   a legitimate reexam request that has been granted.  It is also

14   highly probative of the willfulness issue.

15          THE COURT:  Well, I visited this issue before, and I

16   have never allowed it before; but I am going to take another

17   look at your cases and I will take this one under advisement.

18          MR. VAN NEST:  Thank you, Your Honor.

19          THE COURT:  We will be in recess for ten minutes.

20       (Recess was taken.)

21          THE COURT:  Please be seated.

22          All right.  I want to work through now the various

23   motions to exclude, and we will take up CSIRO's motion to

24   exclude Goolkasian, defendants' inequitable conduct expert in

25   the 549 case, Docket 375; 550 case, 441; 551 case, it is

1    Docket 323.  Who would like to be heard on that?

2            MR. RITCHEY:  Good morning, Your Honor.  Gary

3    Ritchey for CSIRO.

4            THE COURT:  Mr. Ritchey.

5            MR. RITCHEY:  Your Honor, let me begin by noting

6    that there is a recent Federal Circuit case Sundance v.

7    Demonte Fabricating.  It came down actually on December 24th

8    of last year.  That case we believe makes it very clear that

9    in order for an expert to testify, they have to -- on any

10   technical issue they have to be one of skill in the art or

11   have expertise on that issue.  Mr. Goolkasian is being offered

12   to testify on areas for which he is not competent.  Mr.

13   Goolkasian admitted in deposition that he is not of skill in

14   this art; that as a patent examiner he would not have been one

15   who would have even examined a patent in this art; and he

16   basically has no technical training in this particular area.

17   However, he is being offered to provide a variety of opinions.

18           If we could turn to the next slide.  I'm sorry, the

19   one before that.

20           He has been offered to talk about practice and

21   procedures before the PTO, duty of candor and materiality, the

22   prosecution history of the '069 patent, and his conclusion on

23   the failure of the applicants to meet their duty of candor and

24   good faith.  As to practice and procedures before the PTO,

25   Your Honor, we don't think it is necessary to have a Patent

1    Office expert so testify.  We think that there are mutual

2    materials which can be offered to the extent that a jury may

3    need to be informed of those issues.  To the extent that

4    inequitable conduct, of course, will be tried to the Court,

5    the Court is well-familiar with these issues already.

6            In terms of duty of candor and materiality, again,

7    we think that testimony on this issue invades the province of

8    the Court.  The Court is more than capable of issuing any

9    necessary instructions on those duties, and there shouldn't be

10   a need for a patent law expert --

11           THE COURT:  You say instructions; but since both

12   sides have stipulated all of the inequitable conduct defenses

13   will be before the Court, is there anything that this witness

14   would be testifying to in front of a jury?

15           MR. RITCHEY:  Your Honor, he was offered solely for

16   inequitable conduct, so I would hope not.

17           THE COURT:  Let me just ask defendants; is that

18   correct?

19           MR. SHELTON:  He would not, Your Honor.

20           MR. RITCHEY:  Your Honor, in terms of the

21   prosecution history of the '069 patent in his expert report we

22   are in a situation now where he is actually basically using

23   that section to contend that new matter was added during

24   prosecution.  We believe under the Sundance case he is not

25   competent to testify to that, he is not competent to make a

1   determination about the particular file history and the

2   contents of this invention or whether new matter was added.

3   And in terms of the failure of applicants to meet their

4   duty --

5          THE COURT:  Say that again as to the prosecution

6   history.

7          MR. RITCHEY:  Well, in a section titled "prosecution

8   history," Your Honor, in his report, what he is using this

9   section to do is basically argue and make contentions that new

10   matter was added.  This, Your Honor, goes back to something

11   the Court already decided in the Buffalo case; that basically,

12   the radio frequency versus the 60 gigahertz issue.  Your

13   Honor's decision was upheld by the Federal Circuit on this

14   issue.

15          Again, we don't think that Mr. Goolkasian is able to

16   review either the specification or the prosecution history and

17   render any competent opinion particularly in light of the

18   Sundance case.  He is not versed in this technology.  In terms

19   of the failure of the applicants to meet their duty of candor

20   of and good faith --

21          Could I have the next slide, please.

22          What we have here is a situation again where he is

23   rendering opinions in a situation where he is not, again,

24   competent in the art itself and, therefore, not really able to

25   judge materiality of the art.  He didn't consider all of the

1    art before the PTO.  In particular, he didn't consider one of

2    the most important references, the patent by Pommier and

3    whether the art he says should have been submitted to the

4    PTO --

5              THE COURT:  Isn't all of that just cross-examination

6    though rather than --

7              MR. RITCHEY:  It could be done in cross-examination,

8    Your Honor; but at the same time under the Sundance case we

9    believe that he is not properly offered as a witness in those

10   areas at all.  Again, he doesn't have the technical

11   competence; and in order to provide opinions as to the art

12   before the PTO, he would have to have those -- competence.

13             Basically, he is just doing personal fact-finding;

14   and, Your Honor, we think that is for you, for the Court, and

15   it is not proper to have testimony on that issue.

16             THE COURT:  Okay.  Well, I am not going to strike,

17   and I am going to deny the motion.  I will grant it to the

18   extent he wouldn't come in in front of the jury based on the

19   parties' stipulations; but as trial before the Court, I will

20   at least allow plaintiff to qualify the expert and then --

21   defendant qualify the expert; and then if plaintiff wishes to

22   take him on voir dire to challenge his qualifications, I will

23   rule on it at that time.

24             MR. RITCHEY:  Thank you, Your Honor.

25             THE COURT:  Thank you.

1          All right.  Let's move on to Rosenthal, CSIRO's

2    motion to exclude Rosenthal, who is the RAND expert.  That is

3    in the 549 case it is Docket 385, in the 550 case it is 451,

4    and in the 551 case it is 332.  Who would be heard with regard

5    to that?

6          MR. FURNISS:  I will, Your Honor, thank you very

7    much.

8          THE COURT:  Let me clarify again if this is a RAND

9    expert this would only to be the Court and not to the jury;

10   are we in agreement on that?

11         MR. FURNISS:  I believe --

12         MR. VASQUEZ:  Yes, Your Honor.

13         MR. FURNISS:  -- it is defendants' call, yes.  Your

14   Honor, there is no such thing as a RAND expert.  Mr. Rosenthal

15   simply says that in his personal opinion the term RAND

16   reasonable, which is the issue, the issue we are addressing

17   here, means very, very low or zero.  And he says -- and the

18   argument is that we have an unequivocal contract.

19         If we can look at Slide 6.

20         CSIRO sent a RAND letter on 802.11a.  It was on the

21   form provided by the IEEE.  It is admitted that it is

22   unambiguous -- there we are.  They admitted that it is

23   unambiguous, and the interpretation of an unambiguous contract

24   is a question of law for the Court.  We have cited a great

25   deal of Texas law that is directly on that point.

1          He then says, well, very -- "reasonable" means very,

2    very low or not at all.  But the very authorities he cites say

3    exactly the opposite, so if we can --

4          THE COURT:  Well, isn't that just impeachment?

5          MR. FURNISS:  If it is just for the Court, Your

6    Honor, I suppose so.  This relates to our summary judgment.

7          THE COURT:  Motion is denied.

8          What is next -- oh, I have got the list.  Okay.

9    Motion to exclude -- CSIRO's motion to exclude Ungerboeck, the

10   prior art inventor.  Docket No. 439 in the 549 case; 508 in

11   the 550 case, 307 in the 531.

12         MR. J. JONES:  Good afternoon, Your -- morning, Your

13   Honor, Jordan Jones on behalf of CSIRO.  Your Honor, under

14   Federal Rule of Evidence 701(c), an expert is not permitted to

15   give opinion testimony if those opinions are based on

16   scientific, technical, or other specialized knowledge.  If so

17   it then is based on -- it falls under Rule 702.  In this

18   instance Dr. Ungerboeck has a PhD in electrical engineering

19   and is credited as being the inventor of trellis-code

20   modulation.  His report and expertise is definitely based on

21   scientific and technical knowledge.

22         In this instance the defendants have failed to

23   submit an expert report on behalf of Dr. Ungerboeck, and we

24   see this as an end-run around this Court's order in terms of

25   the disclosure deadlines under the Rules.

1          THE COURT:  Okay.  Response?

2          MR. CORDELL:  Thank you, Your Honor, Ruffin

3    Cordell.  I will be speaking on behalf of the defendants.

4          Ms. Ferguson, thank you.

5          May it please the Court.  Your Honor, what we have

6    here in the motion to strike Dr. Ungerboeck is really an

7    effort to exclude this man's factual testimony.  He is a

8    scientist to be sure.  He is certainly knowledgeable about

9    highly-technical matters.  But we are not offering him as an

10   expert.  We are asking him to come into court and explain what

11   he did and what happened to him and the actions he took and

12   the results that he achieved in his own work.  This is

13   percipient testimony at its core, and so we believe --

14         THE COURT:  Well, I think they are only moving to

15   strike his expert testimony, aren't they?

16         MR. CORDELL:  Technically, Your Honor, they moved to

17   strike certain paragraphs of his declaration that we submitted

18   as part of the summary judgment motion.  That is the motion

19   that they filed.  It was -- several of the numbered paragraphs

20   I can pull them out for, Your Honor.  But we also believe that

21   as part of the MIL process they at least suggested they were

22   hoping to exclude him altogether, so perhaps I should get

23   clarification.

24         THE COURT:  Clarification, are you seeking to

25   exclude him all together or just expressing any opinions?

1          MR. J. JONES:  I think both, Your Honor.  In this

2   motion we are talking about right now it has to do with his

3   expert opinion.  But we believe that what Dr. Ungerboeck's

4   views are on his invention have no place in his trial.  The

5   issue that is pending right now before this Court and possibly

6   before the jury is whether the rate 1/2 TCM encoder of the

7   '069 patent, whether the accused products have an equivalent

8   circuit structure that performs the function as defined by the

9   Court.

10          In this instance what Dr. Ungerboeck did and what

11   his views of his own invention are, are not relevant.  What is

12   relevant is what is in the patent, and Dr. Ungerboeck's

13   declaration.  The parts that aren't expert testimony don't

14   speak to that at all.

15          MR. CORDELL:  Dr. Ungerboeck has been brought into

16   this courtroom, Your Honor, not by defendants.  We didn't call

17   him in.  The party that called him in was CSIRO.  The Court

18   heard extensively about Dr. Ungerboeck's work in the Buffalo

19   case, and that testimony was then used, that evidence was then

20   used in the Federal Circuit appeal as their primary piece of

21   evidence with respect to the trellis-coded modulation

22   limitation.

23          What do I mean by that?  They rely on Dr.

24   Ungerboeck's work in the guise of the 1987 paper.  There was a

25   figure from it.  I do have some slides I will try to bring

 1    up.  So in Paragraph 12 of the declaration that they target,

 2    Dr. Ungerboeck talks about his 1987 paper, and he talks about

 3    TCM.  What CSIRO ultimately does with this evidence is they

 4    use it as the fundamental evidence to suggest that a

 5    convolution encoder is the same thing as trellis-coded

 6    modulation.  It is the primary evidence they rely on.

 7         So what I have up here in Slide No. 5 is a reference

 8    to his 1987 paper where he talks about the facts, the factual

 9    underpinnings of his work in inventing trellis-coded

10    modulation, an award-winning technology.

11         MR. J. JONES:  Your Honor, we did not inject Dr.

12    Ungerboeck into this paper.  To the extent he arises at all it

13    is in the sense of the prior art background in terms of

14    showing what one of ordinary skill in the art in reading the

15    '069 patent would have understood the rate 1/2 TCM encoder to

16    be.  It wasn't Dr. Ungerboeck's views and what Dr. Ungerboeck

17    did.  It is viewed from the person of ordinary skill in the

18    art.

19         Now, if Dr. Ungerboeck had been properly disclosed

20    and was going to opine under that standard, we might be

21    talking about something different, but that is not what he has

22    been asked to do, and that is not what this declaration does.

23    What this declaration does is it is being cited line for line

24    along with the defendants' designated experts to support their

25    opinion that they have -- that the convolution encoders in the

1    accused products do not meet the data reliability enhancement

2    limitation of the '069 patent.

3           In fact, in Dr. Ungerboeck's declaration at

4    Paragraph 18, the last sentence on Page 7, he states, "Both

5    coding and mapping and TCM are necessary for enhancing data

6    reliability and are not separable."  Well, that is the exact

7    mantra that has been touted by defendants' designated

8    experts.  So it is clear and transparent what they are trying

9    to do.  They are trying to bring him in as the ultimate expert

10   that has not been disclosed to give these opinions, and he is

11   touting the exact same lines that are being offered by

12   defendants' experts.

13          In addition, the term "data reliability enhancement"

14   doesn't even appear in Dr. Ungerboeck's works.  That is a term

15   of art or a term that has been coined by the inventors of the

16   '069 patent and has a very specific meaning in the context of

17   the patent in this litigation.  So it is very transparent in

18   terms of what they are asking him to do.

19          MR. CORDELL:  Your Honor, I can't stress enough that

20   we have to look at this in the proper context.  Dr. Ungerboeck

21   is here talking about his factual work.  He is talking about

22   facts.  He is not talking about opinions.  He is talking about

23   facts.  But I take direct issue with Counsel's statement about

24   whether nor not they are relying on Dr. Ungerboeck because

25   they are.  In the slides they are going to present to you, I

1   think, as part of this morning's summary judgement analysis of

2   the infringement case, they do it again.

3          They cite to Dr. Ungerboeck's paper, and they use it

4   as substantive evidence to try to suggest that a convolution

5   encoder is part and parcel of trellis-coded modulation.  That

6   was the fundamental fact that we believe created a record that

7   was ultimately appealed to the Federal Circuit that was the

8   fundamental error in the Buffalo case.  It was this assumption

9   that a convolution encoder is part and parcel of trellis-coded

10  modulation that led the Federal Circuit to rule the way it

11  did.  It is the fundamental reason why we are contesting

12  infringement in this case, frankly.  There are several, but

13  that is certainly a very, very large one.  And they are doing

14  it again.

15         So what we are asking is for Dr. Ungerboeck to be

16  heard.  We disclosed him in October, October 10.  We did a

17  quick count, and there have been over 200 days of depositions

18  taken in this case.  There have been over 50 days of

19  deposition taken since October 10th.  CSIRO has practiced

20  studied ignorance with respect to Dr. Ungerboeck.  They don't

21  want to talk to him, they don't want to hear from him.  They

22  are very careful because they don't want to involve him.  They

23  don't want his testimony.  They don't want this evidence.

24         Instead, what they want to do is rely on the hearsay

25  in his paper.  They took this hearsay to the Federal Circuit

1    and they claimed it was fundamental to trellis-coded

2    modulation that a convolutional encoder was included.

3            What does Dr. Ungerboeck say about that?  When you

4    read his declaration, what he says is, in fact, that TCM does

5    not require a convolutional encoder.  I have Paragraph 18 from

6    his declaration up on the slide, Slide No. 7.  I will read it

7    in the record.  He first references the paper Figure 19 of the

8    1987 paper.  Then he says, "However, these are simplified

9    logical block diagrams that do not necessarily imply that a

10   stand-alone convolutional encoder can be extracted from a TCM

11   structure.  Indeed, I know even of cases where TCM scheme

12   cannot be described as a combination of a convolutional

13   encoder and a signal mapper.  The coding scheme and TCM can be

14   implemented with a finite-state machine with a given number of

15   states and specified state transitions which does not have to

16   be a convolutional encoder."

17           He is simply clearing up the hearsay

18   misunderstanding that CSIRO brought into court and is relying

19   on it all the way through this.  It is factual testimony --

20           THE COURT:  Is that an issue in this case?

21           MR. CORDELL:  Absolutely, Your Honor.  It is a

22   fundamental issue.

23           THE COURT:  Is it an issue that you have expert

24   witnesses on?

25           MR. CORDELL:  We do.

1          THE COURT:  Was he designated as an expert witness?

2          MR. CORDELL:  He was not.

3          THE COURT:  That sounds -- what you just read sounds

4     an awful lot like an expert opinion to me.

5          MR. CORDELL:  I apologize.  I know it is

6     complicated, and the technology -- it is certainly imbued in

7     the technology, but that is what he does for a living.  When

8     he goes to work every morning this is what he does.  And this

9     is what he did in 1987.  At the time that -- again, CSIRO

10    tells us that the world was informed that a convolutional

11    encoder was part and parcel of a trellis-coded modulation

12    scheme.  He says that is not true, you are misreading my

13    paper.  The hearsay that you are relying on is not reliable.

14    That is what he is saying here.  It is not expert testimony.

15    He is refuting the characterization of his own work.  That is

16    all he is doing plain and simple.

17         THE COURT:  Why didn't you identify him as an

18    expert?

19         MR. CORDELL:  He works for a third-party, Your

20    Honor, he works for Broadcom who has some involvement here,

21    but they haven't shown up.  We aren't paying him.  He is

22    employed by Broadcom, and we have gotten the time from him

23    that we could.  And we have listed him as a fact witness.  We

24    got a declaration from him.  And, frankly, we fully expected

25    that CSIRO would depose him if they were concerned about his

1   testimony.  But, again, they practiced this studied ignorance.

2   They have made sure that they don't go and depose Dr.

3   Ungerboeck because they don't want him to clear up this

4   record.  They don't want to have him comment about what really

5   happened in 1987.  They don't want to hear the other side of

6   the story.

7            THE COURT:  Isn't what happened in 1987 a matter of

8   what the documents from 1987 show?

9            MR. CORDELL:  They do.  That is absolutely correct.

10  However, that is only part of the story.  So there were many

11  other facts that aren't reflected in the paper; or better

12  said, the paper is subject to misinterpretation.  The reason

13  why we have hearsay rules is to prevent people from making

14  out-of-court statements and then relying on them for the truth

15  of the matter asserted.  That is fundamentally what CSIRO is

16  doing here.  They are saying that because that block diagram

17  that they show again on Slide 18 of their presentation, that

18  figure that -- the Figure 1 on Page 13 of the paper, because

19  that block diagram shows two things side by side, they

20  immediately conclude that they are part and parcel, one

21  structure, they are joined at the hip, and they are always the

22  same thing.  That is not true.

23           THE COURT:  I know you disagree with them on that,

24  and I take it you have got experts that say that and they have

25  experts that say that, right?

1           MR. CORDELL:  Yes.

2           THE COURT:  I am going to grant the motion as to any

3    expert opinions or any opinions that might be expressed by Dr.

4    Ungerboeck, as he has not been timely identified as an expert.

5           MR. CORDELL:  Your Honor, could I ask for one

6    clarification?  We often hear inventors get on the stand and

7    sort of discuss their work.  Would it be permissible to have

8    Dr. Ungerboeck come in like an inventor and simply direct his

9    testimony only to the work that he has done, so he will only

10   talk about the factual work that he has actually performed, no

11   opinions; this is what I did, this is when I did it, and this

12   is how I did it?

13          MR. J. JONES:  Your Honor, I want to be heard on

14   that.  The cases that are cited in defendants' opposition, I

15   think their surreply, the cases in which an inventor has been

16   brought in and permitted to testify about his or her invention

17   are those cases in which the invention is at issue in the case

18   where it is the invention of the patent-in-suit.  The

19   inventors in those cases were allowed to testify about the

20   background in their invention, much like the CSIRO inventors

21   will testify at trial here.

22          But to have Dr. Ungerboeck come in and testify about

23   what he thought and what his invention was, is really

24   irrelevant, prejudicial, and confusing to the jury.  They have

25   experts that have been properly designated to talk about those

1   things.  Even in talking about his invention, it is going to

2   be highly technical and scientific, as you can see from the

3   declaration, at least the one excerpt you have seen today.

4           THE COURT:  All right.  Mr. Cordell, I am not going

5   to foreclose that possibility, but I'm not going to say that

6   you can.  What I will do as we proceed in the case and I

7   become a little more acquainted with the issues at hand, I

8   will allow you to tender him at some point outside the

9   presence of the jury and let me hear what you are going to be

10  asking him and how that might relate from a purely factual

11  standpoint, whether it is relevant or prejudicial or

12  confusing.  And I will allow defendants to cross-examine him

13  outside the presence of the jury, and then I will decide

14  whether to allow his testimony.

15          MR. CORDELL:  Thank you, Your Honor.

16          THE COURT:  But I will caution you, there would be

17  no opinions in that testimony.

18          MR. CORDELL:  Understood.

19          THE COURT:  So I am not sure how helpful that will

20  be if you have got other experts that can express those

21  opinions.

22          All right.  Next is defendants' motion to exclude

23  Levesque, CSIRO's obviousness expert, Docket No. 444 in the

24  549 case, 513 in the 550 case, and 394 in the 551 case.  Who

25  will be arguing that on behalf of defendants?

1           MS. ANDERSON:  Your Honor, I will.  Thank you.

2           THE COURT:  All right.  Ms. Anderson.

3           MS. ANDERSON:  Thank you, Your Honor, Christa

4    Anderson for Intel.  The fundamental problem here, Your Honor,

5    is Dr. Levesque rendered opinions on the subject of

6    obviousness.

7           THE COURT:  I'm sorry, I couldn't hear you.

8           MS. ANDERSON:  Yes, I'm sorry.  Can you hear me now,

9    Your Honor?

10          THE COURT:  Yes.

11          MS. ANDERSON:  The fundamental issue presented by

12   this motion is that Dr. Levesque rendered opinions on the

13   subject of obviousness, yet he was never apprised by Counsel

14   for CSIRO as to what "obviousness" means from a legal

15   perspective.  His opinion is purely issued under his lay

16   understanding of what "obviousness" means.

17          He also was never provided with Your Honor's claim

18   construction.  Because of these issues, Your Honor, his

19   opinion is clearly 403.  It would be misleading to a jury for

20   an expert to take the stand and opine on the ultimate issue of

21   obviousness, yet have actually never understood what the legal

22   standard was or what Your Honor had declared was the meaning

23   of the terms of the patent.

24          THE COURT:  Response.

25          MR. FURNISS:  Your Honor, Dr. Levesque is being

1   offered solely on secondary considerations of

2   non-obviousness.  He is not opining on any of the prior art,

3   and he is an expert on the secondary considerations or the

4   non-objective indicia.  It is clear from his report and from

5   his deposition that that is what he is testifying about.  He

6   said he underread the patent and understood the invention, but

7   he is not opining on anything that goes to the claims and he

8   is not a legal expert and he is not opining on that.

9           What he is opining about -- and I should mention

10  that he is an adjunct at Worcester Poly in Massachusetts which

11  specializes in wireless, which has a Center for Wireless

12  Networking which held two very important conferences.  He is

13  going to testify that 20 or 30 companies attempted to build a

14  high-speed wireless LAN and couldn't do it.

15          Now, in his report his statement of the objective

16  consideration of non-obviousness is exactly accurate.  It is

17  exactly what the Court's instruction will say.  It is exactly

18  what the Federal Circuit is saying.

19          THE COURT:  Has he reviewed the claim construction

20  opinion?

21          MR. FURNISS:  He has now.  He didn't then, but he is

22  not opining on claims at all.  He is opining on the history of

23  the development of wireless LANs.

24          THE COURT:  Response?

25          MS. ANDERSON:  Yes.  Thank you, Your Honor.  With

1   due respect to Counsel, Dr. Levesque doesn't simply opine in a

2   general sense on secondary considerations related issues.  Dr.

3   Levesque opines on the question of obviousness.  It is in his

4   report.  The word is in his report.

5         THE COURT:  Is that correct?

6         MR. FURNISS:  He says that the non-objective indicia

7   of non-obviousness suggests that the patent was non-obvious.

8         THE COURT:  Do you plan to have him testify to that

9   ultimate conclusion at trial, or just as to the secondary

10  consideration?

11        MR. FURNISS:  Only as to the secondary

12  consideration.

13        THE COURT:  Does that solve your problem?

14        MS. ANDERSON:  Unfortunately, Your Honor, it

15  doesn't.  The reason is that Dr. Levesque's whole opinion as

16  to what would be relevant on the consideration of the

17  secondary considerations of non-obviousness is premised on his

18  view of what he thinks the patent encompasses, yet he never

19  read Your Honor's construction.  He doesn't know what Your

20  Honor has called for in terms of means-plus-function

21  limitations, required structures.  He had no idea at the time

22  he opined about the specific constructions offered by Your

23  Honor, and so he had to have a nexus --

24        THE COURT:  But he has now.

25        MS. ANDERSON:  But it is too late, Your Honor.  He

1    issued an opinion.

2              THE COURT:  Well, has his opinion changed after his

3    review?

4              MR. FURNISS:  Not at all, Your Honor.  What he is

5    testifying about are things like long-felt need, failure of

6    others, commercial success.  That is all.  He is not

7    opining -- another expert is opining about the prior art.  He

8    never mentions the prior art.  And he said he understood the

9    invention for what it was.  But he is not opining on that, and

10   he was aware that -- he said there are other experts who were

11   addressing prior art.  Not him.  He is not going to address

12   the prior art.

13             MS. ANDERSON:  Your Honor, if I may.  On subjects

14   such as long-felt need, which is one of the considerations

15   under secondary considerations, this is a perfect example of

16   why Dr. Levesque's opinion is so problematic.  Dr. Levesque

17   thinks this is an invention where wireless LAN is a

18   limitation, yet Your Honor has held it is not.  So this is the

19   kind of thing that is fundamentally at the core of his

20   opinion.  The only opinion that we had from him that was

21   disclosed was one that was improperly based on a lay view of

22   what "obviousness" means, and no view and understanding of

23   what the Court has defined as the claims.

24             THE COURT:  Has he reviewed the correct definition

25   for "obviousness"?

 1              MR. FURNISS:  Yes, he has, Your Honor.  He has the

 2      correct definition of "obviousness" and he has the correct

 3      definition of the secondary considerations.  And he is not

 4      offering --

 5              THE COURT:  He has reviewed the claim construction?

 6              MR. FURNISS:  He has.

 7              THE COURT:  Did that change his opinions any?

 8              MR. FURNISS:  No, Your Honor.

 9              THE COURT:  All right.  I am going to grant the

10      motion to the extent of allowing him to express ultimate

11      opinions as to non-obviousness, but I will allow him to

12      testify as to the opinion as to secondary considerations,

13      provided it is premised on his review of the claim

14      construction and you lay the proper predicate with the proper

15      definition for obviousness, and I will allow defendants to

16      take a follow-up deposition from him, if you would like to,

17      prior to trial.

18              How long would you need for your deposition?

19              MS. ANDERSON:  No more than three hours, Your Honor.

20      Maybe two.  We will keep it short.

21              THE COURT:  Three hours just to deal --

22              MS. ANDERSON:  No more than that, Your Honor.  We

23      will keep it short.  We will try to keep it to two.

24              THE COURT:  I'm going to limit it to an hour, and

25      take an hour's deposition and inquire about the work that he

1  has done since -- because I think he said his opinions are

2  going to be the same.  I am taking that at face value, so I

3  don't think there is any surprise or new information.  But if

4  you want to go into what the basis or the predicate for his

5  opinions will be at trial, you can do that.

6          MS. ANDERSON:  Thank you, Your Honor.

7          THE COURT:  All right.  Does that conclude all of

8  our motions to exclude witnesses or evidence?  I believe it

9  does.

10          MR. FURNISS:  I believe so, yes.

11          THE COURT:  Let's go to motions for summary

12  judgment, and I will hear from -- we will deal with -- let's

13  deal with defendants first as to no willfulness.  That is

14  Docket No. 378 in the 549, 445 in 550, and 327 in 551.

15          MR. VASQUEZ:  Thank you, Your Honor.  Richard

16  Vasquez on behalf of 3Com, Accton, SMC Networks, and D-Link.

17          THE COURT:  Are you speaking for all defendants?

18          MR. VASQUEZ:  I am, Your Honor.  Now, we brought

19  this motion because in the post-Seagate world there are two

20  tests to get to the issue of willfulness.  There is the

21  objective recklessness test which has to be proven by clear

22  and convincing evidence by the plaintiff in order to merit a

23  finding of willfulness.  And then there is the contingent

24  subjective test.  The subjective test is contingent because if

25  the Court finds that there was no objective recklessness, then

1    it doesn't get to this objective inquiry.

2         So as a matter of trial management if you decide

3    this motion as we have advocated, you will eliminate the

4    witnesses that Mr. Van Nest indicated would consume a lot of

5    court time because you have got 12 different defendants who

6    have to put on their witnesses.  The plaintiffs are going to

7    take a shot at all 12 defendants and try to prove their

8    subjective intent.

9         Now, this post-Seagate world has spun the summary

10   judgment tool as an effective tool to ferret out the issue.

11   Contrary to the plaintiffs' arguments in this case, the

12   subjective relevant is absolutely irrelevant to our motion.

13   That is because you are looking at the objective test first.

14   We have established that through the case law that we cited.

15   Summary judgment is indeed proper under these circumstances

16   because the issue is not whether it is willful.  The issue is,

17   is there a credible argument for either noninfringement or

18   invalidity?  If you find that there is, that negates the

19   ability of a jury to come to a reasonable conclusion that

20   there has been willfulness proven by clear and convincing

21   evidence.

22        So in this case we have cited three clear

23   indicators, each of which would require you to grant our

24   summary judgment for non-willfulness.  The first is the

25   Federal Circuit Court of Appeals' ruling obviousness de facto.

1    By denying the motion for summary adjudication, the Court of

2    Appeals has concluded that a reasonable jury could on the

3    evidentiary record in the Buffalo case find obviousness.  As a

4    result, you screen this case out from being one of those

5    category of cases that could be reckless.

6              Secondly, the Federal Circuit Court of Appeals

7    Lourie concurrence by Judge Lourie on the issue of new matter

8    provides a separate and independent bases to conclude

9    non-willfulness.  That was a finding on a stipulated bench

10   trial.  So although the Court of Appeals affirmed the Court's

11   finding of fact on the issue, there was very clear statements

12   by Judge Lourie that the evidence provided the basis for a

13   reasonable alternative.           In other words, if two

14   judges heard the issue or two juries heard the issue, they

15   could have decided for the defendant.  By hitting that level

16   of an objectively credible argument, the new matter defense

17   provides the basis for a finding that it is non-willful as a

18   matter of law.

19             Thirdly, the Court has already said that it would

20   take under advisement the issue of the PTO's reexamination

21   order.  And not to repeat anything that was said earlier, but

22   the important part is that the PTO said very clear that there

23   are 16 substantial questions of patentability.

24             It is a judicially noticeable fact that

25   three-quarters of the petitions for reexam so accepted are

1    altering the initial consideration at the Patent and Trademark

2    Office.  That is a huge number.  It is an objective indicia,

3    what I would call one of the two ways you can have a gold

4    standard for non-willfulness.  One would be the Federal Court

5    of Appeals -- the Federal Circuit Court of Appeals finding

6    that it goes to the jury, as well as this one, Your Honor.

7              Now, is there any particular element of that that,

8    Your Honor would like to hear more about?  Because that's

9    basically our case.

10             THE COURT:  Thank you.

11             Response?

12             MR. FURNISS:  Yes, Your Honor.  The defendants have

13   repeatedly mentioned the Seagate case, and obviously the

14   Seagate case is important in what the Seagate held and what

15   the new jury instructions from the Federal Judicial Center

16   model patent jury instructions say is that you assess

17   willfulness before the initiation of litigation.  So what

18   happened last week or last month or the reexam, is not

19   relevant.  And if CSIRO were trying to put it in, they would

20   say, well, Seagate says you have to look at prefiling

21   conduct.  That is the first point.

22             The second point is in the Datascope case the same

23   issue was raised.  It is cited on Page 13 of our brief.  In

24   that case the Federal Circuit had ruled two to one in favor.

25   The court said, "The district court's reference to this

1    court's two-to-one decision affirming the judgment of

2    liability, was inappropriate in this case.  The decision was

3    rendered several years after the date the infringement

4    began."  The date -- "(i.e., the date employed in determining

5    willfulness under the circumstances of this case), and was

6    based on facts unrelated to the decision on the critical

7    date."  So the problem with this is that it happens later.

8            As far as the Buffalo decision, as you know, Your

9    Honor, the only reason the Federal Circuit sent it back was

10   because Mr. Codding at the very last second withdrew his

11   agreement that the Court could decide the issue; and as Mr.

12   Ritchey I believe pointed out earlier, if the rule is that any

13   case in which you are not entitled to summary judgment, if

14   there is any question of fact, there can be no willfulness.

15   That will essentially eliminate willfulness from mostly all

16   cases.

17           As far as the reexamination, Your Honor -- and I did

18   want to mention this, you said you were going to take it under

19   advisement and I would like to make a parenthetical remark

20   here.  We were served with a number of the cases, two cases

21   that Counsel quoted last night late in the afternoon.  If Your

22   Honor is going to take the reexam under advisement we would

23   like an opportunity to submit a short reply on that.

24           THE COURT:  When can you have that to me?

25           MR. FURNISS:  Tuesday or Wednesday of next week.

1           THE COURT:  I'm going to rule on it by tomorrow.

2   You can submit it by Tuesday if you want to.

3           MR. FURNISS:  We can do it -- we are flying today,

4   Your Honor.  Could we have until Monday?

5           THE COURT:  All right.  Monday then.

6           MR. FURNISS:  Thank you, Your Honor.  I appreciate

7   that very, very much.

8           THE COURT:  Monday --

9           MR. FURNISS:  Monday noon?

10          THE COURT:  10:00 a.m.

11          MR. FURNISS:  10:00 a.m.

12          THE COURT:  Central time.

13          MR. FURNISS:  Central time.  Thank you, Your Honor.

14          THE COURT:  I believe that is, what, 7:00 --

15          MR. FURNISS:  It's 8:00 a.m., Your Honor.

16          THE COURT:  8:00.  Okay.

17          MR. FURNISS:  It is the middle of the night in

18  Australia.  Just joking.  As far as this is concerned, it is

19  what happens before the lawsuit is filed, not what happens

20  years and years and years later.  So both of these things do

21  not make it objective.

22          Now, the question of willfulness, as Your Honor

23  knows, turns on the evidence of infringement, and the jury

24  should hear that because it is a question of fact.  And

25  whether the objective test is met is going to be decided when

1    the evidence is heard.  Now, in taking depositions, none of

2    the defendants provided an opinion of counsel; and when they

3    were asked what they did, there is virtually nothing there.

4    None of them presented any evidence or analysis.  They just

5    said we thought about it and decided it wasn't invalid and we

6    weren't infringing.

7           And the lack of evidence, that is a detailed issue

8    we didn't pile up in front of the Court because it is a lot of

9    deposition testimony.  But the bottom line is that none of

10   them have an opinion of counsel and none of them have any good

11   reason other than the fact that they felt from economic

12   reasons that they weren't infringing or the patent wasn't

13   valid.  There is no actual that -- evidence anybody did any

14   research.

15          In Intel's case in particular, it seems to me there

16   is an admission in the record because Intel looked at Radiata

17   in 1999 -- and we presented these documents.  They are in our

18   papers.  They looked at Radiata to possibly buy it, which was

19   a spin-off from CSIRO using the CSIRO technology, and they

20   decided -- there was evidence in there saying that they were

21   put on notice that CSIRO had a patent.  Radiata told them

22   CSIRO has a patent on this.  Their response was, well, we

23   never investigated it.  They even cited their witness Saltzman

24   to say we never investigated the patent, so we didn't really

25   know.

1          That is the essence of recklessness.  That is the

2     essence to be put on notice that there is a patent and to do

3     absolutely nothing about it.  And that is what they did from

4     1999 until apparently 2003 when they put together the Common

5     Interest Group.  So that kind of evidence prefiling is what is

6     relevant, and what happened in 2008 or 2009 is not.

7          THE COURT:  Final word.

8          MR. VASQUEZ:  Yes, Your Honor, two small points.

9     Number one, Mr. Furniss spent most of his time talking about

10    the subjective elements, and he is not addressing because

11    there is not a good answer for why any of the individual

12    state-of-mind evidence is at issue when you look at the

13    objective tests.  That is the import of these authorities.

14         Secondly, it is a parlor trip to suggest that the

15    events of recognition by the FCA or the PTO of the substantial

16    questions of patentability or these triable issues of fact

17    occurred after the litigation and so they don't count.  These

18    are recognitions by official bodies about a fact that existed

19    on the day they filed the patent.  On the day they filed the

20    patent there was prior art that predated it.

21         The analysis contained in the FCA opinion that says

22    Rault plus Wilkinson or the other combination, that they

23    present this question of obviousness, that was presented on

24    the day they filed the patent.  They did not submit all of

25    these authorities to the PTO, so the PTO didn't recognize it.

1    But it was a fact then in existence, and there is no case that

2    says that you cannot consider the fact of late recognition by

3    a Court of Appeals when the issue finally goes up.

4           THE COURT:  All right.  I'm going to deny the motion

5    for summary judgment as to no willfulness.  We will -- I think

6    there is a fact issue there, but I will hear the testimony and

7    I will certainly leave it open to considering a motion for

8    JMOL or directed verdict.

9           MR. VASQUEZ:  Thank you, Your Honor.

10          THE COURT:  I will take it up at that time.

11          All right.  CSIRO's motion with regard to the RAND

12   defenses, Docket No. 382 in the 549 case, 448 in the 550 case,

13   and 330 in the 551 case.

14          MR. FURNISS:  Yes, thank you, Your Honor.  CSIRO has

15   a statutory right to a reasonable royalty, and it is a

16   statutory right created by Congress, so there is lots of good

17   law that says that right can only be specifically and

18   expressly waived.  CSIRO gave a letter to the IEEE in 1998.

19   It was on a form provided by the IEEE.

20          And if we can get the slides up with the IEEE

21   letter.

22          And it says, "In the event the proposed standard is

23   adopted and the standard cannot be practiced without the use

24   of the patent referenced above, CSIRO agrees upon written

25   request to grant a non-exclusive license under such patent on

1   a non-discriminatory basis on reasonable terms and conditions,

2   including its then-current royalty rates."

3          Now, the interpretation of that -- it is agreed by

4   their expert -- they later tried to avoid that on Mr.

5   Rosenthal that, well, it is not just a contract.  But they say

6   but what is it?  If it is not a contract, what is it?  We

7   agree that it is a third-party contract, but it is

8   unambiguous.  They said it was unambiguous.  It is unambiguous

9   on its face.  And the interpretation of an unambiguous

10  agreement under Texas law and under New York law -- there was

11  a question of what law you would apply.  The letter actually

12  went from Australia to the Netherlands because the chairman of

13  the committee was in the Netherlands.

14         We looked at California law, we looked at -- well,

15  we looked at New York law because that is where the IEEE is.

16  We looked at Texas law, and they are all exactly the same.  An

17  unambiguous contract is a question of law for the Court.

18  So --

19         THE COURT:  Let me ask defendants if they agree it

20  is unambiguous?

21         MR. VASQUEZ:  No.

22         MR. FURNISS:  I am wondering what the ambiguity is.

23         THE COURT:  What is the ambiguity?

24         MR. VASQUEZ:  To the extent they contend that the

25  plain meaning that we see in the words and our witnesses have

1    testified about, there is an ambiguity by the mere fact that

2    two people look at the sentence and believe that it means

3    different things.  For instance, Mr. Furniss has indicated

4    that the phrase "reasonable" is meaningless.  We have

5    witnesses that can come on in the context of trade usage,

6    which is allowed under the evidence, which will allow the

7    Court to be able to make a decision on what "reasonable" meant

8    under these circumstances.  That is one.

9         They also try and hinge together multiple conditions

10    precedent in the clause that they have.  This is not a form

11    agreement that Mr. Furniss just characterized it.  This is a

12    letter cut from whole cloth by CSIRO.  If you'd look at it,

13    you can see that.  But the IEEE sent a request with their

14    rules, and Mr. Furniss at this date is trying to argue that

15    the particular methods by which CSIRO changed the form letter

16    allow him to have cover.  In essence he says it allows us to

17    contend we didn't make a promise.  It allows us to contend

18    that if we did make a promise, we could change the rate at any

19    time we wanted.

20         When he argues that this inclusion of the language

21    that says "including its then current royalty rates," he next

22    argues that if on Tuesday we offered it for six cents to Cisco

23    Systems and on Wednesday we changed the rate to four dollars,

24    we didn't violate our promise.  Those are the types of issues

25    that arise in connection with the RAND case, Your Honor.  And

1    in particular when they adopt a characterization that is at

2    odds with what the witness from the IEEE who promulgated the

3    policy, the witnesses whose job it was to send out the letter,

4    the witnesses who received the letter, the witnesses from the

5    industry that received a reiteration of those promises, not

6    for just "a" but for the "g" standard also, all of that bears

7    on the issue of whether their preferred construction on this

8    document is tenable.

9            MR. FURNISS:  Where to start?  We don't contend that

10   "reasonableness" doesn't -- is meaningless.  "Reasonable"

11   means reasonable.  It is in the statute.  It is in the

12   Congressional statute that the patentholder is entitled to a

13   reasonable royalty.  What they need to do to make this

14   argument is to get Rosenthal to say "reasonable" means very,

15   very low or zero.  It is a bizarre interpretation.  There is

16   absolutely no support for it anywhere.

17           Now, Mr. Vasquez says that CSIRO changed this

18   letter.  Absolutely untrue.  It plugged in its name and its

19   patent number.  But this letter was drafted by the IEEE, and

20   the IEEE says "reasonable" means reasonable.  And "reasonable"

21   is the same standard.

22           Secondly, CSIRO was reasonable, Your Honor.  We made

23   an offer to all of them.  That offer was based on independent

24   third-party advice, and they cut it more than in half before

25   they made it.  They made a reasonable offer to all of these

1   defendants, and they all said, sorry, we don't even want to

2   talk to you.

3          THE COURT:  What was the offer?

4          MR. FURNISS:  It was a 1.90 per unit trending down

5   to 1.40 for volume, and it was negotiable.

6          THE COURT:  What was the Radiata?

7          MR. FURNISS:  Well, the Radiata was a percentage of

8   the chip price, but Radiata was not a patent license, Your

9   Honor.  It was a development agreement.  It required Radiata

10  to use its best efforts to raise money.  It required them to

11  sell 10,000 units by December 31 of 2001, and it was more than

12  a year -- it was eight months prior to this letter.  So when

13  this says "then current royalty rates," that doesn't mean your

14  royalty rates that you gave three months ago or five months

15  ago.  It is as if you said that a baseball player who signed a

16  rookie contract couldn't make any more money --

17         THE COURT:  Did you have other current royalty rates

18  prior to this letter?

19         MR. FURNISS:  Oh, no, Your Honor.  At the time of

20  the Radiata agreement the technology was in development.

21  There was no market for it yet, it hadn't been proven

22  commercially feasible.  The Radiata agreement is just a

23  totally distinct agreement.  It is not a bare patent license

24  at all.  And Radiata raised money and created a commercial

25  chipset, and Cisco bought them.  So it is five years before

1   the hypothetical negotiation.

2       Now, the other point, of course, is that even if you

3   could say "reasonable" means very, very low, there is no

4   evidence that CSIRO had that knowledge.  They thought

5   "reasonable" meant reasonable, which is probably a reasonable

6   thing to think.  There is no evidence anywhere -- the IEEE in

7   2008 said we take no position on the meaning of the word

8   "reasonable."

9       And the very authorities they cite, cited by Mr.

10  Rosenthal and cited by the defendants -- Mark Lemley, who is

11  quite well-known in this area, virtually no SSO policies --

12  which is Standard Setting Organizations -- specify that the

13  phrase "RAND" means leaving Courts to decide what terms are

14  reasonable.  Swanson and Baumol, another article in the

15  "Antitrust Law Journal" it is widely acknowledged that there

16  are no generally-agreed tests to determine whether a

17  particular license does or does not satisfy a RAND

18  commitment.

19      The IEEE posts on its website a letter from the

20  VP -- the late VP of general counsel of Hewlett-Packard Mr.

21  Fromm who says the term "RAND" is without meaning.  He means

22  it means only reasonable, it doesn't have any specialized

23  meaning.  So CSIRO complied with his obligation as to "a" and

24  the obligation isn't as to anything but "a"; and because

25  statutory rights are not rightly waived, there is simply no

1    basis on which to extend it beyond the terms of "a" even if

2    there were a definition of "reasonable" that is other than

3    reasonable.  Our view is "reasonable" means reasonable.  That

4    is what the jury is going to decide.  That is what it should

5    mean.  To try and give words new meaning --

6              THE COURT:  What royalty rate are you going to be

7    asking the jury to apply?

8              MR. FURNISS:  Either four dollars or five dollars,

9    Your Honor, per unit.

10             THE COURT:  Okay.  Response?

11             MR. VASQUEZ:  Sure, Your Honor.  This is a motion

12   for summary adjudication.  It is an improper motion for

13   summary adjudication because the plaintiff admits that there

14   are all these factual disputes.  Virtually everything Mr.

15   Furniss has said about the IEEE is in dispute in this case.

16   For instance, when he says it is IEEE policy not to talk about

17   royalty rates or not to specify, that is simply not true.  By

18   this motion he is seeking to exclude that evidence before the

19   Court sees it.  When there is a triable issue of fact because

20   there are two competing pieces of admissible evidence, you

21   can't grant summary judgment.  That is axiomatic.

22             Let me tell you a little bit about the question you

23   asked which is you asked about the Radiata license.  The

24   Radiata license was first enacted the very year that this

25   promise was made, 1998.  That is the Radiata license.  So if

1    you get that, you understand that when they made this

2    commitment their then current rate was what I simplify as

3    being six cents.  That is because through discovery,

4    unbeknownst to any of the defendants, there was a six-cent

5    deal made with first Radiata, a chipmaker and then with the

6    biggest network company in the world Cisco Systems, which was

7    then extended to another chip maker, which is the defendant in

8    this case Marvell.  Then extended to STMicro, another public

9    entity.  Then extended to Sharp, a consumer electronics

10   company from Japan.  And then extended to SkyPilot, a

11   competitor of my four clients.

12         That particular six-cent deal started in 1998, was

13   reiterated to Cisco in 2001 the year that the 802.11a standard

14   went into effect, reiterated in 2003 the year the 802.11g

15   standard went into effect.  Now, CSIRO is attempting to argue

16   without credible evidence on a motion for summary adjudication

17   that its then current rates language asserted not from the

18   IEEE but from CSIRO's mouth, that that allows them to change

19   this rate under different circumstances.  Clearly six cents

20   and four dollars are two different things.

21         In addition, the evidence is very clear that, for

22   instance, when Accton negotiated with CSIRO -- and this is

23   under oath by both sides of the equation.  The head of

24   licensing at CSIRO admits this and the Accton person admits

25   this, there was talk of a dollar royalty.  In that discussion

1   CSIRO's licensing head was asked was Accton taking a

2   reasonable position?  And he said that they were reasonable in

3   that discussion.  Now, when you have these conflicting facts

4   about what "reasonable" is, you can't grant the motion for

5   summary adjudication.

6            Now, when Mr. Furniss said that the RAND commitment

7   was made five years before the hypothetical negotiation, I

8   think I have laid out the timeline.  But the hypothetical

9   negotiation is not at issue in the RAND case.  You have

10  decided that the Georgia-Pacific case will come in June and

11  that the RAND case will come in two weeks.  And so we need to

12  deal with the RAND case and push aside the Georgia-Pacific

13  case.  But if you were looking at it and later if they renew

14  this motion, the issues that deal with RAND are going to be

15  somewhat relevant.  The same facts as Mr. Van Nest indicated

16  to you are going to have to be put forth to the jury because

17  Mr. Rosenthal is testifying on issues 1 through 5 in

18  Georgia-Pacific and issues 14 through 15 on Georgia-Pacific

19  because of the commonality of these two sets of issues.

20           THE COURT:  Okay.  Thank you.  The motion for

21  summary judgment, CSIRO's motion as to the RAND defenses is

22  denied.

23           MR. VASQUEZ:  Thank you, Your Honor.

24           THE COURT:  Next is CSIRO's motion of non-validity

25  as anticipated are obvious, Docket Nos. 380 in the 549 case,

1    447 in the 550 case, and 329 in the 551 case.

2         MR. FURNISS:  Yes, Your Honor.  The issue on

3    anticipation is that none of the references that are cited in

4    defendants' meet this Court's claim construction, and really

5    they are trying to argue claim construction over again.  The

6    first reference --

7         If we can get to Slide 2.

8         The date, the priority date issue is -- the priority

9    date -- there is undisputed evidence that the priority date is

10   no later than March 12th of 1993.  Now, defendants argue on

11   this, but there is simply no evidence to the contrary.  It is

12   just attorney argument.  On March 12th of 1993 CSIRO provided

13   a copy of what is called its "Flying Fox memo" to IBM under an

14   agreement that said that IBM and CSIRO will jointly develop a

15   very high-performance wireless LAN link.

16        And up there on the slide -- and it is too small for

17   my old eyes so yours are probably better than mine, but I did

18   a blow-up just in case.  And you can see that the defendants

19   say, oh, well, they didn't disclose in the United States the

20   same invention.  And if you look at this block diagram it is

21   very clear they did.  All of the key elements -- in fact, this

22   diagram looks very much like the figure that is in the patent.

23   And there is undisputed evidence from the head of IBM's

24   program, that they worked on it through the end of 1993.  And

25   there is evidence of continuing -- CSIRO sends additional

1   information to IBM in May.  IBM responds with questions in

2   May.  There is additional information in August, additional

3   information in October, additional information in November.

4          There is no contrary evidence whatsoever.  No

5   witness has said this wasn't disclosed to IBM in the United

6   States.  No witness has said they weren't working on it, they

7   paid money, there is a contract.  In other words, just saying,

8   well, we disagree doesn't create a triable issue of fact.  So

9   with that date, then let's turn to the references.

10         The first reference they use is called the Harris

11  modem.  The Harris modem was a high -- was a military modem

12  that was used to bounce signals off the ionosphere for

13  long-distance outdoor communication.  There is no doubt about

14  it.  And the argument is, well, it was used to train people

15  inside; but it was so strong they had to modify it heavily.

16  But most importantly as Your Honor recognized in the Markman

17  order in this case Your Honor held that indoor was a

18  structural limitation, was a structural limitation.  It means

19  it affects the structure of the transceiver.

20         In this case the Harris modem was never intended for

21  indoor use.  And to train people indoors because of the

22  weather, they had to put things called attenuators and dummy

23  loads on them, and those tests were done behind lock doors.

24  So it wasn't a public use.  It wasn't a transceiver intended

25  for use in an indoor environment; and, in fact, there is

1   undisputed testimony that they had to be very careful because

2   it had a tendency to burn people when they used it inside

3   because it was so powerful.  It is an entirely different

4   system.  It has these elements in it, but it was not intended

5   for.

6           And Claim 42, as Your Honor recognized in the

7   Markman ruling, says that it is a transceiver for operation in

8   a confined multipath environment.  Not something that you can

9   jerry-rig and use in a confined multipath environment.

10          The second reference that is used is the so-called

11  Morris Thesis, and the undisputed evidence is that was not

12  publicly accessible until 1994.  If we look -- he says, "Is it

13  correct that you're unaware of your thesis actually being

14  cataloged in any library until 1994?  He says, "yes," that is

15  true.  That is after the date of the US filing, so it is not

16  prior art.  It can't possibly invalidate.

17          They are going to say, well, he gave a copy to an

18  organization called TRLabs in Calgary, but the person who runs

19  TRLabs was asked is there any way for somebody outside of

20  TRLabs to find this?  Is there any catalog, any index, any way

21  to find it?  She said, not that I am aware of.  So there is

22  nowhere to find this document.  It is not publicly accessible.

23  And under Federal Circuit law, there were two cases that came

24  down on the same day that involved theses.  One was cataloged

25  in the university library and the court said that is prior

1    art, and the other one was not.  And the court said it is

2    not.  So the second reference Morris is simply not prior art

3    as well.

4           And the third reference has no interleaving

5    structure.  Morris has no interleaving structure, as well.

6    Xue -- which is X-U-E -- has no interleaving structure, and it

7    is too late as well because there is no evidence that it was

8    publicly available, but it is different as well.  All of those

9    are undisputed facts, admitted facts.

10           For example, the defendants' experts admit that

11   Xue -- X-U-E, no one has figured out exactly how to pronounce

12   that name -- used a block encoder, and a block encoder does

13   not meet this Court's claim construction, so it cannot

14   possibly anticipate because it doesn't meet the Court's claim

15   construction and it doesn't have an interleaving structure and

16   it doesn't have an encoding structure either.  It just

17   mentions in writing block encoding, which Your Honor has held

18   is not sufficient.

19           So none of these references come close.  And it

20   would be -- we have a related motion that the defendants would

21   have to make a foundation, but they cannot make a foundation

22   as to any of these to get them in.  And it would be error to

23   admit them because they don't meet the requirements as to

24   priority date and the Court's claim construction.

25           THE COURT:  Response?

1          MR. VAN NEST:  Yes, Your Honor.  There are just a

2     whole big bundle of facts that address -- or that are relevant

3     to each of these issues, and I will just take them one at a

4     time and very briefly.

5          On the priority date issue, they have the burden of

6     showing that they are entitled to a date before November of

7     '93 when they applied for a patent here in the United States.

8     That is their burden to show.  The March '93 submission to IBM

9     doesn't get them there.  It has no disclosure of the structure

10    for DRE, the 1/2 rate TCM encoder; and even in the diagram

11    that he handed up, you have got an FEC decoder.  It appears

12    that they were using at that point a convolution encoder.

13    There is no reference to TCM anywhere in this document,

14    number one.

15         Number two, there is no indication that this

16    document or this configuration was anything other than a

17    preliminary design study.  That is what it is called.  It is a

18    preliminary design study.  It wasn't limited even to

19    multicarrier modulation, the OFDM that is clearly an element

20    of the '069 patent.  As a matter of fact, we submitted, Your

21    Honor, two subsequent memoranda -- they are listed at Exhibits

22    H and M -- showing that what they were actually testing here

23    was not multicarrier modulation but, in fact, single carrier

24    modulation.

25         They were approaching -- this now after they had

1   filed in Australia, before they had filed in the United States

2   they still weren't sure, they still weren't sure what kind of

3   modulation they wanted.  They still weren't sure what sort of

4   DRE structure they wanted.  So there is absolutely a failure

5   of proof on the issue of whether or not this was a disclosure

6   of the invention.

7         The other key issue that remains a question of fact

8   is, were they diligent?  When all they have is a preliminary

9   design study, they have to show diligence.  Well, that

10  diligence has to be diligence in creating the invention here

11  in the United States.  The Patent Code at Section 104 says

12  activity outside the U.S. is completely irrelevant.  All they

13  have shown is that engineers in Australia were working on a

14  variety of designs, a variety of approaches, not the

15  invention.  Therefore, summary judgment is inappropriate.  It

16  is a question of fact whether the priority date is November

17  '93 or March of '93 as they are contending now.

18        By the way, Your Honor, I would note just in

19  addition, they never mentioned this date in discovery.  We

20  asked them in a specific interrogatory, what dates do you

21  contend are your priority dates earlier than November '93?

22  This date was never provided.  They talked about the

23  Australian application in '92 -- which they are apparently now

24  abandoning -- but this was never identified in their

25  interrogatory.  So that is just another reason to deny the

 1    motion.

 2           On Harris he says, gee, it is undisputed that it

 3    wasn't for indoor use.  Well, we have two declarants, two

 4    witnesses who will be called in the trial that says it was.

 5    Dave Luhowy -- L-U-H-O-W-Y -- wrote an article.  He is really

 6    the inventor of the Harris modem, and he is prepared to

 7    testify, that as he has in a declaration, that the Harris

 8    modem was designed to work outdoors and indoors over long

 9    ranges and short ranges and under a wide variety of conditions

10    and channel interference.  "In fact, I remember the modem

11    being used indoors in our test facilities using all of the

12    various settings."  That is Luhowy.

13           John Liner, who worked originally for the military

14    and then became a salesperson for Harris.  He testifies that

15    he repeatedly tested the device indoors, trained customers on

16    the device, demonstrated the device.

17           Thirdly, we have asked Dr. Wicker to test the device

18    indoors.  He has tested it.  It works indoors.  So not only

19    does it inherently operate indoors, we have two witnesses and

20    a plethora of documents to show it was intended for that use

21    and was used in that way.

22           On Morris I am surprised to see this raised.  Your

23    Honor already denied summary judgment on Morris.  Remember

24    this is the one that they have been desperate to keep out,

25    they moved to strike it, they claimed we defrauded them.  Your

1    Honor issued an order -- it is Document 414 -- on January 27th

2    of 2009 denying summary judgment on this publication issue.

3    You said, "After carefully reviewing the parties' submissions,

4    there are numerous material fact issues concerning the Morris

5    Thesis and the circumstances surrounding its publication.  The

6    parties are free to make their excellent factual arguments at

7    trial.  Summary judgment is denied."  So the issue of

8    publication has been resolved.  There are questions of fact on

9    that.

10          He mentioned that -- or claimed that Harris doesn't

11   describe interleaving.  Well, his thesis does describe

12   interleaving.  Not only that, their expert pointed out that

13   one of skill in the art could build an interleaver based on

14   what was disclosed.  That is testimony from Dr. Monsen in

15   Exhibit 2 attached to our opposition.  So their expert is

16   saying you could build it based on what was there.  It clearly

17   discloses interleaving techniques and shows where in the

18   device it would be done.  So there is no question of fact

19   about that.

20          The publication issue on Xue is easily resolved.

21   The Xue Wilkinson reference has a date stamp on the cover of

22   it that it was provided to the library a month or a month and

23   a half before the application was filed in the United States.

24   That is at Exhibit 13.  And Dr. Wilkinson is going to testify

25   that that article, which he is an author of, was shown,

1    disclosed, and passed out at a conference a month and a half

2    before the patent was applied for.  That is at Exhibit 24.

3    And that that conference was attended by people interested in

4    wireless LAN who not only heard the presentation but saw the

5    article.

6              With respect to interleaving on the Xue article,

7    again, it is the same thing.  This was a quibble on their

8    part.  Interleaving was well-known, as the Federal Circuit

9    pointed out.  Their expert admits anybody could build an

10   interleaver.  They are claiming that all interleaving is the

11   same.  Di-bit interleaving, bit-by-bit interleaving, it really

12   doesn't matter.  That is their contention.  There is clearly

13   disclosure in Xue of interleaving, and their own expert admits

14   that anyone could have built it.

15             THE COURT:  Okay.  Thank you, Mr. Van Nest.  I think

16   that is enough.  Defendants' motion for summary judgment as to

17   the RAND defenses is denied -- I'm sorry, as to anticipation

18   and obviousness is denied.

19             MR. VAN NEST:  I'm sorry, Your Honor.  You mean

20   plaintiffs' motion?

21             THE COURT:  Yes, plaintiffs' motion as to -- not

22   invalid as to anticipation and obviousness is denied.

23             Mr. Furniss, do you care to argue infringement or

24   inequitable conduct?

25             MR. FURNISS:  Just infringement, Your Honor.  I

1   perceive a trend here, Your Honor; however, I think this one

2   has some legs.

3           THE COURT:  How many?

4           MR. FURNISS:  I guess the answer would be, enough.

5           Your Honor, in your Markman order in this case in

6   discussing the Buffalo situation, the Court said that, while

7   Buffalo had contended that a 1/2 rate TCM encoder was

8   different than a 1/2 convolutional encoder, what was missing

9   was any reason why.  And on this one I think it is very

10  important.  Dr. Monsen, Dr. Andrews from UT, and Dr. Negus

11  have all testified that a 1/2 rate TCM encoder is a particular

12  case.

13          TCM encoders is a group of concepts.  There are

14  different rates.  You can have a 2/3, you can have a 4/5; you

15  can have many different types.  But in the 1/2 rate they have

16  all testified that the mapper does not provide any additional

17  functionality, any additional data reliability enhancement in

18  the 1/2 rate.

19          Now, none of the defendants' experts were willing to

20  discuss a 1/2 rate.  All of the testimony -- and I will ask

21  Mr. Van Nest if I am wrong show me where it is -- no one says

22  you get better data reliability enhancement out of a 1/2 rate

23  TCM than out of a 1/2 rate convolutional encoder.  We know

24  that a convolutional encoder is traditionally part of a TCM.

25  In fact, Dr. Wicker says that people often call TCM encoders

1   convolutional encoders.  He said that in his book.  That is

2   what people understood.

3          The key issue is whether it operates differently,

4   and that is what Your Honor said.  None of their experts ever

5   said that a 1/2 rate TCM encoder performed any different

6   function.  There are -- all of CSIRO's experts have said

7   correctly that with a 1/2 rate convolutional encoder, there is

8   one bit in and two bits out; and that in a 1/2 rate TCM

9   encoder, there is one bit in and two bits out.  So you can't

10  create a question of fact unless you meet that fact.

11         None of their experts -- Dr. Williams in his

12  testimony pretended -- when he was asked about a half-rate TCM

13  encoder he pretended to not know what it meant.  I don't

14  understand your question.  So no one has ever made any showing

15  there is any difference, and we made a very specific showing

16  that it has no different function.  It doesn't increase.

17         Now, that is not to say there might not be some

18  other type of convolutional encoder that might make a

19  difference, but that doesn't matter.  What the Court said was

20  it was a 1/2 rate TCM encoder, and there is no contrary

21  evidence.  There is just a bunch of -- they are just going to

22  try and confuse the jury who will not understand convolutional

23  encoding.  Your Honor might.  But even I don't really.

24         And it is just mumbo-jumbo to say, well, TCM

25  encoders generally might add some; but in this specific case

1   there is undisputed testimony and there is nowhere, none of

2   them ever specifically said you get better data reliability

3   enhancement with a half-rate TCM than you get with a half-rate

4   convolutional encoder, and that is why there is no disputed

5   question of fact.  As Your Honor knows, it has to be a

6   material fact that is disputed, not some other fact.  And the

7   fact that they would never address the half rate is because

8   they couldn't.

9          And their main expert Dr. Wicker, who is an expert

10  in convolutional encoding, wouldn't give an opinion on it at

11  all in his deposition, wouldn't give an opinion on it.  And

12  the reason is because he can't because it is not true.  In

13  reality a half-rate TCM encoder is exactly the same.

14         If we can show the diagram.  One bit in, two bits

15  out.  There is no mapping function.  It makes no difference

16  whatsoever.  They haven't controverted that.

17         Now, on the other two issues they are simply

18  rearguing Your Honor's claim constructions.  We have already

19  found that you ruled bits equals blocks and, therefore, you

20  can interleave by single bits.  They are just rearguing that.

21  That was affirmed.  It was a matter of claim interpretation,

22  so it was for the Court.  The Federal Circuit affirmed it.  It

23  is not a question of fact.  It is a question of law.  It has

24  already been determined.

25         And the third -- they only have three

1    noninfringement arguments.  The third one is that 4,000

2    nanoseconds isn't enough.  It is just a rehash of the

3    indefiniteness argument -- which Your Honor denied -- that it

4    is possible that somewhere there could be a signal that was

5    significant multipath that was more than 4,000 nanoseconds.

6    Now, light travels at one foot per second more or less. And as

7    one of their own witnesses, their own witnesses said, well,

8    that would be a room a kilometer -- almost a kilometer in size

9    to have that kind of delay.

10        So the fact is as Your Honor recognized in the

11   Markman order, the IEEE standard sets the delay period two

12   orders of magnitude greater than their expert Dr. Rappaport

13   said was the maximum amount of delay spread he found; two

14   orders of magnitude greater.  So it is a purely -- it is just

15   not a credible argument and creates no question of fact that

16   would prevent summary judgment.  This one is really undisputed

17   because they can't dispute the fact that a half-rate TCM and a

18   half rate convolutional encoder, they are not just equivalent,

19   they are the same, exactly the same.

20        THE COURT:  Response?

21        MR. CORDELL:  Thank you, Your Honor.  Well, I

22   understand Mr. Furniss believes they are the same, but the

23   evidence shows otherwise.  The evidence shows, in fact, there

24   are substantial differences between a half-rate TCM encoder

25   and a convolutional encoder, and I would like to address it in

1   three ways.  There are structural differences, there are

2   differences in the way they operate, and there are differences

3   in the results they achieve.  That is what the law tells us we

4   have to focus on.  We have to focus on those kinds of things

5   when we are evaluating equivalents under 112, paragraph 6.

6           I'm sorry, Your Honor, I apologize.

7       (Pause in proceedings.)

8           MR. CORDELL:  Mr. Furniss began his remarks by

9   referring to the Buffalo record, and we take direct issue with

10  that.  I understand there were findings made in the Buffalo

11  record; but the findings in the Buffalo record were premised

12  on the facts that Buffalo chose to bring into court.  And we

13  maintained and have maintained all along that the facts that

14  Buffalo chose were deficient.  They essentially stipulated to

15  this idea that a convolutional encoder is part and parcel of a

16  TCM scheme.  That is absolutely not true, and we are going to

17  be able to demonstrate that not just through my words but

18  actually through the CSIRO expert.  He has admitted that.

19          I will address briefly the three elements that Mr.

20  Furniss went through, and I would like to touch just briefly

21  if I can on the idea that -- particularly in the summary

22  judgment context, CSIRO hasn't achieved anything close to a

23  prima facie showing of infringement here.  So the reality is

24  that, in fact, Your Honor, we don't have the Buffalo record.

25  We have done a lot of leg work in digging up the real facts to

1  show exactly the way these devices work.  The patent is almost

2  silent on what that trellis-coded modulation scheme looks

3  like.

4         So we have gone the extra mile to disabuse the

5  record of the hearsay concessions that Buffalo made; and,

6  frankly, the very premise of ultimately what became the

7  Federal Circuit's findings turn out to be not true.  It is

8  important to realize in this case, unlike in Buffalo, we are

9  not talking about a preponderance of the evidence standard.

10  Mr. Furniss has to show there is no possible jury that could

11  go his way on these issues, so I really have the wind behind

12  me on this one.

13         Let me jump on the "means to apply data reliability

14  enhancement."  You will recall, Your Honor, this was a

15  means-plus-function claim.  The Court construed it properly as

16  a rate 1/2 TCM trellis-coded modulation encoder.  Didn't say

17  convolutional encoder.  Didn't say some other finite-state

18  encoder.  The claim construction was very clear.  Twice the

19  Court rejected CSIRO's attempt to reinterpret that limitation,

20  to reinterpret the DRE means as a simple convolutional

21  encoder.

22         There is no dispute that, in fact, the Court

23  correctly recognized that those two structures are different.

24  A convolutional encoder is not the same thing as a TCM

25  encoder, and it turns out there are differences in the way

1    they work and in the results they achieve.  Start with the

2    fact that a TCM encoder is a single integrated structure.  It

3    is one thing done.  It is done in concert so that the encoding

4    and the mapping happen essentially simultaneously to achieve

5    better results.  There is a fact that we have been able to

6    develop that the TCM encoders that are talked about in the

7    patents are things called "systematic encoders."

8           What does that mean?  That means that one of the

9    bits that comes in gets out unchanged, so the output of the

10   systematic encoder is always going to have one or more bits

11   that had appeared on its input.  That is not true with the

12   convolutional encoders that are accused here, Your Honor.  The

13   convolutional encoders are not systematic.  None of the bits

14   that are input make it to the output.  They are all modified

15   by the convolutional encoder.

16          We also have evidence supported by all of the

17   experts -- I take issue with Mr. Furniss's statement that we

18   didn't put in evidence showing that a TCM encoder is better,

19   that gets you better data reliability enhancement than a

20   convolutional encoder.  All of our experts spoke to that.  But

21   if there were any doubt, if there were any doubt about whether

22   or not it is better, we can look to two places.  One, we can

23   look to Mr. Monsen, the CSIRO expert who admitted that, in

24   fact, you can make a TCM encoder using things other than a

25   convolutional encoder.  He has disabused the record now of

1    this fundamental assumption that whenever you see TCM you

2    automatically find a convolutional encoder.

3         This is his admission I have at Slide 9, and I will

4    read it into the record.  The payoff -- this was a number of

5    the questions that we have in the briefing.  "But the payoff

6    was right, you can build the TCM without necessarily using a

7    convolutional encoder, correct? " "A. That's correct."

8         So even apart from all of the other testimony that

9    we have on our side of the case, we have their expert saying

10   for the first time that a convolutional encoder is not the

11   same thing as a TCM encoder; that you can have TCM without

12   convolution.  And that is very, very important.

13        There are differences in the way they operate.  When

14   we get to the data reliability enhancement of the TCM encoder,

15   we realize that they do things fundamentally different.  It is

16   the output of the TCM encoder are these symbols that the Court

17   has heard so much about.  And the experts have all told us

18   that the symbols that come out of a TCM encoder are reflective

19   of the particular arrangement of the data and the way that it

20   was processed and mapped simultaneously.  When that happens

21   you maximize this thing called Euclidean distance.  In the

22   convolutional encoding case we talk about Hamming distance.

23   Again, I mentioned this systemic -- or systematic finite-state

24   encoders used with TCM that -- where the output will include

25   the input bits.

1          Convolutional encoders simply enhance data

2   reliability by increasing the number of bits.  They add

3   redundancy, and that is a problem in communications because

4   when you add redundancy you create a bigger load that you have

5   to carry.  There is more data that has to be transmitted.

6   Again, I mentioned earlier that -- the Hamming distance

7   differences and the fact that the convolutional encoders are

8   non-systematic.

9          Now, let me get to Mr. Furniss's point because he

10   said there is no evidence that TCM encoders are better than a

11   mere convolutional encoder.  We absolutely don't agree with

12   that.  At Slide 12 I have a number of cites out of the brief

13   that show that.  But we don't even have to go there, Your

14   Honor.  We don't have to go to the experts because the patent

15   itself tells us this.  The patent itself at Column 9, Lines 36

16   through 46 talk about the use of a conventional forward error

17   correction scheme, such as, but not restricted to,

18   Reed-Solomon or convolutional encoding.

19          So it sets it up.  It tells us that is one thing

20   that could be used.  It then tells us immediately in the same

21   column just below that it, it is also possible to use combined

22   coding and modulation schemes, such as trellis-coded

23   modulation, TCM, to give improved bandwidth efficiency and

24   improved error-correction capability.  We don't have to go to

25   extrinsic evidence at all.  It is right here in the patent.

1   It is right here in the patent that a TCM encoder is better

2   than a convolutional encoder.

3          That results -- that ends up giving you a different

4   result, Your Honor.  The output of a TCM encoder is modulated.

5   A convolutional encoder is not.  There is no evidence in this

6   case that you can replace the TCM encoder of the patent with a

7   convolutional encoder.  We speak of replaceability as being

8   one of the hallmarks of equivalents in 112, paragraph 6.  No

9   evidence in this case whatsoever that is true.

10          At the end of the day, Your Honor, what you have on

11   the data reliability enhancement means is a fact issue.  We

12   have all of the points on our side when we say it is different

13   structurally, it functions in a different way, it achieves a

14   different result.  And I understand Mr. Furniss's evidence, he

15   is not going to lay down on that.  He is going to push back.

16   That amounts to a fact issue.  This is simply not a summary

17   judgment case.

18          If I could just touch on the other two limitations

19   briefly.  The means for interleaving data, Your Honor, are

20   tied back to the data reliability enhancement means in that,

21   recall that the output of the structure, the TCM encoder is a

22   two-bit symbol, and that two-bit symbol are like puzzle pieces

23   and they fit together.  As they fit together, you can't simply

24   break them apart and expect to obtain the data reliability

25   enhancement that you have just achieved by forming the

1    symbol.

2           So what the patent tells us and the construction

3    that this Court reached, is that the corresponding structure

4    for the means for interleaving blocks of data was a di-bit

5    interleaver.  There is no surprise to that because, again, the

6    output of the TCM encoder is this two-bit symbol.  You have

7    got to have a di-bit interleaver or you can't preserve the

8    data reliability enhancement you just achieved using the TCM.

9           So just to illustrate it a bit -- and I won't

10   belabor this, but we have done a little animation where we

11   show the output of the TCM putting out these two-bit symbols.

12   And the Court can see they are sometimes triangles, sometimes

13   are squares; but they fit together like puzzle pieces in very

14   particularized ways.  And the reason why they do that, the

15   reason why the TCM case gives you better data reliability

16   enhancement is they are maximizing how distinct these two

17   symbols are from one another.

18          We use the analogy that the military uses acronyms

19   instead of simply letters to represent grid coordinates.

20   Instead of saying, you know, "BC" on a map which might get

21   somebody bombed because they hear "PC" you say Baker, Charlie

22   because it allows the listener a better chance of receiving

23   that information and understanding what it is.  The same is

24   true with the symbols output by a TCM encoder.  They are these

25   particularized symbols that are chosen for their

1    distinctiveness.

2         The way these are interleaved in the patent is to

3    put them on different channels and ensure that they -- that

4    following a very particularized sequence the interleaving

5    takes place so that the entire symbols are transmitted one at

6    a time.  We see that in the animation.  It will repeat a

7    couple of times.  That can't be the case if what we do instead

8    is abandon that for bit-by-bit interleaving.  The standard,

9    the accused systems in this case, it is undisputed, use

10   bit-by-bit interleaving.  And the standard tells us that it is

11   done using adjacent coded bits being mapped onto non-adjacent

12   sub-carriers.  It is a fancy way of saying that every single

13   bit is mapped individually onto adjacent -- non-adjacent

14   sub-carriers.

15        So what the standard talks about is taking each bit,

16   destroying any relationship that they might have to their

17   neighbors and interleaving them one at a time in some fashion

18   so that none of the original pairs are preserved.  That is all

19   it means.  As a result when this is done in practice, when the

20   accused devices actually do this, they store the bits in a

21   memory unit and then they are mapped out in a different order

22   so that you accomplish this interleaving.  But, again, there

23   is no pairing of the bits.  There is no symbols that are

24   preserved, so I will look to the animation here.  But it will

25   eventually show that the bits were taken out of order and they

1    are put out on a line intentionally to break up any

2    relationship in time between the bits.

3          Now, what would happen if you -- what would happen

4    to that if you did it to a symbol?  So I will try to get ahead

5    if I can.  Here are the symbols that are output by a TCM

6    encoder.  Again, the two puzzle pieces fit together.  Part of

7    the data reliability enhancement is the fact that they relate

8    to one another.  If you did that using a single bit

9    interleaver, you destroy that relationship.  And when you

10   destroy that relationship, you no longer are retaining the

11   data reliability enhancement that you have just achieved.  So

12   you can't simply say that a single-bit interleaver is the same

13   as a di-bit interleaver in this particular case because the

14   output of the claimed TCM encoder requires these two-bit

15   symbols.  So you end up with a difference in the way and

16   ultimately in the result that is achieved.

17         And then, finally, Your Honor, with respect to the

18   modulation means, I heard Mr. Furniss make an eloquent

19   argument about the Harris modem.  He said, you know, Judge,

20   there is no evidence that the Harris modem was ever used

21   indoors.  He gave us a fair amount of that.  Well, the same

22   could be said about the accused products.  So the Court's

23   claim construction was very clear, they have to prove that the

24   period of the symbols have to be longer than a predetermined

25   period that is representative of the time delay of reflected

1   transmission paths of sufficient signal magnitude to impair

2   the reception, et cetera.  That has to be done indoors.

3          But the fact is there is no evidence in this record

4   that they have ever done that.  None of their experts ever

5   took these systems indoors and began measuring, measuring the

6   symbol period and measuring the reflections and measuring the

7   power of those reflections to know whether or not this

8   impairment takes place.  So at the very least, Your Honor, we

9   have a failure of proof on this fundamental issue, the one he

10  told us distinguished the Harris modem on all of the accused

11  products.

12         Finally, with respect to the prima facie case, I

13  will just pause on one -- I just mentioned the confined

14  multipath environment.  That is missing from the record.

15  There is also no evidence of any practice of the method Claims

16  68 to 72.  But then, finally, there are a whole host of

17  limitations that the parties haven't spent a lot of time on,

18  but we can't forget that CSIRO carries a burden on those. They

19  have got to show that these systems are used, you know, with

20  respect to Claim 10, for example, with a plurality of hub

21  transceivers.

22         That is a not a natural or expected network

23  arrangement.  Normally people buy one hub, they stick it in

24  their house, and then they use it.  They don't buy four and

25  have them scattered around their homes.  So there are specific

1    factual showings that CSIRO has simply ignored.

2            The, finally, Your Honor, there are a number of

3    products that their experts didn't even analyze.  We had the

4    debate earlier today about the verdict form, and the thing

5    that struck me about is that CSIRO is asking to put on the

6    verdict form, products that their experts did not even

7    analyze.  The Zune is the Microsoft version of the iPod.  It

8    is a music player that you carry around with you.

9            When we deposed Dr. Monsen, the CSIRO expert, we

10   asked him what did you do to analyze the Zune?  And we got

11   this blank stare back.  And we said what -- did you take it

12   apart? What did you do to do your work with respect to the

13   Zune?  He finally confessed, Your Honor, he didn't know what

14   the Zune was.  He had never seen it.  He had never thought

15   about it.  And the reality is that is not the way these cases

16   are supposed to go.  But particularly on summary judgment they

17   have got to be able to make a factual showing with respect to

18   all of the accused parts, and they simply haven't done it.

19           Thank you.

20           MR. FURNISS:  Your Honor, if I may be heard.  First

21   of all, with regard to I said in my opening that we needed to

22   hear some evidence that a 1/2 rate TCM encoder was different

23   than a 1/2 rate convolutional encoder.  Mr. Cordell didn't do

24   it.  They can't do it because it is all theoretical.  It is

25   all TCM encoders in general.

1          THE COURT:  Let me ask him again.

2          Do you have any such evidence Mr. Cordell?

3          MR. CORDELL:  We do, Your Honor.  Our experts went

4    through exactly that.  And what Mr. Furniss is referring to is

5    the relationship between that Euclidean distance I talked

6    about and the Hamming distance; but the reality is that when

7    the TCM encoder even at half rate does its mapping, it chooses

8    those symbols to maximize the distinctiveness between each of

9    those symbols and those that come after it.

10          Mr. Furniss says, well, the output of those are both

11   two-bit signals.  Your Honor, there is nothing, there is

12   nothing that says a two-bit signal is particularly relevant.

13   The idea that there is a two-bit output of both the

14   convolutional encoder in this case and the TCM encoder has to

15   do with the kinds of data communications that we are doing

16   here.  That is not a particularly relevant fact.

17          MR. FURNISS:  That is a very non-specific response,

18   Your Honor.  Our experts say that the inputs and outputs are

19   exactly the same.  None of their experts say that the inputs

20   and outputs of a 1/2 rate TCM encoder and a 1/2 rate

21   convolutional encoder are different.  They could have, and

22   they won't do it.  They would never talk about the 1/2 rate

23   because they know that it is the same.

24          And Mr. Cordell -- you asked him where is the

25   evidence?  He is very well-prepared, so where is the evidence

1    that it makes any difference?  We have three experts who say

2    it makes no difference.  And there is just two bits coming

3    out.  It is not a symbol.  In the CSIRO there is a mapper

4    later on in the chain.  It is a QPSK encoder, so that is later

5    on in the chain.  It is not mapped in the 1/2 rate TCM

6    encoder.  This is an entirely theoretical argument, and I will

7    say it again, if they can point to any expert who says there

8    is any difference in performance -- that is what Your Honor

9    said he wanted to hear in the Buffalo case, and you didn't

10   hear it.  You haven't heard it here today either.  You have

11   just heard this theoretical argument that it could be

12   different, but it is not.  And it is a fact.

13          And, again, they have three experts on this and they

14   were all deposed and they all wrote long reports and they all

15   could have said there is a difference in the particular

16   embodiment and none of them did it and we have asked twice now

17   for the evidence that it makes any difference whatsoever and

18   you haven't gotten it.  You have just gotten vague

19   generalities, and that is what they want to do to the jury is

20   bamboozle them with something they are not going to

21   understand.  Unless they can say that it is not a TCM

22   encoder -- if it said a TCM encoder, it would be different.

23   It says a half-rate TCM encoder in which the mapper, as Dr.

24   Monsen says is trivial.  It is the equivalent of multiplying

25   by one.  It makes no difference.

1           The argument that it won't work is belied by the

2    fact that defendants' devices all work and use exactly this

3    structure, so there is simply no evidence.  You can't create a

4    material issue of fact by talking generalities.  And, perhaps,

5    you should try a third time, but where is the evidence?  They

6    won't talk about a half rate.  That is why Dr. Wicker wouldn't

7    talk about a half rate because he couldn't.  He was too

8    honest.  The others were honest, too.  They just talked

9    theoretically; it could make a difference, it could make a

10   difference.

11          Euclidean distance, when you have only got two bits,

12   the Euclidean distance is derogare.  There is no issue there.

13   There is nothing to map.  There are no uncoded bits coming out

14   of the half-rate convolutional encoder.  There are no uncoded

15   bits coming out of the half-rate TCM encoder, so there is no

16   issue of fact here.  It is just all generalities.  And our

17   experts were very specific.  And unless they can meet it, it

18   doesn't create a question of fact.

19          On interleaving, that is a claim construction issue.

20   It is a dependent claim.  Your Honor has found that bits

21   equals blocks and that blocks can be single bits, which means

22   that you can understand the structure.  The di-bit interleaver

23   is the one that is appropriate for QPSK modulation, but the

24   argument that you can't change the interleaving scheme is

25   totally untrue because you just undo the order.  As long as

1   the receiver knows the original order it doesn't matter.  You

2   do need to separate them; but as long as the algorithm on the

3   receive side is the same as the algorithm on the send side,

4   you put them back together, you get to exactly the same place.

5          But this is precluded by claim construction.  That

6   has already been decided, affirmed by the Federal Circuit.

7   That is a question of law for the Court on claim construction,

8   so that one, it seems to me, has already been decided.

9          Finally, as far as the 4,000, their own experts said

10  that 800 nanoseconds was the largest delay spread he could

11  find in a factory building.  So the idea that somewhere in the

12  world there is some possibility of it being longer is simply

13  not true.

14         THE COURT:  Okay.  Thank you.

15         All right.  CSIRO's motion for summary judgment of

16  infringement is going to be taken under advisement.  CSIRO's

17  motion for inequitable conduct, Docket No. 376 in the 549 case

18  and 442 in the 550 case and 324 in the 551 case, is denied.

19         MR. CORDELL:  Your Honor, could I just ask for a

20  30-second rebuttal just because Mr. Furniss --

21         THE COURT:  All right.

22         MR. CORDELL:  -- threw the spear in the sand.  I

23  disagree with him.  Williams and Bims both addressed the very

24  issue he is asking about, whether we show additional data

25  reliability means -- or data reliability enhancement with TCM.

1          But I am pointing again back to the patent.  The

2     patent itself tells us that.  The patent tells us that TCM

3     gives you improved error-correction capability.  That is what

4     CSIRO wrote in its patent.  We don't have to go to any expert,

5     we don't have to go anywhere outside the patent.  It is right

6     there.

7          Also recall that the TCM encoder that they are

8     talking about here is systematic.  One of the bits that comes

9     in gets preserved on the output.  That is not true for the

10    accused convolutional encoders.  So when Mr. Furniss talks

11    about the Euclidean distance and the Hamming distance, I am

12    sorry we even got into that because we know fundamentally

13    these two things work in a different way.  So all of his

14    comments were relating to the result that might be achieved,

15    but he has ignored the structure itself and the way that they

16    operate.  He has got to address that if he wants to make out

17    equivalents under 112, paragraph 6.

18         Thank you.

19         THE COURT:  All right.  I believe that deals with

20    all of the summary judgments.  Am I correct?  Anybody have

21    anything else?

22         All right.  The final thing I have on my list are

23    objections to exhibits and depositions, and I am going to

24    instruct the parties to get together and meet and confer on

25    those and try to get those boiled down.  I'm going to instruct

1   you to have somebody with authority there in those

2   meet-and-confers that can make the decisions.  Let's get this

3   thing boiled down to really the exhibits and deposition --

4   depositions that are really going to be introduced into the

5   case.

6          I'm not going to rule on any of this line by line.

7   If the parties need any general guidance as to questions, I

8   will be glad to provide that if you have particular areas that

9   you think need some direction in.

10          MS. ANDERSON:  Thank you, Your Honor.  This is

11   Christa Anderson for Intel.  Your Honor, we would appreciate a

12   little bit of guidance on one issue related to exhibit

13   objections which I raised with CSIRO's Counsel a few days ago.

14          Just to give the Court a little bit of history why I

15   am asking for help here, in October of last year we issued a

16   30(b)(6) notice to CSIRO asking for testimony on a number of

17   subjects.  One of those subjects was to ask CSIRO to put up a

18   witness to testify about any facts CSIRO might be aware of

19   that relate to whether or not a particular prior art reference

20   is a printed publication.

21          We did this for a number of reasons.  CSIRO attended

22   conferences where patents have been presented, et cetera.  We

23   believe they have knowledge.  We engaged in a long series of

24   meet-and-confers with CSIRO's Counsel.  They did not want to

25   put up a witness on that topic and we negotiated and agreed

124

1   that they could instead simply respond to an interrogatory

2   that we agreed on the language of.  And the interrogatory

3   basically said CSIRO please tell us to the extent that you

4   dispute that one of our pieces of prior art is a printed

5   publication, state any facts that you are aware of that either

6   support publication or suggest that it wasn't published,

7   anything you might have in your knowledge.  And we have tried

8   very hard to get full and complete answers out of CSIRO to

9   that interrogatory to put to rest this issue that has been

10  going on for months.

11       We received the last round of their responses from

12  CSIRO over the weekend, and it still does not respond fully to

13  this interrogatory, and we really believe, just like we are

14  entitled to know which products are actually being tried in

15  this case, we need to know if they have facts that relate to a

16  printed publication or if they can stipulate, great.  But if

17  they are going to dispute the fact of printed publications, we

18  are entitled to know facts in their knowledge.  We would

19  really appreciate if CSIRO's Counsel could provide that

20  information.  Any assistance the Court might give us would be

21  very much appreciated.

22       MR. FURNISS:  We stipulated to over 30 references as

23  being prior printed publications; and on the rest -- the

24  interrogatories say we don't have any information.  These are

25  the references that they dug up.  It is their burden.  And we

1    have said -- for example, there is a conference paper.  We

2    have said you have got to prove that it was there -- CSIRO

3    doesn't have any information.  If anyone was there, they don't

4    remember it.  But there is no further information about it.

5    We stipulated to over 30, I believe, and we stipulated to

6    every one that we had any information on.

7           The other thing, of course, is that this 30(b)(6)

8    was issued on the last day of discovery after all of our

9    people had been deposed.  We brought a lot of them here.  Went

10   to Australia.  Everybody was deposed for two days.  And all of

11   a sudden a new interrogatory that says tell us everything you

12   know about printed publications.  But the answer is we have

13   told them everything we know about printed publications

14          MS. ANDERSON:  Two quick points in response.  First

15   of all, the interrogatory response CSIRO has provided is not

16   complete.  They do stipulate to certain things as printed

17   publications, but what they don't tell us -- which is what we

18   have been trying to get at for months now -- is to the extent

19   that you dispute and you actually have facts that might

20   support the fact of publications, narrow references -- we

21   know their representatives were at conferences where the

22   papers were presented.  We want your facts in an interrogatory

23   response.  If you won't put up a witness in depo, what is

24   there within the scope of your knowledge.

25          We know CSIRO has been investigating which ones were

1    printed publications and have searched libraries and gathered

2    facts -- some of which we only learned of after the close of

3    discovery.  This seems to be simple.  If CSIRO has no facts

4    within the scope of their knowledge, they should be required

5    to state --

6              THE COURT:  I think he just did.

7              MR. FURNISS:  I did, Your Honor.

8              MS. ANDERSON:  Thank you, Your Honor.  In the

9    interrogatory response CSIRO does not state that -- given what

10   we have learned from the informal conversations we have had

11   and from other depositions, we know they have facts about some

12   of these disputed publications yet won't put them in a

13   response.

14             MR. FURNISS:  We have said they put out a piece of

15   prior art -- and as I said we have stipulated to 30 of them.

16   It is clear they were public, but the idea there is any

17   information, at best it is their burden so it is a contention

18   that you haven't proven it as a printed publication.  How do

19   you prove a negative?  In other words, a reference we have

20   never seen, we don't have any witness going to take the stand

21   and say I was at this conference and it wasn't given out, no

22   such -- not aware of any such information.  Our interrogatory

23   answer does state we have given them everything.  They are

24   trying to shift the burden to us to prove there weren't

25   printed publications, but there is nothing further there.  My

 1    people don't recollect some conference in 1992.

 2              MS. ANDERSON:  Your Honor, we absolutely are not

 3    trying to shift the burden.  If it were a defense to discovery

 4    to say it is not my burden not to answer your interrogatory,

 5    we wouldn't have answered a lot of interrogatories in this

 6    case.  All we are asking for is a single reference -- and it

 7    was stated about this big conference.  They don't make any

 8    reference at all in their interrogatory response to that.  We

 9    know they have inquired about the Shu reference.  They make no

10    reference to it.  We are simply requesting a response.  As for

11    the timing of when we issued notice, CSIRO issued depo notices

12    after we did.

13              THE COURT:  Well, it sounds to me like you have an

14    answer.  You may have suspected something else is out there.

15    Mr. Furniss is saying there is not.  At the time of trial they

16    are going to be held to their interrogatory answer.  If he

17    comes in with something else that he knew about earlier, he

18    won't be allowed to put it in.

19              MS. ANDERSON:  Thank you, Your Honor.

20              THE COURT:  Understood?

21              MR. FURNISS:  Yes, Your Honor.

22              THE COURT:  Any other general guidance that I can

23    give you other than deposition and --

24              MS. ANDERSON:  We are working hard trying to work

25    them all out.

 1          THE COURT:  Very good.  Is there anything else from

 2   plaintiffs that they would like to bring to the Court's

 3   attention or need any guidance on by way of pretrial?

 4          MR. FURNISS:  There are some issues in the limine

 5   motions, but I assume that is a new topic.

 6          THE COURT:  Oh, yeah.  Okay.  What else other than

 7   that?

 8          MR. VAN NEST:  I have one simple thing, Your Honor,

 9   and that is just to inquire of the Court, is it the Court's

10   plan to play the Judicial Center patent video to jurors?

11          THE COURT:  It will be played for the jury before.

12          MR. VAN NEST:  Play that before openings?

13          THE COURT:  Right.  It will be played before voir

14   dire to the entire panel.

15          All right.  What do we have by way of limines?  Are

16   they pretty extensive?  Are y'all still meeting and

17   conferring?  Does that need to be resolved today prior to voir

18   dire.

19          MR. GILCHRIST:  Your Honor, we did -- Ms. Anderson

20   and I were up late last night.  We do have quite a few

21   agreements that we have made.  I am Greg Gilchrist, by the

22   way.  It is a pleasure to be here.  We can, I think, continue

23   working if you would rather us to do that and perhaps submit

24   some sort of joint brief about what is left in dispute.  There

25   are quite a number of the plaintiffs' motions in limine that

1   have been worked out.  We have agreed to some of theirs, but

2   there is still 15 or 20.

3           THE COURT:  But I guess my question is, do all of

4   these need to be resolved prior to voir dire?

5           MS. ANDERSON:  No, Your Honor.

6           MR. GILCHRIST:  I don't believe so, no.  And your

7   rulings today will help us resolve --

8           THE COURT:  Why don't y'all -- excuse me, Mr.

9   Furniss, go ahead.

10          MR. FURNISS:  Well, there is one I think that needs

11  to be resolved probably just so the parties can prepare, and

12  that is the defendants want to prohibit any reference to speed

13  or anything to do with the patent itself.  They have made a

14  motion to say you can't talk about a high-speed wireless LAN,

15  you can't refer to speed.  Now, it is very difficult for us to

16  prepare the case and, frankly, it is a summary judgment motion

17  because the entire object of this invention is to come up with

18  a high-speed wireless LAN.  There were slow-speed wireless

19  LANs going back.  That one I really think should be denied.  I

20  don't understand it.

21          MR. VAN NEST:  Your Honor, there are a number of

22  them that I think need to be resolved before opening but not

23  before voir dire.  What we would suggest is, perhaps, we need

24  to continue the meet-and-confer process.  We have agreement on

25  a lot of them but certainly not all.  There are several

1   important ones that need to be decided.  Maybe we could get an

2   hour or so of the Court's time that week of the 6th -- between

3   the 6th and 13th to resolve anything --

4           THE COURT:  I understood Mr. Furniss to say that he

5   is concerned about this high-speed issue with regard to voir

6   dire.

7           MR. VAN NEST:  I don't think it has anything to do

8   with voir dire.

9           MR. FURNISS:  Well, in doing things like estimating

10  witnesses.  There is an awful lot preparation.  This one is so

11  fundamental.  As I say, if we can't talk about speed that is

12  the object of the invention, I don't know how to comply with

13  the Court's ruling on witnesses if that is going to be the --

14          MR. VAN NEST:  We can certainly argue that one, Your

15  Honor.

16          THE COURT:  All right.  Go ahead.

17          MS. ANDERSON:  Yes, Your Honor.  The quarrel that we

18  have with what CSIRO appears to be intending to do at trial is

19  that instead of addressing the actual limitations of the

20  claims and using those as the nexus for arguing things like

21  secondary considerations and the like for invalidity, CSIRO

22  treats the patent as if it is about power and consumption and

23  size and speed.  It is not.

24          And there are witnesses such as Dr. Bantz who

25  acknowledge that all of the limitations of the patent existed

1   in the prior art before he supposedly saw and heard about

2   CSIRO's invention in 1992; yet he says while these elements

3   have existed in the prior art before, CSIRO had some new way

4   of doing it that was fast or was good in regards to the power

5   consumption and you know was small, could be built inside of a

6   small structure.

7          None of those are limitations of the claims, and

8   that kind of evidence will mislead the jury into believing

9   that what CSIRO's patent is about is about building a small

10  chip that doesn't use a lot of power.  That is not claimed by

11  this invention.  What is claimed by this invention is

12  particular techniques, multicarrier modulation, di-bit

13  interleaver, TCM encoder.  That is the only kind of

14  limitations that matter in terms of assessing things like

15  secondary considerations of non-obviousness, yet many of the

16  witnesses, especially Dr. Bantz, all of his testimony revolves

17  not around the limitations but about his argument that CSIRO

18  had somehow built some kind of prototype or idea for how to do

19  something that already existed in the art before.

20         That is 403.  That is misleading because what CSIRO

21  would like to say is we have come up with some special way to

22  build a smaller chip.  That was not the patent.  And to

23  mislead the jury that way distracts the jury from the real

24  issue.  The real issue is whether or not those limitations

25  existed together in the art beforehand; and to suggest that

1    some special power relationship or size of the chip is what

2    CSIRO's invention was, will completely confuse this jury and

3    be very prejudicial to defendants.

4           THE COURT:  Response?

5           MR. FURNISS:  Your Honor, my motion is directed to

6    speed.  Now, the questions about power consumption and those

7    kinds of things were part of the reason why Dr. Bantz didn't

8    think it would work, but that is his point.  But speed is the

9    object of this invention.  In other words, we can't even talk

10   about the patent.  This is why the patent is an improvement.

11   The evidence will show that everyone else was using a single

12   carrier.  Not an OFDM.  Not a multicarrier system.  There will

13   be Extensive evidence that people rejected it for a variety of

14   reasons.  In fact, in a huge conference in 1996 no one even

15   mentions it.

16          So the issue here, the improvement in this patent is

17   to go multicarrier, which no one else did; no one.  And if we

18   can't talk about the speed -- that is the object of the

19   invention.  You might as well just throw the patent away.

20          THE COURT:  Are you opposed to them talking about

21   speed?

22          MS. ANDERSON:  Well, yes to the extent his witnesses

23   are suggesting that is CSIRO's invention.  That is not CSIRO's

24   invention.  The invention is defined by the limitations.

25   Speed has nothing to do with this invention.  It is not a

1    claim.  It is not one of the limitations of any claim.  And to

2    suggest to the jury that CSIRO's invention was so novel and

3    special because it was fast, is telling the jury that there is

4    a limitation there that doesn't exist.  There is nothing in

5    this Court's claim construction about speed, and there

6    shouldn't be because there is nothing in the limitations about

7    it.

8         And if CSIRO's Counsel argues to the jury that what

9    was novel about this invention is speed, that is extremely

10   misleading and very prejudicial to the defendants when that is

11   not an element, especially when we are trying at the same time

12   questions about invalidity.  There were many prior art

13   references that disclosed the combination of these techniques,

14   including multicarrier modulation.  And CSIRO suggesting to

15   the jury that this patent is about speed, will lead the jury

16   to think, oh, if that prior art wasn't particularly fast, I

17   guess it doesn't anticipate and I guess it isn't an obvious

18   combination.  That, again, is very misleading to the jury in

19   403 and prejudicial to the defendants.  Nothing in the patent

20   says speed.  Now, to suggest that it is will lead certainly to

21   the jury to look at the prior art and say, well, where is the

22   speed, I need to compare speed, they simply can't do that

23   because there is no limitation to that effect.

24        MR. FURNISS:  Your Honor, Ms. Anderson is confusing

25   the claims and how you execute it from the object of the

134

1    invention.  In Column 1 of the patent, Line 50, "Such wireless

2    LANs are known; however, hitherto, they have been restricted

3    to low-data transmission rates.  In order to achieve

4    widespread commercial acceptability, it is necessary to have a

5    relatively high transmission rate."  That is the whole

6    purpose.  You don't do this invention.

7              Now, it is clearly relevant -- I agree on

8    anticipation because you look at the claims, speed is not

9    relevant.  But on obviousness speed is very, very relevant.

10   The Harris modem that they want to say renders the patent

11   obvious had a maximum bit rate of 2400 bits, not kilobits, not

12   megabits; 2400 bits.  So they want to preclude us from arguing

13   that someone of skill in the art would look to a very, very,

14   very slow outdoor system in order to develop a very, very,

15   fast indoor system when at the time there were indoor systems

16   that went a thousand times faster than the Harris modem.  That

17   is clearly a relevant argument.

18             The other argument on speed is that is why this is a

19   commercial success.  That is why it is used all over the world

20   because it is faster.  So it is not in the claims, but the

21   claims are what allow you to achieve that result.  So it is

22   highly, highly relevant.  To not talk about speed, how are you

23   going to even explain the multipath problem.  If you go slow

24   enough, there is no multipath problem.

25             THE COURT:  All right.  The motion in limine is

1    denied as to that particular one.  Any others that you need

2    guidance on?

3            All right.  Y'all meet and confer.  We are set for

4    jury selection on the 6th.  Why don't you have into me by the

5    preceding Thursday at noon what your -- where you are on your

6    objections and kind of a status report as to what is agreed to

7    and what is still at issue.  And I may try to make some time

8    available after jury selection to deal with whatever is left.

9    Okay?

10           MR. CORDELL:  Your Honor, if I could just seize the

11   floor for a moment.  Mr. Furniss asked me to respond to a

12   direct question.  I want to make sure that I do that without

13   leaving today.  In the Bims Declaration at Paragraph 66

14   through 71, which is attached to our opposition, is one

15   example where they specifically address that 1/2 TCM question

16   that he asked.

17           THE COURT:  Okay.  Thank you.

18           Anything further?

19           MR. FURNISS:  No, Your Honor.

20           THE COURT:  All right.  Very well.  The attorneys in

21   the CSIRO case will be excused.  The attorneys in the Nissan

22   case, if I could see you in chambers.

23       (End of hearing.)

24

25                   C E R T I F I C A T I O N

1

2    I certify that the foregoing is a correct transcript from the

3    record of proceedings in the above-entitled matter.

4

5

6    /s/ Shea Sloan

7    SHEA SLOAN, CSR, RPR
     OFFICIAL COURT REPORTER
8    STATE OF TEXAS NO. 3081

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25