IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| COMMONWEALTH SCIENTIFIC AND | ) | |
| INDUSTRIAL RESEARCH | ) | |
| ORGANISATION, INC. | ) | DOCKET NO. 6:06cv324 |
| | ) | |
| -vs- | ) | |
| | ) | Tyler, Texas |
| BUFFALO TECHNOLOGY, INC., | ) | April 14, 2009 |
| ET AL | ) | 5:00 p.m. |

| | | |
|---|---|---|
| MICROSOFT CORPORATION, ET AL | ) | |
| | ) | DOCKET NO. 6:06cv549 |
| -vs- | ) | |
| | ) | |
| COMMONWEALTH SCIENTIFIC AND | ) | |
| INDUSTRIAL RESEARCH | ) | |
| ORGANISATION, INC. | ) | |

| | | |
|---|---|---|
| COMMONWEALTH SCIENTIFIC AND | ) | |
| INDUSTRIAL RESEARCH | ) | |
| ORGANISATION, INC. | ) | DOCKET NO. 6:06cv550 |
| | ) | |
| -vs- | ) | |
| | ) | |
| TOSHIBA AMERICA, ET AL | ) | |

| | | |
|---|---|---|
| INTEL CORPORATION, ET AL | ) | |
| | ) | DOCKET NO. 6:06cv551 |
| -vs- | ) | |
| | ) | |
| COMMONWEALTH SCIENTIFIC AND | ) | |
| INDUSTRIAL RESEARCH | ) | |
| ORGANISATION, INC. | ) | |

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES DISTRICT JUDGE

```
 1                    A P P E A R A N C E S

 2              (SIGN-IN SHEETS DOCKETED IN EACH CASE)

 3

    COURT REPORTERS:      MS. KIMBERLY JULIAN
 4                                      MR. D. KEITH
    JOHNSON
 5                        CURRY JOHNSON JULIAN, INC.
                          CERTIFIED SHORTHAND REPORTERS
 6                        P.O. BOX 270
                          TYLER, TEXAS  75710
 7

 8   PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY,
     TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**CSIRO v. Intel, et al. - RAND Bench Trial**                    **April 14, 2009**

```
 1                    P R O C E E D I N G S
 2              (Following close of jury trial:)
 3              THE COURT:  All right.  Mr. Jones, you
 4   may proceed.
 5                    ALBERT PETRICK,
 6   having been duly sworn, testified as follows:
 7                        EXAMINATION
 8   BY MR. MIKE JONES:
 9        Q    Mr. Petrick, would you please just state your
10   name for the record real quick.
11        A    Albert A. Petrick.
12        Q    Mr. Petrick, are you familiar with what a
13   Letter of Assurance is?
14        A    Yes.
15        Q    And what is a Letter of Assurance?
16        A    That's a legal document that the IEEE has in
17   place for companies that have proposals with
18   intellectual property that's being considered as a part
19   of the standard.  It basically outlines the terms and
20   conditions for a Letter of Assurance.
21        Q    And on occasions do chairmen of the committees
22   for the various applicable 802.11 standard committees
23   send out requests for such letters?
24        A    Yes.
25        Q    Thank you, sir.
```

4

1          Now, I would like to direct your attention to

2    the last exhibit in your notebook which I think has

3    already been admitted in evidence.  This is a printout,

4    is it not, of all the Letters of Assurances that have

5    been given with regard to all the 802.11 standards and

6    the inventors, true?

7          A    Yes.

8          Q    Now, we won't go through all of those.  But

9    let me ask you this:  Why does the patent policy of the

10   IEEE request that those be given?  Why are they

11   important?

12         A    Well, they're important for several reasons,

13   one of which is if they're -- there is a piece of a

14   proposal that -- that has got intellectual property tied

15   to it, the standard requires that the LOA is put in

16   place prior to the approval of that particular standard.

17         Q    Do members such as yourself on these various

18   committees rely upon these letters?

19         A    Yes.

20         Q    Are they important to you when you vote?

21         A    They are important, because we would like to

22   know, you know, if there's a RAND commitment associated

23   with that or if there is a RAND-z commitment associated

24   with that.

25         Q    Now, if you know about intellectual property

1    and you cannot get such a letter, would that affect the

2    way you would vote when you have been a member on these

3    intellectual committees?

4                    MR. FURNISS:  Object, calls for

5    speculation, Your Honor.

6                    THE COURT:  Overruled.

7         A    Yes.

8    Q    (By Mr. Mike Jones) And what kind of effect did

9    that have?

10        A    Well, a couple things.  When we're looking at

11   a particular proposal, we want to understand, you know,

12   if there's a royalty involved, if there's a licensing

13   fee that may affect the value of a particular proposal

14   if someone was to implement it.

15        Q    Has your company in the past provided Letters

16   of Assurance?

17        A    Yes.

18        Q    Why would they provide Letters of Assurance,

19   sir?

20        A    Well, the Letter of Assurance that we provided

21   at Harris Semiconductor in this particular case for .11b

22   was a RAND-z and a RAND commitment.  And the purpose of

23   that was for the modulation we provided a RAND-z

24   commitment.  And we were in the business at that time to

25   develop chipsets, and we felt that the modulation would

1    allow companies and individuals to go out and build

2    products to that particular standard without, you know,

3    being at the risk of any royalties of that sort.

4            On the RAND side of the commitment what we did

5    was if we had a particular implementation, we were

6    trying to protect anyone doing a copycat of our

7    particular implementation, we thought that that was

8    satisfied under a RAND commitment.

9        Q    Now, when you were working as a committee

10   member on the 802.11 standard committee, are you allowed

11   to consider pricing?

12       A    No, not absolute value.  We could not discuss,

13   you know, the actual dollar figure, if you will.

14       Q    You cannot discuss and you do not discuss what

15   the products would cost that might be subject to the

16   standard, right, sir, or how they would be priced?

17       A    We can discuss the relative, but we cannot

18   discuss dollar figure.

19       Q    Thank you, sir.

20            Do you consider, though, costs such as IP

21   costs that might be incurred in implementing the

22   standard?

23       A    Yes.

24       Q    Now, are you aware of any situations or

25   circumstances where excessive demands for IP have

1    affected the deliberations of an IEEE standards

2    committee?

3         A    Yes.

4         Q    And what occasions do you know of, sir?

5         A    There was a situation back in the development

6    of 802.11a that was a proposal from Lucent and it had to

7    do with the fact that Lucent had a licensing fee

8    attached with a royalty associated with that as well on

9    the product costs.

10        Q    Now, I would like to direct your attention to

11   the notebook, again, Exhibit 854.

12                  MR. MIKE JONES:  And Your Honor, I will

13   move for the admission of 854 for purposes of the RAND

14   trial only.

15                  THE COURT:  Any objection?

16                  MR. FURNISS:  No objection.

17                  THE COURT:  Be admitted for the Court

18   only.

19                  MR. MIKE JONES:  Thank you, Your Honor.

20        Q    (By Mr. Mike Jones) And I would direct your

21   attention to page 317 of this document.  Does this begin

22   a discussion of what was going on in connection with the

23   circumstances you were just describing?

24        A    Yes.

25        Q    And here Mr. Baker in these minutes -- these

CSIRO v. Intel, et al. - RAND Bench Trial                     April 14, 2009

```
 1    are actual minutes of a meeting, right?
 2         A    Yes.
 3         Q    Does he indicate that he concerned about IP
 4    costs and it's affecting the cost?
 5         A    Yes.
 6         Q    It's affecting the weight; is that correct,
 7    sir?
 8         A    Yes.
 9              THE COURT:  Now, let me ask a question
10    here.  The reference that will be difficult to anyone
11    other than Lucent, is that because Lucent had acquired
12    Radiata and had the license?
13              THE WITNESS:  No.
14              THE COURT:  Why would it be difficult for
15    anyone other than Lucent?
16              MR. MIKE JONES:  Can I explain, Your
17    Honor?
18              THE COURT:  I would rather for the
19    witness.
20              THE WITNESS:  Could you restate the
21    question?
22              THE COURT:  Why would it be difficult for
23    anyone other than Lucent, I mean, what was it that was
24    special about Lucent that it would not be difficult for
25    them?
```

```
 1                    THE WITNESS:  Because they actually had
 2    the weight form developed themselves.
 3                    THE COURT:  Go ahead.
 4    Q    (By Mr. Mike Jones) Was there any relationship
 5    between Lucent and Radiata, sir?
 6         A    No.
 7         Q    And does this refer in any way to the Radiata
 8    or the '069 patent, sir?
 9         A    No.
10         Q    Was this other technology that Lucent had?
11         A    That's correct.
12         Q    Thank you, sir.
13                    THE COURT:  Thank you.
14    Q    (By Mr. Mike Jones) And if I could, I'm not going
15    to belabor this point and go through it, but these are
16    minutes of the station that went on where this
17    particular IEEE committee is discussing and talking
18    about IP costs in the way it affects your voting with
19    regard to this standard, right, sir?
20         A    Yes.
21         Q    And just not to belabor the point and try to
22    get through this, the judge will have this before you
23    and I'm not going to go through it, I would just ask
24    you, what was the resolution?  How did this particular
25    situation work out?
```

1        A     Relative to the IP costs?

2        Q     Yes, sir, exactly.  What I'm trying to say is,

3    obviously we could go through this and we could go point

4    by point a debate over IP costs and how it affected,

5    right, sir?

6        A     Yes.

7        Q     Could you just summarize for us and tell us

8    what happened?  You were there, you participated in it.

9        A     Yes.  The Lucent particular LOA had come in at

10   a $10,000 cost for the five percent royalty in the end

11   product that was being sold.  There was a lot of

12   controversy on the floor in that whole subject matter.

13   And in return, Lucent had retracted that particular LOA

14   and kickback and decided to submit an LOA that was a

15   percentage or five percent royalty based on the

16   implementation at the chip level, not at the product

17   level.  And the rationale that was behind that was

18   because the technology was actually implemented in the

19   semiconductor device itself.

20       Q     Now, I would like to direct your attention to

21   the next occasion that you can tell us about that you

22   know of where IP costs affected the deliberations to the

23   standard or affected the standard itself?

24       A     Another example was when we were developing

25   the first one- and two-megabit-per-second standard, we

CSIRO v. Intel, et al. - RAND Bench Trial                        April 14, 2009

1    were getting close to closure on that, and there was a

2    concern that there wasn't any security involved and

3    wrapped into the standard itself.

4          And with the time constraints of getting the

5    standard completed, the only solution that we had at

6    that time was RSA Security.  So it was a security

7    algorithm that was actually adopted within the standard.

8          As part of that, RSA Security had put forth a

9    Letter of Assurance that put their -- that identified

10   their licensing terms and they broke it out into various

11   segments, including a one-time licensing fee with no

12   royalty.

13   Q    Now, I would like to direct your attention to

14   Defendant's Exhibit 853, if you would look at it here?

15             MR. MIKE JONES:  And Judge, for purposes

16   of the bench trial, we would move for admission of 853.

17             THE COURT:  Any objection?

18             MR. FURNISS:  No objection.

19             THE COURT:  Admitted.

20   Q    (By Mr. Mike Jones) And is this -- 835 is the

21   letter that RSA Data Security sent in reference to this

22   controversy, correct?

23   A    Yes.

24   Q    And what kind of fees did they charge?

25   A    Well, there were fees ranging from 5,000 to

1    70,000 for prepaid licensing fees with a royalty

2    associated on a per unit for implementing that

3    particular security algorithm based in implementing in

4    either software or hardware.

5              And they also had another option which was a

6    one-time fee per company with no royalty for a value of

7    125,000.

8         Q    Thank you, sir.  Finally --

9              THE COURT:  Excuse me, Mr. Jones, what

10   was the royalty rate?

11             THE WITNESS:  There was no royalty rate

12   on that.  There was particular -- these were just

13   various options.

14             In particular, at Harris Semiconductor

15   our engineers took a look at that and what it would take

16   to actually implement this particular security algorithm

17   and hardware, and from a business perspective when we're

18   looking at, you know, what it's going to cost, a typical

19   business plan you would set up is to deliver either a

20   million units or 5 million units over a two- or

21   three-year period.  And when you amortize that 125,000

22   over 5 million units, you're talking a couple of cents.

23             THE COURT:  I thought you were talking

24   about there were two options; one was the one-time fee

25   of 125,000 the other one was a 5 to $7,000 fee plus a

1    royalty?

2                    THE WITNESS:  Yes, that's right.  Those

3    were the two options.  One was 125,000 with no royalty,

4    and the other one was a licensing fee from 5, 15, 35 and

5    75, 70,000 with a per-unit royalty that was ranging

6    anywhere from a dollar to 25 cents per unit.

7                    MR. MIKE JONES:  And Your Honor, if the

8    Court would like, I have that royalty schedule right

9    here.

10                    THE COURT:  Okay.  Let me ask on this

11   one, what were the units selling for?

12                    THE WITNESS:  Back then, anywhere from 40

13   to $50 per chipsets.

14                    THE COURT:  Thank you.

15   Q    (By Mr. Mike Jones) Directing your attention to

16   your work on the 802.11 committee, particularly "a" and

17   "g" committees, with regard to that, what affect would

18   it have to you as a committee member if you had known

19   that somebody was paying a multi-dollar royalty on those

20   types of products?

21        A    It would make me have reservation on selecting

22   that particular proposal.

23        Q    And why was that?

24        A    Well, not knowing what -- not knowing what

25   their actual royalty rate was or if I did know what

1    their royalty rate was, it raised concern on how well

2    this would actually sell in the market and if I could

3    actually be competitive in the market for the particular

4    licensing fee.

5              MR. MIKE JONES:  Your Honor, we would

6    also like at this time to introduce, with regard to IEEE

7    minutes, Exhibit 899 which are IEEE minutes, Exhibit

8    0368, Exhibit 898 and Exhibit 0900.  And these, again,

9    are merely for the purposes of the RAND trial.

10             THE COURT:  Any objection?

11             MR. FURNISS:  I object, Your Honor.

12   These were not identified prior to this afternoon.

13             MR. MIKE JONES:  I'll be happy to do it

14   at another time.

15             THE COURT:  All right.  Y'all try to get

16   together on these exhibits for the RAND trial and let's

17   try to do them the same way instead of taking them one

18   at a time.  Go over them and let's just get them offered

19   and in.

20             MR. MIKE JONES:  Thank you, Your Honor.

21             I pass the witness.

22             THE COURT:  All right.  Cross-exam.

23                  CROSS-EXAMINATION

24   BY MR. FURNISS:

25        Q    Good afternoon, Mr. Petrick.

```
 1        A     Hello.
 2        Q     Now, when the IEEE sends a Letter of
 3   Assurance, does it provide -- back in 1998, did it
 4   provide forms that the responder could use to respond to
 5   the request for a Letter of Assurance?
 6        A     Yes.
 7        Q     And there were three forms, were there not?
 8        A     I don't remember the number of forms.
 9        Q     Do you recall there were forms that said we'll
10   allow you to use the patent without any charge, that was
11   one of the options; isn't that right?
12        A     Yes.
13        Q     And the other option was to agree to provide
14   licenses at reasonable and nondiscriminatory rates or
15   RAND; isn't that right?
16        A     Yes.
17        Q     Now, when someone agrees to a reasonable and
18   nondiscriminatory royalty, does that mean zero?
19        A     Reasonable and nondiscriminatory?
20        Q     Yeah.  Does it mean zero dollars per unit?
21        A     No.
22        Q     Does it mean five cents per unit?
23        A     Don't know.
24        Q     Ten cents?
25        A     Don't know.
```

**CSIRO v. Intel, et al. - RAND Bench Trial**                    **April 14, 2009**

```
 1          Q     Well, when a RAND letter is given, how will
 2     you expect -- because it's down the road if it happens,
 3     how will you expect the parties to reach an agreement as
 4     to a reasonable royalty?
 5          A     It depends on, you know, the -- I don't know.
 6          Q     Could they get together and try and negotiate
 7     a reasonable rate?
 8          A     Sure.
 9          Q     Now, do you know any of the history of CSIRO's
10     attempts to license this patent?
11          A     No.
12          Q     Are you aware that none of the defendants in
13     this room, prior to the initiation of this lawsuit,
14     offered any documents for this patent?
15          A     Prior to the --
16          Q     Prior to start of the litigation, are you
17     aware of none of the defendants that were contacted
18     offered anything, zero?
19          A     I was not aware of that.
20          Q     You're not aware of that?
21          A     Prior the start of this litigation?
22          Q     Yes.
23          A     I was not aware of that.
24          Q     Would you agree with me that if the buyer sets
25     the price, then it would almost always be zero?
```

```
 1          A      If the buyer -- I'm sorry?
 2          Q      Right.  If the buyers, if the people who were
 3     using the standard were unilaterally allowed to set
 4     whatever price they wanted, it would almost always be
 5     zero, wouldn't it?
 6          A      Yes.
 7          Q      And isn't that what happened here?
 8          A      Yes.
 9          Q      The entire industry got together and decided
10     that they weren't going to offer CSIRO anything; isn't
11     that what happened?
12          A      No.
13          Q      You don't know that?
14          A      No.
15          Q      Do you know anything about the history of
16     these negotiations?
17          A      No.
18          Q      So let me give you a hypothetical then since
19     you're presenting yourself as an expert in RAND matters.
20     What if the buyers of the standard, the users of the
21     standard get together and decide that they're not going
22     to offer anything, what does the RAND letter mean in
23     that situation?
24          A      It's whatever they come up with.
25          Q      Whatever the buyers come up with?
```

```
 1        A    Whatever has been negotiated between them.
 2        Q    Well, if a negotiation is we'll give you
 3   nothing, what does the patent holder do in that
 4   situation?
 5        A    That means you don't get nothing.
 6        Q    So the buyers collectively decide that the
 7   patent holder gets nothing; is that you're understanding
 8   of a RAND letter?
 9        A    No.
10        Q    Well, how would you deal with that situation?
11        A    I don't know.
12        Q    You mentioned the RSA situation.  In that
13   situation, the IEEE contacted RSA; isn't that right?
14        A    Yes, we did.
15        Q    And essentially said to them, unless you give
16   us a royalty we like, we're not going to put your
17   technology in the standard; isn't that right?
18        A    I don't know.
19        Q    Isn't that what happened with Lucent, if you
20   don't drop your royalty rate we're not going to use your
21   technology in the standard; isn't that what happened
22   with Lucent as well?
23        A    Yes.
24        Q    So in effect, the committee was in the
25   position to set the price of particular intellectual
```

1    property rights; isn't that right?

2        A    No, it wasn't.

3        Q    Well, they were able to tell Lucent, a huge

4    company, that they had to drop their royalty or they

5    would not be included in the standard, isn't the effect

6    of that to set the price for the patent rights?

7        A    But they didn't set the standard -- they

8    didn't set the price.

9        Q    Well, you just told me they withdrew their

10   Letter of Assurance.

11       A    They withdrew their Letter of Assurance and

12   they came back -- they, meaning Lucent, came back with a

13   new Letter of Assurance of something that was reasonable

14   for the group to accept.

15       Q    And what was that rate?

16       A    That was a five percent royalty on the

17   implementation cost.

18       Q    Now, do you recall that Bruce Tuch made some

19   comments to the group?

20       A    Yes.

21       Q    And was that when he said that they would go

22   to a five percent royalty on the chip?

23       A    Yes.

24       Q    So there was in effect a negotiation with

25   Lucent, wasn't there?

```
 1        A     There was a comment made by Lucent.   Nobody
 2   really negotiated.   Lucent basically came back with
 3   something that was acceptable to the group.
 4        Q     And they understood that if they didn't come
 5   back with something that was acceptable to the group,
 6   that the technology would not be incorporated in the
 7   standard; isn't that right?
 8        A     No.   Or they would have come back and looked
 9   at other alternatives or looked at ways to get that
10   particular standard under consideration.
11        Q     In other words, they would have designed
12   around Lucent technology, right?
13        A     It may have been.
14        Q     Now, there's been a lot of mention of the IEEE
15   website.   Are you familiar with that?   Did you hear that
16   testimony?
17        A     Yes.
18        Q     And on the IEEE website, the CSIRO patent is
19   listed, isn't it?
20        A     Yes, it is.
21        Q     And there's a contact person for CSIRO; isn't
22   that right?
23        A     Yes.
24        Q     And did anyone attempt to contact CSIRO and
25   say what would your royalty rate be just like they've
```

```
 1    done with RSA Security?
 2        A    That's the obligation of the chair or the
 3    patent committee.
 4        Q    Well, Mr. Hayes wrote a letter to CSIRO,
 5    right?
 6        A    Yes.
 7        Q    And CSIRO came back and said it would be
 8    reasonable, right?
 9        A    Yes.
10        Q    And what we have here is the respective
11    parties' difference of what the term "reasonable" means;
12    isn't that right?
13        A    Yes.
14        Q    And isn't it true that the IEEE itself takes
15    no position as to what is reasonable or not reasonable?
16        A    That's correct.
17        Q    So there was no contract or agreement between
18    CSIRO and the IEEE as to what reasonable would or would
19    not be, it would be set by negotiation; isn't that
20    right?
21            MR. MIKE JONES:  We object to this, Your
22    Honor.  He doesn't know what contract or agreements
23    there were.
24            THE COURT:  Overruled.
25        A    Can you repeat the question, please?
```

1    Q     (By Mr. Furniss) Isn't it true that there was no

2    agreement between CSIRO and the members of the IEEE that

3    would charge any particular royalty rate except one that

4    was, quote, reasonable?

5         A    It's not true, because I don't know if there

6    was any agreements between the members of the IEEE and

7    CSIRO.

8         Q    Well, in fact you know there are no such

9    agreements; isn't that right?

10        A    I don't know.

11        Q    Well, you were chairman of the committee.  Did

12   you ever hear there was such an agreement?

13        A    No.  I was not -- I was vice chairman, I

14   wasn't chairman of the committee.

15        Q    Sorry.

16             Now, if the letter says reasonable

17   nondiscriminatory, do you have an understanding what the

18   term "discriminatory" means?

19        A    Yes.

20        Q    And what does that mean?

21        A    It means that I can't license it for one price

22   to one individual or company and license and price to

23   another individual company.

24        Q    Is that to all companies or to

25   similarly-situated parties?

23

```
 1          A    I don't know.
 2          Q    And as far as reasonable, you don't know
 3     exactly how that would be set in any particular case
 4     either, do you?
 5          A    No.
 6          Q    And you don't know whether CSIRO was being
 7     reasonable or not being reasonable, do you?
 8          A    I do not.
 9          Q    And you don't know whether CSIRO was willing
10     to negotiate or not on a reasonable rate; isn't that
11     true?
12          A    That's true.
13          Q    Now, you've done negotiations, haven't you?
14          A    Yes.
15          Q    Do you start with your bottom line when you
16     make an offer to someone?
17          A    I do a number of things.
18          Q    Do you start with your bottom line when you
19     make an initial offer to some people?
20          A    Yes.
21          Q    You go right to the bottom, you never
22     negotiate; is that right?
23          A    I go with what's fair and reasonable in my
24     mind.
25          Q    What you think is fair and reasonable?
```

CSIRO v. Intel, et al. - RAND Bench Trial                    April 14, 2009

24

```
 1        A    Yes.
 2        Q    Do you have any reason to believe that CSIRO
 3   did anything different than that?
 4        A    I don't know.
 5        Q    So you don't have any opinion that CSIRO
 6   violated any commitment to the IEEE, do you?
 7        A    No.
 8        Q    And you don't have any reason to believe that
 9   CSIRO's patent rights should be restricted because of
10   its Letter of Assurance to the IEEE?
11        A    Can you repeat that?
12        Q    You don't have any reason to believe that
13   CSIRO's rights should be restricted or are restricted
14   because of its RAND letter to the IEEE?
15        A    No.
16             MR. FURNISS:  Pass the witness, Your
17   Honor.
18             THE COURT:  Redirect?
19                 REDIRECT EXAMINATION
20   BY MR. MIKE JONES:
21        Q    You said you didn't have any reason to believe
22   the rights were restricted by the RAND letter.  You
23   believe those RAND letters are important, right?
24        A    Yes.
25        Q    And you believe those are commitments that
```

1    should be kept, don't you, sir?

2         A    Yes.

3         Q    Thank you, sir.

4              Now, the business of the committee is to set

5    standards, right, not cost for IP?

6         A    That's right.

7         Q    And there is no obligation on the committee at

8    all to use any particular technology, right, they can

9    choose what they want to?

10        A    That's correct.

11        Q    And one of the things that you do consider and

12   often do consider is what IP costs and whether or not

13   RAND commitments have been made, right?

14        A    Yes.

15        Q    Thank you, sir.

16             MR. MIKE JONES:  I pass the witness, Your

17   Honor.

18             THE COURT:  Let me just ask a couple

19   follow-up questions.  Did the committee ever contact

20   CSIRO with regard to using -- going with this standard

21   or not going with this standard depending upon what

22   royalty they might charge?

23             THE WITNESS:  No.  The only contact that

24   they made with CSIRO, that I can recall, is in the last

25   year with respect to .11n, and that had to do with the

CSIRO v. Intel, et al. - RAND Bench Trial                    April 14, 2009

```
 1   fact that they were looking for a particular Letter of
 2   Assurance in the proper form.
 3                 THE COURT:  All right.  But in regard to
 4   this -- the letters that have been introduced as
 5   Plaintiff's Exhibit 87 and Defendant's -- let's see,
 6   Defendant's 887 and Plaintiff's 86, that was the only
 7   communication between the committee and CSIRO prior to
 8   the adoption of the standard?
 9                 THE WITNESS:  As far as I can recall,
10   yes.
11                 THE COURT:  Thank you.  All right.  You
12   may stand down.
13                 Who will be your next witness?
14                 MR. MIKE JONES:  Dr. Shoemake.
15                 May he be excused, Your Honor?
16                 THE COURT:  Yes.  He may be excused.  Any
17   objection, Mr. Furniss?
18                 MR. FURNISS:  No, Your Honor.
19                 THE COURT:  All right.  He can be
20   excused.
21                 MATTHEW SHOEMAKE,
22   Having been duly sworn, testified as follows:
23                 DIRECT EXAMINATION
24   BY MR. MIKE JONES:
25       Q    Dr. Shoemake, please state your name for the
```

1    record again.

2         A    Matthew Brendon Shoemake.

3         Q    Now, Dr. Shoemake, you were the chairman of

4    the 802.11g standards committee, right, sir?

5         A    Yes.  It actually goes by the name task group.

6    Yes, I was.

7         Q    Now, we have in evidence, the Court can

8    certainly see the patent policy of the IEEE.  But let's

9    go through it a little bit with regard to letters of

10   assurance.

11            If a person attends the committee meetings,

12   correct --

13        A    Yes.

14        Q    -- is the patent policy presented to them?

15        A    Yes, it is.

16        Q    How is the patent policy presented?

17        A    So at every meeting as a standing part of my

18   agenda, I had a set of slides, two or three slides that

19   I would put in front of the members to inform them that

20   there was a patent policy and go over key elements of

21   that policy and also to solicit their compliance with

22   that policy.

23        Q    Thank you, sir.  And as part of that policy,

24   does it tell people that if you know of any patents that

25   might be applicable in this area, you need to disclose

1      them to the committee?

2              A      Yes, absolutely.

3              Q      And it is based upon your request to the

4      people that are in attendance that you become

5      knowledgeable about patents as the committee chair; is

6      that correct?

7              A      Yes.  That's absolutely correct.

8              Q      And then if you become knowledgeable as

9      committee chair, do you then send them someplace -- send

10     notice to another part of the IEEE so that requests can

11     be made for letters of assurance?

12             A      So, yes, this can happen multiple ways, so I

13     would --

14             Q      Tell us how that would happen.

15             A      So this is how this happens.  I give the

16     presentation.  I inform the membership of the patent

17     policy of their duties as a member under these policies,

18     and I request at every meeting if they know of such

19     patents that may relate to -- to the standard to

20     disclose that.

21                    I actually pause in the meeting and ask --

22     they can come to the mike from -- there's a microphone

23     in there, and they could from the floor at that time

24     notify us.  We also make them aware that there is a

25     standard form that they can fill out, which may have

1    been what you're referring to.  There's a standard form

2    that they can also fill out and submit to us as well.

3    So they have multiple ways to do this.

4         Q    Okay.  Now, once they do that, what -- what

5    happens then?  How does the process continue?

6         A    Certainly.  So, for example, if I receive a --

7    one of these letters, indicating their compliance, what

8    happens is I take that letter, I forward it to the

9    chair -- the chair above me, the working group chair; it

10   gets forwarded to the IEEE's headquarters in Piscataway,

11   New Jersey, and actually posted on the website.

12        Q    How -- okay.  Now, the companies, they can

13   voluntarily give the letters, right?

14        A    That's correct, yes, sir.

15        Q    Or they can be requested to give the letters?

16        A    Yes.  That's correct.

17        Q    Once y'all have notice of the letters?

18        A    That's correct.

19        Q    Are any attempts whatsoever made by the IEEE

20   to determine whether or not the patents that are listed

21   actually apply to the standard?

22        A    We do not.

23        Q    Okay.  That's never done?

24        A    We do not.  As a matter of practice, we do

25   not.  We try to illuminate the situation so people know

1    what the patents are.  But we do not, as the IEEE, try

2    to determine whether or not they bear on the standard or

3    not.

4         Q    Now, with regard to the patent's validity, is

5    anything done with regard to that?

6         A    No, definitely not.

7         Q    Now, we have seen -- in your slides, I

8    believe, the slides that you showed that give this

9    patent policy that you give at the beginning of every

10   meeting --

11              MR. MIKE JONES:  That's Defendant's

12   Exhibit 297, Your Honor.  I believe there is no

13   objection to that.  It's for purposes of the RAND trial

14   only.

15              MR. FURNISS:  No objection, Your Honor.

16              THE COURT:  Be admitted.

17        Q    (By Mr. Mike Jones) Now, we've already put it

18   into evidence, and we're not going to put it up again.

19        A    Okay.

20        Q    But we have seen the IEEE's website that lists

21   all of the patents with regard to the 802.11 that have

22   been dedicated.

23        A    Okay.

24        Q    Okay.  And you're familiar with that?

25        A    I am indeed.

```
 1        Q    And there are literally dozens of companies
 2   that have listed a hundred or more patents, right?
 3        A    Yes, sir.
 4        Q    Now, with regard to all of those letters of
 5   assurance -- and let me zero in a little bit more with
 6   my questioning.
 7             With regard to your work on the 802.11g
 8   committee, all the patents that you got letters of
 9   assurance from are listed there, right, sir?
10        A    Yes.  That's correct.
11        Q    Now, in your work on the "g" as well as the
12   other committees' work on the other standards, do you
13   rely on those letters?
14        A    Yes.
15        Q    Do you, in fact, consider whether or not you
16   have letters like that for patents that you know of?
17        A    We do.  In fact, the purpose of our procedure
18   is to solicit these letters to get them into the record
19   in a very public way on our website so members can take
20   them into consideration in their voting.
21        Q    And is there anything wrong with members
22   taking that into consideration in their voting, taking
23   into consideration, number one, whether or not such
24   letters exist and also taking into consideration the
25   cost of intellectual property that might be applicable
```

1    to the standard?  Is there any prohibition to that?

2         A    No.  There's no prohibition on that.

3         Q    Now, with regard to your work on the "g"

4    committee, we know that -- we know that the patent was

5    disclosed on the "a" and that there was a letters of

6    assurance on "a".  You've seen that?

7         A    Yes, I have.

8         Q    With regard to your work on the "g", did they

9    ever disclose the patents?

10        A    The CSIRO patent, no, sir, they have not.

11        Q    And did anyone ever submit a letter of

12   assurance?

13        A    No, sir.  I never received one.

14        Q    Now, do you know of any situations where

15   people who have been on -- excuse me -- let's strike

16   that.  Let me start over again.

17             Do you know of any situations -- do you have

18   any knowledge of any situations where intellectual

19   property costs affected either the deliberations of an

20   802.11 standards committee or an IEEE standards

21   committee or a standard that was enacted by an IEEE

22   standards committee?

23        A    I do.

24        Q    Okay.  Can you tell us of that situation.

25        A    The one I'm the most familiar with is actually

```
 1      after a standard was set.  There's something called the
 2      IEEE 1394 standard.  In the marketplace, it's sometimes
 3      referred to as Firewire.
 4            And early this decade, approximately 2001,
 5      Apple computer, after the standard was set, announced
 6      that they were going to charge a royalty of one dollar
 7      per 1394 port.  And what this did was there was -- if
 8      you're not familiar with 1394, this is a technology to
 9      connect computers to things like printers and digital
10      cameras and video camcorders.
11            And what this did was it caused the
12      marketplace to move to -- to an alternative.  There's an
13      alternative technology that did a very similar thing,
14      arguably not quite as good as 1394 in some aspects, but
15      it was -- but that was adopted because this one dollar
16      royalty report actually pushed the whole market towards
17      USB, and manufacturers of digital cameras, mobile
18      phones, et cetera, started choosing USB over IEEE's 1394
19      standard.
20         Q    Now, going back to the time that you're
21      chairman of the 802.11g committee.  What effect would a
22      multi-million-dollar royalty claim have had on you and
23      your work there and your vote there if you had known
24      about one that was applicable to the proposed at that
25      point in time, 802.11g standard?
```

```
 1        A    So I was actually one of the voters that voted

 2    for the compromised proposal.  And if I had thought or

 3    known that there was going to be a multi-dollar royalty,

 4    I would not have voted for it.  I would have voted

 5    against.

 6        Q    And why is that, sir?

 7        A    Because my background has been, for many

 8    years, in the semiconductor business.  And I know for

 9    example at the time -- just as an example, I was working

10    at Texas Instruments in our WiFi business.  We had a

11    roadmap to make WiFi chips cost $10, down to 5, down to

12    $3.  So if we were looking at a multi-dollar royalty on

13    our chips, it would be -- it would actually be -- it

14    would materially, in an adverse way, affect our business

15    by raising costs, and it would make us noncompetitive.

16    And I knew that there were potentially paths to avoid

17    that.

18        Q    Thank you, sir.

19             MR. MIKE JONES:  I pass the witness, Your

20    Honor.

21             THE COURT:  All right.  Cross-examine.

22             MR. FURNISS:  Thank you, Your Honor.

23                  CROSS-EXAMINATION

24    BY MR. FURNISS:

25        Q    Good afternoon, Mr. Shoemake.  I think we've
```

CSIRO v. Intel, et al. - RAND Bench Trial                    April 14, 2009

1    met before.  I'm Dan Furniss, and I represent CSIRO.

2    Nice to meet you.

3         A    Nice to meet you, sir.

4         Q    Did the IEEE receive a RAND letter of

5    assurance from CSIRO on 802.11g?

6         A    They did not.

7         Q    Did not.  Did the committee ask CSIRO for a

8    letter of assurance on 802.11g?

9         A    I did not ask CSIRO directly for a letter.  I

10   solicited membership for -- for letters.

11        Q    But you're aware that 802.11g was -- used the

12   same technique as "a"; in fact, it was taken from "a" to

13   "g" and the only material change was the frequency

14   change when it went from the 5 gigahertz band to the 2.4

15   gigahertz band?

16        A    I was aware that "g" was using "a" technology

17   as part of our draft standard, yes, sir.

18        Q    Now, the -- the example that you gave when the

19   cost of -- affected the voting on the standard, in that

20   situation, the committee knew of the price of the IP,

21   right?  The Apple situation, they knew that Apple wanted

22   a dollar a unit?

23        A    No, they did not.  Apple made this

24   announcement after IEEE 1394 had been ratified.

25        Q    But you said they went back at changed it,

1    right?

2         A    This changed -- maybe I wasn't clear.  The

3    change -- the IEEE 1394 standard did not change.  The

4    change actually happened in the marketplace.  The

5    marketplace shifted from two competing standards, one

6    IEEE and one non-IEEE.

7              The USB standard comes from an organization

8    called the USB Implementers Forum, and it shifted

9    momentum towards that standard and away from IEEE's 1394

10   standard after ratification.

11        Q    Well, in this situation, you're aware that

12   CSIRO has been attempting to license the patents since

13   2003; is that right?

14        A    I am now.  But not at that point in time.

15        Q    And the market has available to it other

16   technologies it could shift to if it thought CSIRO's

17   demands were excessive; isn't that true?

18        A    No, not at this point in time.

19        Q    Well, all the devices -- there have been

20   testimony that all of the devices are 802.11b

21   compatible, right?

22        A    So there's not another option right now where

23   there is 802.11b compatibility with a higher data rate.

24   So in the example I gave, 1394 and USB, there was a way

25   to switch.  And in this case, there's no longer another

**CSIRO v. Intel, et al. - RAND Bench Trial**                     **April 14, 2009**

1   standards organization where you can have backward

2   compatibility with 802.11b and have -- and in the market

3   realistically shift.

4       Q    Isn't it true that CSIRO gave no letter of

5   assurance on 802.11g, right?

6       A    That's true.  That is a true statement.

7       Q    So do you have any belief or opinion that

8   CSIRO's patent rights in the '069 patent are restricted

9   in any way as to 802.11g?

10      A    I do.

11      Q    What's the basis for it?

12      A    So the basis for that is that -- if it's okay

13  with you, I'll answer this as a voting member.  I was

14  also a member, and I voted on 802.11g, not as

15  chairperson but --

16      Q    Did you know about CSIRO's patent when you

17  voted?

18      A    I did not.

19      Q    How can you tell us what you would have done

20  five years ago?

21      A    Well, so I can answer with respect to if I'd

22  known that there was a royalty to pay, what I would have

23  done.

24      Q    Any royalty at all?

25      A    No, not any royalty.  A royalty that would

1    have inhibited the market and made it noncompetitive.

2        Q    Well, you understand that WiFi is included in

3    computers that can cost $400, $500, $1000, $2000; isn't

4    that right?

5        A    Yes, that is correct.  I understand that.

6        Q    Would you consider a dollar royalty to be

7    prohibitive in that -- to those kinds of manufacturers?

8        A    I would.

9        Q    Even if it's half of one percent of a price?

10       A    I would.  Because this is like saying that a

11   car costs $20,000 and trying to put a multiple dollars

12   on a lug nut.  This is a component in the computer.  It

13   is not the -- the WiFi technology exists in a small

14   piece of the computer that's really dominated by a chip

15   and the now single chips that don't cost nearly the

16   price of the computer.  They cost single dollars.

17       Q    You worked for Texas Instruments, did you not?

18       A    I did.  That's correct.

19       Q    And were you aware that Texas Instruments

20   charges royalties as a percentages of finished products?

21       A    To tell you the truth, I'm not that familiar

22   with what Texas Instruments has done in the various

23   markets with charging royalties.

24       Q    Well, you referred to the DRAM -- the DRAMs,

25   did you not?

```
 1          A     I have not, sir.
 2          Q     I thought you referred to computer memory in
 3    your testimony just a few minutes ago -- to the DRAM
 4    situation.
 5          A     No, sir.  That may have been another witness.
 6          Q     Okay.  I must have misheard you.
 7                Were you aware that IBM charged percentage
 8    royalties on finished products?
 9          A     I'm not familiar with IBM's -- how IBM charges
10    for their intellectual property.
11          Q     So you don't really know what a reasonable
12    royalty is for any particular product, do you?
13          A     No.  I do, actually.
14                So, for example, in the -- in the space of
15    WiFi, reasonable royalties would be -- would be
16    royalties that are in tune with the -- the value that is
17    brought by that technology to -- to the actual product
18    versus other alternatives that may be there.  So the
19    incremental value that's been brought by that
20    technology.
21          Q     And if WiFi added $50 or $100 to the value of
22    a product, would a dollar royalty be excessive in those
23    situations?
24          A     I'm sorry.  I didn't follow your question.
25    Can you repeat it?
```

CSIRO v. Intel, et al. - RAND Bench Trial                      April 14, 2009

```
 1       Q    If a WiFi-enabled product were $50 or $100
 2   more than a non-WiFi-enabled product, would it be
 3   reasonable to charge a percentage or a per-unit royalty
 4   in that situation?
 5       A    No, not in my opinion.  I would think it's --
 6   me, as a member of the IEEE, when you ask me about
 7   reasonable and nondiscriminatory and -- in the
 8   reasonable part, I think about if there is intellectual
 9   property that bears on the standard, I think about what
10   is reasonable is that -- that that is attached to the
11   product that actually implements that functionality in
12   the system.
13              MR. FURNISS:  Your Honor, may I approach
14   the witness?
15              THE COURT:  Yes, you may.
16       Q    (By Mr. Van Nest) Mr. Shoemake, let me show
17   you what has been marked as Defendant's Exhibit 124.
18       A    Okay.
19       Q    And I believe -- I'm going to ask you about
20   Page 4.  But have you seen that document before?
21       A    I may have.  I don't recall.  I certainly
22   haven't seen it recently.  I was at this meeting -- this
23   is meeting minutes for a meeting that took place in The
24   Netherlands.
25       Q    If you look on Page 4 there --
```

1      A     Okay.

2      Q     -- under the plenary meeting?

3      A     Okay.

4      Q     9.4 -- it says 9.4.1.  "Antitrust laws

5   reviewed by Dick Hayes stressing that product pricing

6   should not be discussion of IEEE meetings and

7   intellectual property pricing as well."  Do you see

8   that?

9      A     Yes, sir, I do.

10     Q     So it's not allowed to discuss the pricing of

11  intellectual property in the IEEE; isn't that right?

12     A     What's not allowed is discussing dollars.  So

13  when Mr. Hayes, the chair, talks about price -- and when

14  I was a chair and had this direction from him and also

15  the other chair that came after him -- was when he says

16  price, do not talk about dollars.  So that's what he --

17  and so that is a true statement.

18     Q     Well, how do you talk about price without

19  talking about money?

20     A     Well, we analyze a lot of the cost.  So

21  members, what we try to do in our policy, is we try to

22  illuminate the patents that are out there.  We try to,

23  since we are engineers, and so as a matter of our

24  policy, we -- we stay away from trying to value those,

25  but we do try to illuminate, so every individual member,

1    along with taking into consideration how long it might

2    take them to build the standard and how much silicon

3    area it might take, they can take into account these

4    patent statements and they can try to estimate these

5    things.

6              We, just as a matter of our proceedings, we --

7    we don't allow discussing of price inside our

8    proceedings.

9              So with respect to -- if you ask me with

10   respect to cost, do people analyze -- do members analyze

11   costs, they do.  Engineers do things just like --

12       Q    I think you answered my question.  In the

13   context of IP rights, is there any distinction between

14   price and cost?  I mean the price is the cost for a

15   patent license, isn't it?

16       A    Yes.  I can't think of an exception right now.

17       Q    And in order to rely upon a RAND letter of

18   assurance, you have to know what someone might charge as

19   their cost for their IP or their price for their IP;

20   isn't that right?

21       A    I'm sorry.  Could you repeat the question

22   again?

23       Q    In order to rely upon a letter of assurance,

24   if there is one, you have to know something about what

25   the IP owner thought was a reasonable value for their

```
 1    IP?
 2        A    So I think the answer is yes.  A member would
 3    need to estimate what -- what this means and take and
 4    try to come up with maybe their own estimate on what
 5    that cost or price might be.
 6        Q    So -- and you agree that no one ever contacted
 7    CSIRO either with regard to 802.11a, where they gave a
 8    letter of assurance, or with regard to 802.11g, where
 9    they didn't; isn't that true?
10        A    So with respect to 802.11a, I was not
11    involved.  With respect to 802.11g, as chairman, all of
12    my actions were to -- to solicit from the -- from the
13    chair, if you will.  And I did not personally send a
14    letter directly so CSIRO soliciting them.
15        Q    And my last question:  Isn't it true that you
16    can't rely upon something you don't know?  Isn't that
17    right?
18             If you have no idea what the cost -- what the
19    price will be, how can you rely upon it?  If the letter
20    says "reasonable royalty," what are you relying upon,
21    other than people being reasonable?
22        A    Oh, I think you can.  I think you -- you can
23    rely on what reasonable is.  You know what your
24    building, whether it's a lug nut or a WiFi chipset, and
25    you can -- you can look and you can look -- and in the
```

1    case of patents, you can look and you can try to

2    determine the value that is broad.  You can try to make

3    sure that the value, as well as other alternatives --

4    that the cost or price in this case are in proportion,

5    to make sure things are reasonable.

6         Q    And you don't know in CSIRO's case whether

7    that was true or not; isn't that right?

8         A    So in CSIRO's case, I did not know what --

9    what was being asked at the time.  I subsequently

10   learned, I believe, last year was the first time I

11   learned what was being asked.

12        Q    Isn't it true that CSIRO made contact with

13   members of the IEEE prior to the ratification of

14   802.11g?

15        A    I'm not aware of that, sir.

16        Q    Would that -- if they did, would that make a

17   difference in your analysis?

18        A    I'm not sure what -- it might depend on the

19   type of contact.

20        Q    Thank you, Mr. Shoemake.

21             MR. FURNISS:  Pass the witness.

22             THE COURT:  Any redirect?

23             MR. MIKE JONES:  No, Your Honor.

24             THE COURT:  Very well.  You may stand

25   down.

1            MR. MIKE JONES:  May he be excused?

2            THE COURT:  If there's no objection.  Any

3    objection to the witness being excused?

4            MR. FURNISS:  No.

5            THE COURT:  That will be fine.  The

6    witness is finally excused.

7            Any further RAND testimony this evening.

8            MR. MIKE JONES:  Not tonight, Your Honor.

9            THE COURT:  All right.  Anything further

10   from either party?

11           All right.  Y'all have a good evening.

12   We'll be in recess until tomorrow morning.

13

14

15               REPORTER'S CERTIFICATE

16       We certify that the foregoing is a correct

17   transcript from the record of proceedings in the

18   above-entitled matter.  Dated at Tyler, Texas, this the

19   14th day of April, 2009.

20

21                   _____

22                   D. KEITH JOHNSON, RDR, CRR

23                   _____

24                   KIMBERLY J. JULIAN, RPR, CRR

25