IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

COMMONWEALTH SCIENTIFIC AND )
INDUSTRIAL RESEARCH          )
ORGANISATION, INC.           )      DOCKET NO. 6:06cv324
                             )
-vs-                         )
                             )      Tyler, Texas
BUFFALO TECHNOLOGY, INC.,    )      April 16, 2009
ET AL                        )      5:00 p.m.

MICROSOFT CORPORATION, ET AL )
                             )      DOCKET NO. 6:06cv549
             -vs-            )
                             )
COMMONWEALTH SCIENTIFIC AND  )
INDUSTRIAL RESEARCH          )
ORGANISATION, INC.           )

COMMONWEALTH SCIENTIFIC AND  )
INDUSTRIAL RESEARCH          )
ORGANISATION, INC.           )      DOCKET NO. 6:06cv550
                             )
-vs-                         )
                             )
TOSHIBA AMERICA, ET AL       )

INTEL CORPORATION, ET AL     )
                             )      DOCKET NO. 6:06cv551
-vs-                         )
                             )
COMMONWEALTH SCIENTIFIC AND  )
INDUSTRIAL RESEARCH          )
ORGANISATION, INC.           )

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES DISTRICT JUDGE

CSIRO v. Intel, et al.                                    April 16, 2009

2

1                      A P P E A R A N C E S

2              (SIGN-IN SHEETS DOCKETED IN EACH CASE)

3

   COURT REPORTERS:      MS. KIMBERLY JULIAN
4                                        MR. D. KEITH
   JOHNSON
5                           CURRY JOHNSON JULIAN, INC.
                            CERTIFIED SHORTHAND REPORTERS
6                           P.O. BOX 270
                            TYLER, TEXAS  75710
7

8   PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY,
    TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CSIRO v. Intel, et al.                                   April 16, 2009

```
 1                    P R O C E E D I N G S
 2              (Following at close of jury trial:)
 3              THE COURT:  All right.  Very well.  Who
 4   will be your witness with regard to the RAND defenses?
 5              MR. VAN NEST:  Your Honor, can the
 6   non-RAND counsel be excused for the day?
 7              THE COURT:  I don't know.
 8              MR. MIKE JONES:  Just say no, Your Honor.
 9              THE COURT:  No.
10              MR. MIKE JONES:  Your Honor, he was
11   waiting in my office, and if we can run to get him.
12   He'll be here just like this.  I was just notified a
13   minute ago of the change of plans, and we've got him on
14   his way here.
15              THE COURT:  All right.  I would like
16   non-RAND counsel to stay this afternoon, seriously.
17              MR. MIKE JONES:  Okay.  Yes, sir.
18              THE COURT:  It won't be long, Mr. Jones
19   promised me.  And we both mean that sincerely, I know.
20              All right.  I'm going to be in recess
21   until he gets here.
22              (Recess.)
23              THE COURT:  All right.  Has this witness
24   been sworn?
25              MR. VASQUEZ:  No, he hasn't, Your Honor.
```

**CSIRO v. Intel, et al.**                                                    **April 16, 2009**

```
 1                    THE COURT:  All right.  Raise your right
 2     hand and be sworn.
 3                    (Witness sworn.)
 4                    THE COURT:  All right.
 5                    DEAN KAWAGUCHI,
 6     Having been duly sworn, testified as follows:
 7                    DIRECT EXAMINATION
 8     BY MR. VASQUEZ:
 9          Q    Good afternoon, Mr. Kawaguchi.  Please state
10     your name.
11          A    Dean Kawaguchi.
12          Q    And where do you live?
13          A    San Jose, California.
14          Q    What is your current employment?
15          A    I work for Intelleflex Corporation.
16          Q    And how long worked for Intelleflex?
17          A    A little over three years.
18          Q    What does Intelleflex do?
19          A    We do RFID tags and meters, radio frequency
20     identification.
21          Q    Can you explain what RFID is?
22          A    Sure.  It is very low-cost chips that enable
23     wireless tracking of products, identification of
24     inventory, assets, cattle, anything.
25          Q    Okay.  Before you got into RFID, were you also
```

**CSIRO v. Intel, et al.**                                    **April 16, 2009**

 1    involved in the wireless industry?

 2        A    Yes, I was.

 3        Q    For how many companies did you work in the

 4    wireless industry before Intelleflex?

 5        A    Two before Intelleflex.

 6        Q    And what was the first one?

 7        A    The first one was TRW Incorporated in Redondo

 8    Beach.  I started there in 1983 and worked there for ten

 9    years, working on wireless communication satellite

10    systems.

11        Q    Okay.  What's your educational background?

12        A    I have a BSEE from the University of

13    Washington, received that in 1983, and an MSEE in --

14    from the University of Southern California.  Both of

15    them were specializing in communication theory and

16    signal processing.

17        Q    Okay.  And what was your next employment after

18    TRW?

19        A    I worked for Symbol Technologies in 1993.

20        Q    Okay.  And did you work on any 802.11

21    projects?

22        A    Yes.  That was what I was hired in for, was to

23    work on pre-802.11, which then became 802.11 wireless.

24        Q    Okay.  Thank you.  While at Symbol, was it

25    part of your job to work in any professional

CSIRO v. Intel, et al.                                    April 16, 2009

6

1  associations?

2      A    Yes.  Part of my job was to attend the IEEE

3  802.11 standards meeting, which I did from 1993.

4      Q    For how long did you attend those meetings?

5      A    Approximately seven years that I went

6  full-time.

7      Q    Okay.  How frequently?

8      A    That would be six times a year, since we met

9  every two months.

10     Q    What committees were you involved in?

11     A    Primarily in the physical layer group, the

12 frequency hopping, phy ad hoc group.  I also went to the

13 general meetings, the Mac layer meetings, and I also

14 participated in the 802.11a, 11b task groups.

15     Q    Were you selected for any leadership posts?

16     A    Yes, I was.

17     Q    Okay.  Can you identify those for us.

18     A    Yes.  The physical layer subgroup, the

19 frequency hopping, phy ad hoc group, and I was asked to

20 chair -- if I wanted to chair one of the 11a or 11b task

21 groups.  I declined, but I agreed to be a substitute

22 chair for 802.11a.

23     Q    And when you were the substitute chair, did

24 the 802.11a committee do the voting to get to the final

25 standard?

CSIRO v. Intel, et al.                                              April 16, 2009

```
 1        A     Yes, they did.
 2        Q     Okay.  Can you please take a look at
 3   Exhibit 283.
 4              MR. VASQUEZ:  And, Your Honor, in advance
 5   of the examination, counsel for both sides agreed to
 6   admit Exhibits 124, 283 and 853.
 7              MR. FURNISS:  Yes, Your Honor, that's
 8   true.  The first and the third were already in, and
 9   there's no objection to the middle one, 283.
10              THE COURT:  Be admitted.
11        Q     (By Mr. Vasquez) Do you recognize Exhibit 283?
12   That's going to come up on the screen.  Meanwhile, I'll
13   give you the paper copy.
14              MR. VASQUEZ:  May I approach the witness,
15   Your Honor?
16              THE COURT:  Yes, you may.
17        A     Yes, I do.
18        Q     (By Mr. Vasquez) Okay.  And what is it?
19        A     It is a summary of the proposals that were
20   being considered for the 802.11a physical layer.
21        Q     And what -- at what meeting were these
22   proposed?
23        A     This was in the January 1988 meeting.
24        Q     And where was that meeting?
25        A     Let's see.  I'm not -- I can't --
```

CSIRO v. Intel, et al.                                    April 16, 2009

8

1      Q     It says Lynnwood, Washington, in the first

2    line?

3      A     Okay.  Lynnwood, Washington.

4      Q     And you were present?

5      A     Yes, I was.

6      Q     And you were the chair that?

7      A     Let's see.  I was chair on some of the

8    meetings.  If the permanent chair was not presenting on

9    his proposal, then he would take over back as chair.

10     Q     Now, before the "a" standard, was there a

11   predecessor standard?

12     A     Yes.  There was the original 802.11 standard.

13     Q     And what was the characteristics of that

14   standard?

15     A     Well, we had a Mac, media access control,

16   layer and three physical layers, frequency hopping, phy

17   and direct sequence phy, back at 2.4 gigahertz, and an

18   infrared phy.

19     Q     Okay.  When was 802.11, the first standard,

20   completed?

21     A     In July of 1997.

22     Q     Okay.  And during the entire process of

23   developing that first standard, did you ever hear

24   anything about CSIRO?

25     A     No, I did not.

**CSIRO v. Intel, et al.**                                      **April 16, 2009**

```
 1        Q     Did CSIRO make any proposals for the first
 2   standard?
 3        A     No, they did not.
 4        Q     Okay.  Now, speaking to the "a" standard,
 5   particularly the exhibits that you have here, what is
 6   this comparison proposals chart?
 7        A     Well, it is the six proposals that were being
 8   considered at this point, and some of the key
 9   characteristics.
10        Q     Okay.  The list -- these list them by
11   companies; is that right?
12        A     Yes.
13        Q     And that's the company associated with the
14   proposals, correct?
15        A     That's correct.
16        Q     Okay.  The first one says Lucent Technology.
17   Who is Lucent Technology?
18        A     Lucent was part of the break-up of AT&T.  And
19   it included the Bell Laboratories, which is a noted
20   group in wireless communication, or in all
21   communications.  But they had also purchased a group in
22   the Netherlands called NCR Wireless.  And this was the
23   group that was presenting this particular proposal.
24        Q     Were they known as the U-Trip group
25   (phonetics)?
```

**CSIRO v. Intel, et al.**                                              **April 16, 2009**

```
 1        A     Yes.
 2        Q     And the U-Trip group was responsible for the
 3   Lucent proposal; is that correct?
 4        A     That's correct.   That was the wireless LAN
 5   group.
 6        Q     Does Lucent have any connection to CSIRO?
 7        A     Not that I know of.
 8        Q     Does it have any connection to Radiata?
 9        A     Not that I know of.
10        Q     Okay.   Now, can you tell us where the
11   technology from the Lucent proposal emanated from?
12        A     Yeah.   To my knowledge, there were two efforts
13   going on in Europe prior to the 802.11a.   One was the
14   DVBT standard and the other one was the Magic Wand
15   project.
16        Q     What is DVBT?
17        A     It is Digital Video Broadcast Terrestrial.
18        Q     And what's it used for?
19        A     It's used to transmit digital TV signals from
20   regular radio towers, as opposed to DirecTV's
21   transmissions from satellites.
22        Q     Similar to the DirecTV satellite system, but
23   it comes from broadcast -- from terrestrial towers?
24        A     That's correct.
25        Q     Okay.   Did it use OFDM as a modulation scheme?
```

**CSIRO v. Intel, et al.**                                    **April 16, 2009**

```
 1        A    Yes, it did.
 2        Q    Was it part of the Lucent presentation, this
 3   was kind of a successful way to use OFDM?
 4        A    That was part of their basis for presenting
 5   OFDM as a viable candidate.
 6        Q    Did they also mention the Magic Wand project?
 7        A    Yes, they did.
 8        Q    And what was the Magic Wand project?
 9        A    That was a consortium between several
10   universities and companies in Europe that were working
11   on an OFDM-based wireless ATM demonstration.
12        Q    What was the intent of that project?
13        A    Well, basically to develop an equivalent to
14   what would be the fiber backbone on data networks, for
15   example, between cities where you couldn't apply fiber
16   as the carrier; you could apply wireless.
17        Q    Was that considered a successful demonstration
18   of OFDM used in this type of technology?
19        A    Yes.  I believe it was.
20        Q    Okay.  Now, so let's cover some of the
21   principles that were present in Lucent Technology
22   proposal.
23             Was this an OFDM-based proposal?
24        A    Yes, it was.
25        Q    Did it use convolutional coding for forward
```

CSIRO v. Intel, et al.                                          April 16, 2009

1    error correction?

2          A     Yes, it did.

3          Q     Did it also use interleaving?

4          A     Yes, it did, across carriers.

5          Q     Was there a second OFDM proposal on this list?

6          A     Yes, there was.

7          Q     By whom?

8          A     NTT, Nipon Telephone and Telegraph.  Basically

9    and AT&T of Japan.

10         Q     And did their proposal, besides using OFDM,

11   did it use convolutional coding for forward error

12   correction?

13         A     Yes, it did.

14         Q     Did it also use interleaving?

15         A     Yes, it did.

16         Q     And then of the remaining proposals, Micrilor,

17   NEC, BreezeCom and RadioLAN, were any of them OFDM-based

18   proposals?

19         A     No.  They were all various forms of

20   single-carrier proposals.

21         Q     Okay.  Now, at some point, was there a vote to

22   determine which of these six proposals would be the

23   ultimate 802.11a standard-bearer?

24         A     Yes.

25         Q     Okay.  And how was that voting process done?

CSIRO v. Intel, et al.                                    April 16, 2009

13

```
 1        A    Well, it was a down-selection process.  So at
 2   each voting round, we would eliminate the lowest vote,
 3   similar to American Idol, getting rid of the one with
 4   the lowest votes there.
 5        Q    So you have a six-pack vote, and then a
 6   five-pack, on down to a one?
 7                   THE COURT:  Was there a save provision?
 8                   (Laughter.)
 9                   THE WITNESS:  There were no popular --
10        Q    (By Mr. Vasquez) Okay.  Now, at 6-to-1 odds,
11   did any of these proposals decide to alter their
12   proposals or join forces with the other in an effort to
13   succeed?
14        A    Yes.  Four of the companies combined into two
15   separate proposals.  So it went from six down to four.
16        Q    Which companies combined a single-carrier
17   proposal?
18        A    That would be NEC and BreezeCom.
19        Q    Did any of the OFDM companies combine?
20        A    Yes.  Lucent and NTT combined to create one
21   joint proposal.
22        Q    Okay.  We've heard NTT in this trial before.
23   Who was the leader of NTT?
24        A    I believe the prime presenter was Hitoshi
25   Takanashi.
```

CSIRO v. Intel, et al.                                      April 16, 2009

```
 1        Q     Okay.  Did NTT have any relationship to CSIRO?

 2        A     Not to my knowledge.

 3        Q     Any relationship to Radiata?

 4        A     Not to my knowledge.

 5        Q     Just to make clear, you were personally aware

 6   of the proposals made by Lucent and NTT had no

 7   connection to either CSIRO or Radiata, correct?

 8        A     That's correct.

 9        Q     Okay.  Let's look at Exhibit 124, if you

10   would.  Do you recognize 124, sir?

11        A     Yes, I do.

12        Q     What is it?

13        A     It is the minutes from the meeting in Ulrecht,

14   Netherlands, in May of 1998.

15        Q     That was the meeting in the Lucent Wireless

16   Group's backyard?

17        A     Yes.  They were the host.  That was their

18   office location.

19        Q     Were you present?

20        A     Yes, I was.

21        Q     And you attended these meetings?

22        A     Yes, I did.

23        Q     Were you chairing the 802.11a at the time?

24        A     Yes.  I believe I chaired most of this

25   particular session.
```

**CSIRO v. Intel, et al.**                                     **April 16, 2009**

```
 1        Q    So is there a section in here where you
 2   recorded the vote results of the election, the American
 3   Idol election, that took place after the combined
 4   proposals?
 5        A    Yes.
 6        Q    Okay.  Where is that located?  Is that section
 7   2.4?
 8        A    That would be in -- on page -- at the top of
 9   that page.
10        Q    Okay.  So it says BreezeCom, Lucent, RadioLAN
11   or none.  It was a three -- the object of the vote was
12   to drop out the third place?
13        A    The lowest vote, right.
14        Q    And who one the most votes in that vote?
15        A    BreezeCom won -- BreezeCom/NEC proposal won
16   the most votes in that round.
17        Q    That was the single-carrier proposal?
18        A    That was.
19        Q    And Lucent got second?
20        A    That's correct.
21        Q    With NTT, correct?
22        A    Right.
23        Q    So why didn't BreezeCom, the single-carrier
24   solution, become the 802.11a standard after that vote?
25        A    Well, in order to win the standard, you have
```

CSIRO v. Intel, et al.                                      April 16, 2009

1    to have at least 75 percent.  But the primary goal of

2    this round was to eliminate the -- from three down to

3    two.

4        Q    Okay.  So you were the chair.  What happened

5    next in this voting process?

6        A    So we then proceeded on to the next round of

7    voting, which is from two to one proposal.

8        Q    Okay.  And is that reflected under 2.6?

9        A    That's correct.

10       Q    Okay.  And what were the vote tallies in that

11   by percentage?

12       A    Well, Lucent/NTT had a majority with

13   53.4 percent.  BreezeCom 41.4 percent.

14       Q    Okay.  So what do the rules dictate occur when

15   you have a 53 but not 75 percent?

16       A    Well, we were down selecting from two to one.

17   So BreezeCom/NEC proposal was eliminated.

18       Q    Did that make it the standard?

19       A    Not yet, because it still didn't have

20   75 percent.

21       Q    Okay.  So what was the process of determining

22   whether you can arrive with 75 percent in the favor of

23   the standard?

24       A    Well, we had another round of questions and

25   answers to try and resolve the remaining issues that was

CSIRO v. Intel, et al.                                          April 16, 2009

17

1    keeping it from getting to 75 percent.

2        Q    Okay.  And basically the committee members

3    could ask anything they want?

4        A    That's correct, within bounds.

5        Q    Okay.  Anything pertaining to the object of

6    the vote?

7        A    Yes.

8        Q    What were the considerations by the committee?

9    What were the criteria that was proposed and discussed?

10        A    Well, the criteria for comparison was into two

11    different categories.  One is performance.  The other

12    one is cost.  We want the best possible performance for

13    the lowest possible cost.

14        Q    Okay.  Now, are you familiar, as chair, with

15    the IEEE patent policy?

16        A    Yes, I am.

17        Q    Did the IEEE rely upon the use of letters of

18    assurance, or LOAs, to enforce their patent policy?

19        A    Yes, it did.

20        Q    And what was the basic process to get an LOA

21    from either a member or a third party?

22        A    Well, it requested from all of the

23    participating members an LOA that stated their IP

24    position.  And if there was any patents that may apply

25    from nonmembers, there were letters sent out to those

CSIRO v. Intel, et al.                                        April 16, 2009

```
 1    companies requesting some --

 2         Q    Okay.  And what were the third-party companies

 3    asked to do with their letters of assurance?

 4         A    Well, there are three possible positions.  One

 5    is agree to license on a royalty-free basis; the second

 6    was to license on a reasonable and nondiscriminatory

 7    basis, or RAND; and the third one is they don't agree to

 8    license.

 9         Q    Okay.  Were you directed to follow a policy if

10    a third party didn't sign a letter of assurance?

11         A    Yes.

12         Q    What was it?

13         A    Well, let's see.  As long as they agreed to

14    license it on a free or reasonable and nondiscriminatory

15    basis, we could consider it for the -- for the standard.

16    But if they did not agree, we were not allowed to use

17    non-licensed technology, and we had to find alternative

18    methods to accomplish it that was either royalty free or

19    reasonable and nondiscriminatory.

20         Q    Was it the practice of 802.11 to evaluate

21    proposals, to favor proposals that did not contain

22    patented technology?

23         A    Yes.  We preferred non-patented technology

24    that wouldn't infringe on any patents.  We also

25    preferred zero-royalty patents, because we're trying to
```

CSIRO v. Intel, et al.                                         April 16, 2009

1    get the lowest possible cost for the end users.  That

2    would stimulate the market.  That would create the

3    biggest volume possible for everybody's benefit.

4         Q    Okay.  So if a third party said I have a

5    patent, I think that it's necessary to practice the

6    standard, did the IEEE, when they saw that in the

7    letter, do anything to verify the accuracy of that

8    claim?  In other words, did they make a determination of

9    whether the standard would infringe on that patent?

10        A    No, they don't.

11        Q    Do they make any determination or study of

12   whether that patent is valid?

13        A    No, they don't.

14        Q    And did the IEEE make a list of the people who

15   signed the letter of assurance?

16        A    Yes, they did.

17        Q    Does presence on that list indicate that the

18   IEEE has either done an infringement or an invalidity

19   analysis?

20        A    No.

21        Q    Okay.  Now, the 802.11a standard is a standard

22   for what?  Is it a specification for a product?

23        A    802.11a is a physical layer extension to the

24   5.2 gigahertz band.

25        Q    Is there a target in mind for the committee

CSIRO v. Intel, et al.                                           April 16, 2009

20

1    members?  Is there a target for a specification for a

2    chip or product, what?

3         A    We are primarily targeting from, an

4    implementation standpoint, a chip in which the RF and

5    digital functions would be implemented, that's correct.

6         Q    Did the committee members discuss what type of

7    cost targets were involved for an 802.11a chip?

8         A    It was generally understood that cost targets

9    and volume for these chips, chipsets, would be in the

10   five to ten dollar range.

11        Q    During the 802.11a proceedings, what did the

12   committee consider a reasonable royalty?

13        A    Well, I would have to say based on the

14   discussions we had, that it would be in a small

15   percentage of the cost of the ASIC.

16        Q    So did the target price of the chipset, you

17   say this five to ten dollars, have any impact on what

18   was a reasonable royalty?

19        A    Yes.  So if you take a few percent of five

20   dollars, that would put it in the region of five cents.

21        Q    Okay.  Have you ever heard of a gentleman

22   named Camilla Farerra (phonetics)?

23        A    Yes.

24        Q    Who is Camilla Farerra?

25        A    He was a professor from U.C. Davis who had

Case 6:06-cv-00550-LED Document 725 Filed 08/18/09 Page 21 of 48 PageID #: 23859

CSIRO v. Intel, et al.                                    April 16, 2009

21

1    attended the 802.11 meetings, the original 802.11

2    meetings.

3         Q    Okay.  What did the group learn about

4    Mr. Farerra as it relates to 802.11?

5         A    Well, he had a patented modulation technique

6    that he was trying to get the group to adopt.

7         Q    Okay.  Did the group consider the merits of

8    his technology?

9         A    We did, but outside the meetings, he had also

10   distributed a statement that he would be willing to

11   license his technology for 10 cents per unit.

12        Q    And what was the group's response?

13        A    Well, we all felt that it was an unreasonable

14   cost for the -- the benefits that he was proposing.

15        Q    And was that in keeping with the target price

16   of the five to ten dollars a chip?

17        A    Well, it --

18        Q    Or maybe you should just explain why.

19        A    So basically we look at, you know, what --

20   what it achieves versus what it costs.  And for the

21   benefits, we could find alternative technologies that

22   did not have any licensing fees, and so we would always

23   prefer zero-royalty approaches.

24        Q    Okay.  So did the committee use Farerra's

25   approach?

CSIRO v. Intel, et al.                                        April 16, 2009

22

```
 1        A     No.  We rejected it.

 2        Q     Did they use a different approach?

 3        A     Yes, we did.

 4        Q     Did they use an approach that had a 10 percent

 5   royalty?

 6        A     No.

 7        Q     Did they use one that had any royalty?

 8        A     No, we didn't.

 9        Q     It was royalty free?

10        A     Yes.

11        Q     Okay.  So even a 10-cent per unit, or chip,

12   royalty was viewed as unreasonable by the committee

13   where they had readily available alternatives to solve

14   the same problem?

15        A     Right.  The basic costs do get multiplied.

16        Q     Now I'll take you to a different situation.

17              The Lucent proposal, which was eventually the

18   winner of the standard, during the process and before

19   the 75 percent vote, were there any IP issues or

20   controversies with respect to Lucent and its proposal?

21        A     Yes, there was.

22        Q     Can you tell us the controversy.

23        A     Well, they had submitted an LOA stating that

24   they were willing to license on a five percent of the

25   product, but that was too ambiguous for us to -- to
```

CSIRO v. Intel, et al.                                    April 16, 2009

1    accept.

2         Q    Okay.  So what did the committee do about it?

3         A    So we had a series of questions related to

4    that, and he answered that.

5         Q    Did you convene a meeting of the IEEE with the

6    members?

7         A    That was part of the meeting, yes.

8         Q    And was Lucent present to answer those

9    questions?

10        A    Yes.  Bruce Tuch from the Netherlands office

11   was the representative from Lucent.

12        Q    And did the committee members question

13   Mr. Tuch about the five percent royalty that he had

14   indicated in that letter?

15        A    Yes, we did.

16        Q    And what was -- what were the questions?

17        A    Well, primarily, you know, what the five

18   percent applied to is the first question.  And he

19   clarified that it would be five percent of the chip,

20   which if you assume that it's a five dollar chip in

21   volume, would mean about 25 cents.

22        Q    Okay.  That's what you inferred from five

23   percent of the chip?

24        A    Right.

25        Q    All right.  And was that understood by the

CSIRO v. Intel, et al.                                    April 16, 2009

```
 1    rest of the committee?
 2        A    Yes.
 3        Q    Okay.  Now, did the suggestion by Mr. Tuch
 4    that Lucent was going to charge a 25 cent royalty on a
 5    five dollar chip, if it became the standard-bearer, did
 6    that gain any resistance from the group during that
 7    meeting?
 8        A    Yes.  It only partially addressed the issues.
 9        Q    What was the other issue expressed by the
10    members to Lucent about its patent issue?
11                  MR. FURNISS:  This calls for hearsay,
12    Your Honor.
13                  THE COURT:  Repeat the question, please.
14        Q    (By Mr. Vasquez) What was the question
15    expressed at the meeting by the group that was not
16    related to the 25 cents and the five percent issue?  You
17    said there was a second question that they asked for
18    clarification on.
19        A    Yes.
20                  THE COURT:  Overruled.  Go ahead.
21        A    Okay.  Basically 25 cents is still a large
22    additional cost on a chip.  I mean, these chips are
23    selling for five dollars, but their product cost is much
24    lower than that, typically, less than half of that.
25                  So what they were concerned about was whether
```

CSIRO v. Intel, et al.                                              April 16, 2009

1    everyone, all the companies, had to pay that particular

2    fee, or if it was an implementation patent versus an

3    essential patent.

4         Q    (By Mr. Vasquez) Okay.  So let me take that --

5    really two pieces there I want to inquire about.

6              So you said on a five dollar chip, there's the

7    cost of the chip.  That's the sales price, right, five

8    dollars?

9         A    That's the sales price to a box builder like

10   Netgear or 3Com.

11        Q    So the seller in your example, at five

12   dollars, would be somebody like who?

13        A    The seller?

14        Q    The seller of that chip for five dollars.

15        A    Yeah, that would be like Intersil, Lucent,

16   Atheros.

17        Q    And the buyer of that chip is going to be like

18   Netgear and 3Com?

19        A    Right.

20        Q    So when Intersil or Atheros sell a five-dollar

21   chip to Netgear, you say their cost would be much lower

22   than five dollars?

23        A    Yeah.  It would have to be in order to cover

24   their engineering cost and overhead.  And they have to

25   make at least some profit.

CSIRO v. Intel, et al.                                    April 16, 2009

26

1       Q    And the 25 cents would really be more

2    appropriately compared to a product costing 5.50?

3       A    Right.

4       Q    And the 25 cents compared to the 2.50 overall

5    cost, in your view, is --

6       A    That's still a fairly large amount.

7       Q    Okay.  And was that the expression that you

8    heard in the room that led to the questions to Bruce

9    Tuch?

10      A    Yes.

11      Q    Okay.  Now, what did Bruce Tuch say to address

12   the concerns about whether they'd have to pay the 25

13   cents, which might be too high?

14      A    Right.  Well, he further clarified their

15   position, that the five percent was a license fee on

16   their technology.  So basically if you wanted to use

17   their implementation, that you would be able to pay them

18   that amount, but that the IP royalty was much, much less

19   and basically didn't really apply.  It wasn't necessary

20   to implement the same.

21      Q    So I saw in the minutes the phrase "an

22   essential patent versus an implementation patent."  Are

23   you familiar with those terms?

24      A    Yes, I am.

25      Q    Okay.  So what's an essential patent?

**CSIRO v. Intel, et al.**                                    **April 16, 2009**

1    A    An essential patent is one that is required to

2    implement a compliant device, as opposed to the

3    implementation patent is a particular way of designing

4    something to meet that device, but there are other ways.

5    Q    Was Lucent asked, "Are your patents

6    implementation or are they essential?"

7    A    Yes.

8    Q    And what was their response?

9    A    The answer came out that their patents were

10   essentially implementation patents.

11   Q    So where did that leave this potential 25 cent

12   royalty from Lucent, the proposer of the standard?

13   A    Well, as long as a chip company was able to

14   design their own circuits that didn't infringe upon

15   their patents, that they did not have to pay the five

16   percent of that chip cost.

17   Q    After Mr. Tuch's explanation of Lucent's

18   patent policy as regards the 802.11a in this particular

19   proposal on the patents, did the committee have further

20   questions on that?

21   A    Nothing significant.

22   Q    Did they appear satisfied?

23   A    Yes.

24   Q    Was Lucent's clarified patent position

25   consistent with those who had made proposals and agreed

**CSIRO v. Intel, et al.**                                        **April 16, 2009**

1    not to charge a royalty?

2         A    At that point, yes.

3         Q    And why is that?

4         A    Because essentially if you designed your own

5    implementation and avoided their -- their implementation

6    patents, you were royalty free, which is as good as it

7    will get to get a low-cost solution.

8         Q    And I want to talk to you about a different

9    situation.  You heard of the RSA patent in connection

10   with 802.11?

11        A    Yes, I have.

12        Q    What is an RSA patent?

13        A    The RSA had a security mechanism which the

14   IEEE 802.11 considered to address a hole in the

15   standard, which is the inability to block eavesdropping

16   or intrusion.  So we had to have some solution.  And RSA

17   was one of the possible solutions for that.

18        Q    Was RSA's solution or invention, did it deal

19   with important aspects of 802.11, the security issue?

20        A    Yes, it was.

21        Q    What was the important security issue that was

22   involved through the RSA solution?

23        A    We had some means to block at least casual

24   eavesdropping and intrusion.

25        Q    Okay.  So was that an important part to the

1    industry when they sell these devices?

2        A    Yes, it was.  It was necessary.

3        Q    Okay.  Was there some indication that without

4    it, there might be a suffering of sales or a lack of an

5    adoption?

6        A    Yes, because our customers at the time were

7    large companies, and they couldn't afford large security

8    holes.

9        Q    Let me direct your attention to Exhibit 853,

10   please.

11            Now, is 853 the license cost for the RSA

12   solution?

13       A    Yes, it was.

14       Q    Okay.  And what was the rate if one wanted to

15   acquire the RSA solution proposed into the 802.11

16   solution?

17       A    Well, there are several tiers, but for most of

18   the chip companies, who basically count on making

19   millions of chips to become profitable, they would take

20   out the one-time licensing fee of $125,000.

21       Q    Okay.  And what did that equate to in cents

22   per unit?

23       A    Well, if you amortize it over two million

24   units, it would about six cents per unit.  If you built

25   ten million units, it would end up being

**CSIRO v. Intel, et al.**                                  **April 16, 2009**

1    one-and-a-quarter penny.

2        Q    Would the major suppliers of this product be

3    licensing at that level likely?

4        A    Yes.

5        Q    Okay.  Now, Radiata, I mentioned that company

6    before.  Have you ever met anyone at Radiata?

7        A    Yes, I have.

8        Q    Okay.  Who?

9        A    I met David Skellern, their president who

10   attended the 802.11a meetings.

11       Q    Okay.  The company that you were working for

12   at the time of these meetings was Symbol Technology,

13   correct?

14       A    Yes, it was.

15       Q    And you said they built -- what product did

16   they sell?

17       A    Well, at the time we did our own baseband

18   chips and the full radio modules as well as the end

19   products that it would go into.

20       Q    Were they intending to be a purchaser of

21   802.11 chipsets when they participated in the standard?

22       A    Yes.  We were not intending to build our own

23   next generation chips for 802.11a.

24       Q    So would you call that the same tier of

25   commerce or a different one to Netgear and its

**CSIRO v. Intel, et al.**                                          **April 16, 2009**

```
 1   competitors?
 2        A     It would be similar to the Netgear.
 3        Q     Who was the biggest competitor in that tier of
 4   commerce?
 5        A     It was Cisco, in the wireless area.
 6        Q     Now, a company at that level of commerce, what
 7   do they do to decide which vendor of chips they're going
 8   to do business with for the succeeding years once the
 9   standard is made?
10        A     Could you repeat that question?
11        Q     Yes.  Is there a process where a company like
12   Symbol goes out and decides what chip to buy, whether
13   it's a Atheros, Intersil, Lucent?
14        A     Yes.  We have a selection process.  We look at
15   the potential vendors for the chips, and we will have
16   talks with them or visit them and evaluate their
17   capabilities.
18        Q     Okay.  Did Symbol undertake an evaluation of
19   the chip companies that said they were going to go into
20   the 802.11a market?
21        A     Yes.  We did visit them in Australia.
22        Q     You visited who in Australia?
23        A     We visited Radiata in Australia.
24        Q     Did you get an invitation from Mr. Skellern?
25        A     Yes, we did.
```

**CSIRO v. Intel, et al.**                                                    **April 16, 2009**

1       Q     And what was the purpose of that visit?

2       A     Well, to evaluate their technical capabilities

3   and the likelihood that they can produce the chip in

4   that timeframe that they were planning that would meet

5   our requirements.

6       Q     Did you go down there with an idea that if

7   they checked out, as good as Mr. Skellern said they were

8   going to be, that you would enter into business with

9   them and buy their chips?

10      A     Yes.  That was a definite possibility.

11      Q     What happened when you evaluated their chips?

12      A     Well, we evaluated their team as well as the

13  design they were working on.

14            But upon questioning, it became apparent that

15  it did not have the seasoned experience required to

16  develop a good working chip through all of the

17  manufacturing process variations and all of that.

18  They -- they didn't have any understanding of what

19  offsets were at the time.  And that was a shock to us,

20  that they hadn't planned in on compensating for those,

21  because that's a major part of RF design.

22      Q     Did that cause Symbol to lose confidence in

23  Radiata as a potential chip supplier?

24      A     Yes.  That is what we reported back to both

25  the Symbol executive team as well as what we had told

**CSIRO v. Intel, et al.**                                                                        **April 16, 2009**

1    Radiata.

2         Q    Okay.  Did Symbol go with Radiata or another

3    chip vendor to purchase its 802.11a chip supply?

4         A    Well, we eventually went with somebody else.

5         Q    And did Symbol ever hear that Radiata was

6    subsequently purchased, after your visit, by Cisco?

7         A    Yes, we did.

8         Q    What was your reaction?

9         A    Well, actually, at the time we were very

10   happy.

11        Q    Why?

12        A    Because based on our experience, we thought

13   that Cisco would end up wasting quite a bit of time

14   trying to get that design to work and that would be an

15   advantage to us, because they were our biggest

16   competitor.

17        Q    Okay.  If CSIRO had done what Mr. Farerra did

18   and Bruce Tuch did, send you a price list on what they

19   intended to charge for their patents, and on their price

20   list it said two to four dollars, what would have

21   happened in the 802.11a committee with the Lucent

22   proposal that proposed the OFDM solution?

23        A    Well, two to four dollars would have been a

24   nonstarter.  We would have rejected that one and gone

25   with a different approach.

**CSIRO v. Intel, et al.**                                            **April 16, 2009**

```
 1        Q     And why do you say that?
 2        A     You can look at our history.  I mean, even at
 3   25 cents, we were pretty much up in arms and trying to
 4   look for ways that it was much less than that.  For four
 5   dollars, two dollars, that's way beyond even the cost of
 6   the basic chip.  We're talking about chips that would
 7   end up costing 2.50.
 8        Q     And am I correct in recalling that
 9   Dr. Farerra's 10 cents caused a similar reaction?
10        A     Yes.
11        Q     Okay.  And were there other alternatives on
12   this six-pack of the American Idol contestants?
13        A     Well, the BreezeCom/NEC proposal was very much
14   in contention.  And in the first round, it actually had
15   more votes than the OFDM.  And even in the second vote,
16   it was a close second.
17        Q     Did anyone think that alternative
18   technologies, the single-carrier from BreezeCom,
19   wouldn't have worked as an 802.11a solution, and it
20   wouldn't have given manufacturers of laptops and devices
21   equivalent or --
22        A     No, not at all.  There was more comfort with
23   the single-carrier approach at that time, because most
24   of the previous solutions were single carrier.
25        Q     What had the single-carrier patent positions
```

**CSIRO v. Intel, et al.**                                    April 16, 2009

```
 1    been expressed as being?
 2         A    Zero.  BreezeCom said they had no patents on
 3    it.
 4                   MR. VASQUEZ:  No further questions.
 5    Thank you.
 6                   THE COURT:  All right.
 7    Cross-examination.
 8                   MR. FURNISS:  Thank you.
 9                   CROSS-EXAMINATION
10    BY MR. FURNISS:
11         Q    Good evening, Mr. Kawaguchi.
12         A    Good evening.
13         Q    I'm Dan Furniss.  I represent CSIRO.
14              First of all, do you recall giving your
15    deposition in this case?
16         A    Yes, I do.
17         Q    And you were asked whether CSIRO provided a
18    letter in the form requested by the IEEE?
19         A    Yes, I believe I was asked that.
20         Q    And you recognize that they had provided a
21    letter in the form suggested by the IEEE; isn't that
22    right?
23         A    It was submitted.
24         Q    And it was unaltered from the form that the
25    IEEE had sent?
```

CSIRO v. Intel, et al.                                    April 16, 2009

1        A     Yes.  It didn't come to my attention.  It

2    wasn't a notable presentation there was any proposals

3    from them, so everybody submitted IP statements, whether

4    they were actively involved or not.

5        Q     And those statements were read at the

6    beginning -- if they were received, they were read at

7    the beginning of the meetings, were they not?

8        A     Yes.

9        Q     And were you on the committee in December of

10   1998?

11       A     Yes, I believe I was.

12       Q     And you don't recall the CSIRO letter being

13   read?

14       A     No, unfortunately, I don't.

15       Q     Now, with regard to the question of royalties

16   on particular technologies, does the amount of royalty

17   have to be reasonable?

18       A     Yes.

19       Q     And does the IEEE take any position on what's

20   a reasonable royalty?

21       A     Well, from the committee standpoint we do.

22       Q     Does the IEEE officially or in writing take

23   any position on what's a reasonable royalty?

24       A     We leave it to the judgment of the voter,

25   which are each of us, and we each have our own concept

Case 6:06-cv-00550-LED  Document 725   Filed 08/18/09  Page 37 of 48 PageID #:  23875

CSIRO v. Intel, et al.                                    April 16, 2009

37

 1    of what reasonable is.

 2         Q    And you each have your own concept of what

 3    reasonable is; is that right?

 4         A    That's correct.

 5         Q    And did anyone contact CSIRO and ask them what

 6    their concept of reasonable was?

 7         A    Not that I know.

 8         Q    Now, if a party disagrees about what a

 9    reasonable royalty is, can they negotiate with one

10    another?

11         A    Yes, I suppose they could negotiate.

12         Q    Do you know any of the history and

13    negotiations of this particular patent?

14         A    Not of this one.

15         Q    Do you expect patentholders who list their

16    patents on the IEEE website to automatically license

17    their patent at zero?

18         A    No.

19         Q    So the position that was taken by the members

20    or companies who were part of the IEEE that the

21    reasonable royalty for the patent-in-suit here was zero,

22    you wouldn't necessarily agree with that, would you?

23         A    Could you repeat that question, please?

24         Q    If the position of any particular person,

25    hypothetical person, let's say, that CSIRO should

**CSIRO v. Intel, et al.**                                    **April 16, 2009**

1   license -- having given the letter that said they charge

2   reasonable royalties, if the position was zero, would

3   you think that that was a reasonable position for a

4   company to take?

5        A    No, but it would affect our voting.

6        Q    Well, before the 802.11 standard was ratified,

7   the IEEE was aware of CSIRO's patent; isn't that right?

8        A    I would believe that if they submitted it by

9   December '98, that it would have been in there, and it

10  wasn't brought out.

11       Q    And the companies that make up the IEEE

12  include many, many large companies; isn't that right?

13       A    That's right.

14       Q    And they have staffs that could take a quick

15  look at patents very easily, couldn't they?

16       A    That is questionable.

17       Q    Well, let's take Intel, for example, do they

18  have a patent department?

19       A    I believe they do.

20       Q    And they have a lot of competent people,

21  engineers and lawyers; isn't that right?

22       A    I suppose they do.

23       Q    And they could take a look at a patent and --

24  strike that.

25            It's true that a lot of those patents, when

**CSIRO v. Intel, et al.**                                    **April 16, 2009**

1    you look at them, you can quickly conclude that they're

2    not relevant to a particular standard; isn't that true?

3         A    Some.

4         Q    And there's others where you say, well, this

5    one has to be checked out; isn't that right?

6         A    Yes.

7         Q    And these big companies have plenty of staff

8    that could easily do that initial cut and figure out

9    whose patent might be relevant or might not; isn't that

10   true?

11        A    I know of a case where it wasn't true.

12        Q    Well, I'm talking -- I'm talking about this

13   case, okay?

14        A    Yes.  But you're asking me if that is true,

15   and to my knowledge it is not.

16        Q    Well, it's not the responsibility of the IEEE

17   to watch out for patents, right?

18        A    That's correct.

19        Q    But any of the individual companies could

20   easily do their own analysis to begin with and if they

21   saw a problem or a potential problem they could pursue

22   it further; isn't that right?

23        A    If they choose to, but some companies choose

24   not to.

25        Q    Well, David Skellern was -- you met Skellern,

CSIRO v. Intel, et al.                                        April 16, 2009

```
 1    right?
 2         A    Yes, I did.
 3         Q    And he chaired some of the meetings or
 4    subcommittee meetings, didn't he?
 5         A    I'm not sure.
 6         Q    When he went down to Australia, did you learn
 7    that they had obtained the technology from CSIRO that
 8    underlied Radiata?
 9         A    Not to my knowledge.
10         Q    You didn't know that?
11         A    No.
12         Q    Now, are you aware of whether anybody ever
13    contacted CSIRO and said, "We're thinking of using your
14    technology in the standard, would you like to talk to us
15    about royalties"?
16         A    No, not to my knowledge.
17         Q    Do you have any reason to believe that that
18    had not happened, that CSIRO would not have engaged with
19    the committee and told them their views and negotiated
20    with them a reasonable royalty?
21         A    What was the question?
22         Q    Is there any reason to believe that if someone
23    had contacted CSIRO that you wouldn't have learned their
24    views in the patent and had an opportunity to talk to
25    them the way you did with RSA, for example, about what a
```

**CSIRO v. Intel, et al.**                                    **April 16, 2009**

1    reasonable royalty was?

2         A    Possibly, but it didn't happen.

3         Q    That's right, it didn't happen, because no one

4    took the time to even look at the patent; isn't that

5    right?

6         A    I don't know if anybody was aware of the

7    patent.

8         Q    Well, it was on the website about eight months

9    before 802.11a was ratified, right?

10        A    There are many statements on that website.

11        Q    Well, if somebody is not going to look at the

12   statements, what's the purpose of having them?

13        A    A volunteer organization, if nobody looks at

14   it, that particular one --

15        Q    You don't look, you proceed at your own risk;

16   isn't that right?

17        A    Well, it is a best effort standard which we

18   try to do everything we can.

19        Q    Well, looking at a patent, everything you can

20   means not looking at any of the patents?

21        A    Well, it's like saying do we look at every

22   single patent that exists that might apply.  I mean,

23   that's one of them.

24        Q    Well, at that point in time someone could have

25   taken a quick look at the patents and figured out which

CSIRO v. Intel, et al.                                    April 16, 2009

```
 1    ones might be relevant; isn't that true?
 2         A    Possibly.
 3         Q    And no one did?
 4         A    Apparently.
 5         Q    Do you think it's reasonable to attempt to
 6    negotiate either a royalty arrangement or a partnership
 7    arrangement or other kinds of arrangements between a
 8    patentholder and technology company; is that a
 9    reasonable thing to do?
10         A    It is one possible approach.
11         Q    Now, this consensus of the committees, is it
12    written down anywhere?
13         A    Yes.
14         Q    Where?
15         A    In the minutes.
16         Q    With specific rates?
17         A    Well, with regard to the discussion for Lucent
18    which talked about five percent of the chip and our
19    understanding of what chip costs were, there was a
20    discussion that was recorded in the minutes.
21         Q    That's because of proposing the standard was
22    Mr. Tuch, right?
23         A    That's right.
24         Q    And that wouldn't apply to anybody else who
25    wasn't proposing a standard, those six companies were
```

**CSIRO v. Intel, et al.**                                         April 16, 2009

```
 1     the only ones that would have been asked or even could

 2     have been asked; isn't that right?

 3          A     Yes.

 4          Q     And so if you weren't a proponent -- I mean,

 5     do you think the patents are limited solely to people

 6     who are proposing proposals?

 7          A     No.

 8          Q     And you don't even know right now whether

 9     there are or not other patents that apply to the 802.11a

10     standard; isn't that right?

11          A     That's correct.

12          Q     And the same thing, were you on the committee

13     when the "g" standard was adopted, ratified?

14          A     I was not.  I only attended the first few

15     minutes.

16          Q     When you were with Symbol Technologies, did

17     they get into a lawsuit with Proxim?

18          A     Yes, they did.

19          Q     And what royalty rate did they seek?

20          A     I have no idea.

21          Q     Isn't it a fact they sought 12 percent of

22     finished products in Proxim?

23          A     I am not aware of the particulars of that

24     lawsuit.

25          Q     Symbol recovered in that case, didn't they?
```

CSIRO v. Intel, et al.                                       April 16, 2009

44

```
 1        A    I believe they got a judgment.  I'm not sure
 2   what they recovered.
 3                    MR. FURNISS:  Thank you, Mr. Kawaguchi.
 4   That's all I have.
 5                    THE COURT:  Any redirect?
 6                    MR. VASQUEZ:  No, Your Honor.
 7                    THE COURT:  May this witness be excused?
 8                    MR. FURNISS:  Yes, Your Honor.
 9                    THE COURT:  You are excused and thank you
10   for coming.
11                    All right.  Do we have any other RAND
12   witnesses this afternoon?
13                    MR. MIKE JONES:  No, Your Honor.
14                    THE COURT:  All right.  Anything else the
15   Court needs to take up before the jury returns in the
16   morning?
17                    MR. VAN NEST:  Your Honor, I don't think
18   so.  We're going to file our brief at seven, is that
19   what we're planning to do, on claim construction?
20                    THE COURT:  7:00 p.m., yes.
21                    MR. VAN NEST:  7:00 p.m.  And I believe
22   Your Honor already knows we have a RAND witness tomorrow
23   in the afternoon.
24                    THE COURT:  Right.  How long will that
25   witness be?
```

**CSIRO v. Intel, et al.**                                    **April 16, 2009**

```
 1                THE WITNESS:  We have an expert 40

 2    minutes and a 15- minute percipient -- I'm sorry, two

 3    15-minute percipients and one expert 35, 40.

 4                MR. FURNISS:  And Your Honor, we're going

 5    to put on our defense witnesses to the equitable

 6    defenses when the defendants have rested on that.

 7                MR. VASQUEZ:  You have two witnesses on

 8    your list?

 9                MR. FURNISS:  Three.

10                MR. VASQUEZ:  What's the time?

11                THE COURT:  Y'all get together and meet

12    and confer on that.

13                MR. VAN NEST:  Just for our planning,

14    though, Your Honor, we're planning to put on three

15    witnesses.  Is Your Honor expecting the entire RAND case

16    to be finished tomorrow night, is that what -- or do you

17    care?

18                THE COURT:  I don't care.  I mean, I want

19    it finished by the time we're through with the jury

20    trial and I've got Friday afternoon open, so I would say

21    fill it up if you need to.

22                MR. LAM:  Defendants still have the

23    motion to exclude their damages expert, Mike Wagner,

24    from the jury trial, that's pending.

25                THE COURT:  Yes.  That's denied.
```

```
 1                    MR. LAM:  Your Honor, may I be heard on a
 2     follow-up issue regarding that?
 3                    THE COURT:  All right.
 4                    MR. LAM:  I've had a chance to go through
 5     the exhibits that CSIRO tends to offer through
 6     Mr. Wagner, and if I could just show Your Honor this
 7     kind of example of the can of worms that Mr. Wagner
 8     would open up at the jury trial.
 9                    This is an ABI market research that talks
10     about WiFi integrated circuit chip prices, revenues and
11     average selling prices.
12                    We had withdrawn a host of ABI market
13     research materials in response to their objections.
14     They now, intend, I suppose, to offer one through
15     Mr. Wagner.  Truth be told, this document is not all
16     that bad for defendants, as it shows average selling
17     prices of WiFi ICCs, integrated circuit chips, ranging
18     from $3.40 to $11.51 in 2008 and he's the same guy who
19     is their damages expert saying that Intel owes $5.
20                    THE COURT:  Okay.  It will be great for
21     cross-examination then.
22                    MR. LAM:  We think this is an irrelevant
23     side show.
24                    MR. GILCHRIST:  Just to be clear, Your
25     Honor, what Mr. Wagner was going to do was simply
```

**CSIRO v. Intel, et al.**                                    **April 16, 2009**

1    prepare a slide from that document showing only the

2    sales volumes which were within the motion in limine.

3    We're not planning on introducing the exhibit.  I think

4    he may have gotten that idea because he put the source

5    on the slide we sent over.  But we're not planning on

6    introducing that exhibit.  If we said we were, I

7    apologize.

8                    THE COURT:  Okay.  Anything further?

9                    MR. LAM:  No.

10                   MR. VAN NEST:  Your Honor, what time did

11   you indicate to the jurors they should return?

12                   THE COURT:  Nine o'clock.

13                   MR. VAN NEST:  9:00 a.m.

14                   And I would like to see lead counsel in

15   chambers, please.

16

17

18

19

20

21

22

23

24

25

Case 6:06-cv-00550-LED   Document 725   Filed 08/18/09   Page 48 of 48 PageID #: 23886

CSIRO v. Intel, et al.                                      April 16, 2009

48

1                    REPORTER'S CERTIFICATE

2          We certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.  Dated at Tyler, Texas, this the

5    16th day of April, 2009.

6

7                              _____

8                              D. KEITH JOHNSON, RDR, CRR

9                              _____

10                             KIMBERLY J. JULIAN, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25