IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

COMMONWEALTH SCIENTIFIC AND   )
INDUSTRIAL RESEARCH           )
ORGANISATION, INC.            )     DOCKET NO. 6:06cv324
                              )
-vs-                          )
                              )     Tyler, Texas
BUFFALO TECHNOLOGY, INC.,     )     April 17, 2009
ET AL                         )     9:00 a.m.

MICROSOFT CORPORATION, ET AL )
                              )     DOCKET NO. 6:06cv549
              -vs-            )
                              )
COMMONWEALTH SCIENTIFIC AND  )
INDUSTRIAL RESEARCH          )
ORGANISATION, INC.           )

COMMONWEALTH SCIENTIFIC AND  )
INDUSTRIAL RESEARCH          )
ORGANISATION, INC.           )     DOCKET NO. 6:06cv550
                             )
-vs-                         )
                             )
TOSHIBA AMERICA, ET AL       )

INTEL CORPORATION, ET AL     )
                             )     DOCKET NO. 6:06cv551
-vs-                         )
                             )
COMMONWEALTH SCIENTIFIC AND  )
INDUSTRIAL RESEARCH          )
ORGANISATION, INC.           )

TRANSCRIPT OF JURY & BENCH TRIAL
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES DISTRICT JUDGE, AND A JURY

1                        A P P E A R A N C E S

2                (SIGN-IN SHEETS DOCKETED IN EACH CASE)

3

   COURT REPORTERS:       MS. KIMBERLY JULIAN
4                          MR. D. KEITH JOHNSON
                           CURRY JOHNSON JULIAN, INC.
5                          CERTIFIED SHORTHAND REPORTERS
                           P.O. BOX 270
6                          TYLER, TEXAS  75710

7

   PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY,
8  TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S
 2                (The jury entered the courtroom.)
 3                THE COURT:  Good morning, Ladies and
 4     Gentlemen of the Jury.  Well, I have some good news and
 5     some bad news.
 6                Would you like the good news first or the
 7     bad news?
 8                A JUROR:  Bad news.
 9                THE COURT:  The bad news.
10                All right.  The bad news is, you drove
11     over here this morning and didn't have to, because I'm
12     going to -- some matters have come up that I've got to
13     deal with during the day today that if you stay, you'd
14     be in the jury room most of the time.  And I did that to
15     you too much yesterday, and since we're going to stop at
16     1:30 anyway.
17                The good news is that you're going to get
18     to go home.
19                A JUROR:  Woohoo.
20                THE COURT:  I know everybody is
21     disappointed and anxiously awaiting to hear more about
22     di-bit interleavers, but we're going to let you have a
23     nice long weekend.  We will start back on Monday morning
24     at nine o'clock, is the plan.
25                Now, I would encourage you to check with
```

 1    the 1-800 number the night before, just to be sure that
 2    that hasn't been moved up or back or sideways or
 3    something like that.  Because as I'm sure you realize by
 4    now, you can't anticipate everything that's happening in
 5    a case.  And if we could, it would be a lot smoother.
 6    And I apologize again for having you drive in this
 7    morning.  But it wasn't until this morning that I made
 8    the decision that we just weren't going to get in enough
 9    time with you today to, I think, make it worth your
10    while to be here.
11              Please -- it's going to be a three-day
12    weekend.  Remember my instructions.  Do not discuss the
13    case among yourselves, not with your family members or
14    friends.  Don't do any independent research.  You've got
15    very important duties as jurors in this case, and you
16    need to follow the instructions that have been given and
17    come back on Monday, and we'll -- I anticipate that
18    we'll start on Monday, and we should finish the evidence
19    probably on Tuesday and should get the case to you
20    possibly on Tuesday, but more probably on Wednesday of
21    next week.
22              Thank you for attendance today, and you
23    are excused to the jury room.
24              (The jury left the courtroom.)
25              THE COURT:  Okay.  Please be seated.

CSIRO v. Intel, et al. - Jury and RAND Trials                    April 17, 2009

```
 1              All right.  I understand from visiting
 2     with the parties, would you like to announce the
 3     settlements that have been accomplished?
 4              MR. VAN NEST:  I'll let Mr. Furniss do
 5     that.
 6              THE COURT:  Mr. Furniss.
 7              MR. FURNISS:  Settlements have been
 8     reached between CSIRO and Intel and Dell.  And I believe
 9     that a tentative agreement has been reached with Buffalo
10     as well, but that MOU is in the process of being
11     drafted.
12              THE COURT:  "MOU" being memorandum of
13     understanding?
14              MR. FURNISS:  Yes, Your Honor.
15              THE COURT:  Mr. Van Nest, do you confirm
16     that representation?
17              MR. VAN NEST:  I understood there was a
18     partial settlement with Toshiba.
19              MR. FURNISS:  The settlement with Intel
20     removes part of the case against Toshiba.
21              THE COURT:  But Toshiba is still in the
22     case to the extent -- not indemnified by Dell -- I mean
23     by Intel?
24              MR. VAN NEST:  No, Your Honor.  They're
25     resolved from the case with respect to any Intel parts
```

CSIRO v. Intel, et al. - Jury and RAND Trials                    April 17, 2009

6

```
 1    they purchased.  They're still in the case based on any
 2    parts they purchased from people other than Intel.
 3                  THE COURT:  And who is representing
 4    Toshiba?
 5                  Mr. Wilcox.
 6                  MR. WILCOX:  Yes, Your Honor.
 7                  THE COURT:  Do you agree with that?
 8                  MR. WILCOX:  Well, our lead counsel is
 9    across the street, but that's my understanding, Your
10    Honor.
11                  THE COURT:  All right.
12                  MR. VAN NEST:  Your Honor, we're now
13    appearing here on behalf of Nintendo of America.
14                  THE COURT:  All right.  Due to the
15    settlement of Dell and Intel?
16                  MR. VAN NEST:  Yes, sir.
17                  THE COURT:  All right.  What -- what
18    about Buffalo?  Is there someone here from Buffalo?
19                  MR. MIKE JONES:  Your Honor, I represent
20    Buffalo.  And unfortunately nobody else is here but me
21    from Buffalo.  I do not doubt what Mr. Furniss said, but
22    I have not been informed of that yet.  And I'm certain
23    over the weekend, I will be.
24                  MR. BUFE:  Your Honor, if I could also
25    speak.  John Bufe for -- I'm also co-counsel for
```

 1    Buffalo.  I do see that I have an email indicating that

 2    there is an agreement with Buffalo, and they're papering

 3    the agreement, but there is an agreement.

 4                    THE COURT:  All right.  We have Dell,

 5    Intel and Buffalo settled, right?

 6                    Correct?

 7                    MR. VAN NEST:  Correct, Your Honor.

 8                    THE COURT:  Do the parties agree if

 9    there's any disagreement regarding the meaning of the

10    memorandums of understanding that are being executed,

11    you'll submit those to the Court to resolve it?

12                    MR. VAN NEST:  On behalf of Intel, yes,

13    Your Honor.

14                    THE COURT:  What about Dell?

15                    MR. JACKSON:  Your Honor, I think the

16    memorandum of understanding has been -- we've agreed to

17    submit any disputes to Judge Faulkner as an arbitrator.

18                    THE COURT:  All right.  That's the

19    best course, but if not Judge Faulkner, will you accept

20    me?

21                    MR. JACKSON:  I was about to say, not to

22    deprive you of the opportunity.

23                    THE COURT:  Mr. Wilcox?

24                    MR. WILCOX:  Yes, Your Honor.

25                    THE COURT:  Mr. Furniss?

CSIRO v. Intel, et al. - Jury and RAND Trials                    April 17, 2009

```
 1              MR. FURNISS:  Yes, Your Honor.

 2              THE COURT:  All right.  Very well.  Now,

 3    as I've discussed with counsel in chambers, we're

 4    standing down for the day.  I've sent the jury home.

 5    We'll be back Monday morning at nine o'clock.

 6              Y'all have a mediation, I believe, with

 7    Judge Faulkner beginning at 11:00 today.  I would

 8    encourage all of the parties to make their best efforts

 9    to find a common ground and business solution to

10    whatever issues remain between whatever parties.

11              In the event that doesn't happen, we'll

12    start back on Monday, we'll finish the evidence on

13    Tuesday, and we'll hopefully get it to the jury on

14    Tuesday, but it may be on Wednesday.

15              I would appreciate it if lead counsel

16    would notify me or notify Judge Faulkner -- that would

17    probably be better -- and I would like a report by, say,

18    three o'clock Sunday afternoon as to what parties are

19    left in the case, because I do not want to bring this

20    jury -- I want to put a message on the phone by 5:00

21    o'clock Sunday where they won't have to come back if

22    everybody settles.  But if not, we will start back on

23    Monday morning.

24              So y'all -- every party is instructed to

25    get with Judge Faulkner, and he's going to let me know
```

```
 1    by three -- and ask him, if you would, when you see him
 2    to let me know by three o'clock.  He has my cell phone.
 3    And let me know by three o'clock on Sunday if there are
 4    any parties remaining, who they are.
 5                    MR. VAN NEST:  We'll do that, Your Honor.
 6                    MR. FURNISS:  Yes, Your Honor.
 7                    THE COURT:  All right.  Very good.
 8                    Anything further the Court can help you
 9    with today?
10                    MR. VAN NEST:  I don't believe so.
11                    THE COURT:  All right.  I commend the
12    parties for the progress they've made.  And keep up the
13    good work this weekend and see if we can't get this
14    thing behind everybody.
15                    Thank you.  Be adjourned.
16                    (Recess.)
17                    THE COURT:  Please be seated.
18                    All right.  I understand you have a RAND
19    witness; is that correct?
20                    MR. VASQUEZ:  Yes, Your Honor.  We have
21    Gerald Rosenthal and he has not been sworn.
22                    THE COURT:  Mr. Rosenthal, if you would
23    be stand.
24                    (The witness was sworn.)
25                    THE COURT:  You may proceed.
```

10

```
 1                      GERALD ROSENTHAL,
 2      having been duly sworn, testified as follows:
 3                      DIRECT EXAMINATION
 4      BY MR. VASQUEZ
 5           Q     Could you please state your full name for the
 6      record.
 7           A     My name is Gerald Rosenthal.
 8           Q     And where do you reside?
 9           A     I reside in Weschester County, New York.
10           Q     Can you give us your educational background?
11           A     I received a bachelors and master's degrees in
12      electrical engineering from New York University and a
13      law degree from Pace University.
14           Q     A law degree?
15           A     Yes.
16           Q     And can you tell us a little bit about your
17      work history, what did you start out in and went to work
18      for your first company?
19           A     I started out as an engineer, biomedical
20      engineer, and I worked for them, then I worked for the
21      Institute of Health in dialysis research.  I joined IBM
22      in 1968 as a systems engineer, became a marketing rep,
23      eventually marketing manager, and I moved into the
24      licensing operation in 1984.
25           Q     At some point did you go to law school?
```

1       A    I did, I went to law school in the evening

2    while I was working for IBM from 1980 through 1984.

3       Q    And at some point did you get involved in the

4    licensing?

5       A    I joined the licensing operation in 1984.

6       Q    What did you do in the licensing --

7       A    I started out as a licensing rep and doing

8    licensing negotiations for IBM in the patent licensing

9    area.  I eventually moved out to Tokyo again for all of

10   our licensing in the Asia Pacific area from 1988 through

11   '91.  I came back as director of licensing in '91.  Then

12   in 1999 I was their vice-president of intellectual

13   property and licensing.

14      Q    Tell us about the work you did in Japan.

15      A    I was responsible for all of IBM's licensing

16   activities in Japan, Korea, Taiwan, and the entire Asian

17   area.

18      Q    At some point did you go back to the IBM

19   headquarters?

20      A    I did.  In 1999 -- I take that back.  In 1991

21   I came back to New York.

22      Q    How did IBM's licensing change from the time

23   you joined through your tenure as director of licensing?

24      A    I'm not sure how it changed.  Our income grew

25   quite a bit over those years.

```
 1        Q     Okay.  What was the general level of licensing
 2    expressed in dollars between '98 -- or beginning in
 3    1998?
 4        A     When I joined in 1998 before, we were probably
 5    bringing in five to ten-million dollars a year.  By the
 6    time I retired from IBM in 2005 our income was over a
 7    billion-and-a-half dollars a year.
 8        Q     Was it all from one patent?
 9        A     Oh, golly no, it was for IBM's entire patent
10    portfolio.
11        Q     And how many patents are we talking about for
12    the entire IBM patent portfolio?
13        A     Thousands and thousands of patents.  We were
14    the number one issuer of patents for the last twelve
15    years for the US patent industry.
16        Q     At some point I think you said you became the
17    vice-president of licensing and intellectual property?
18        A     Yes, that's correct.
19        Q     And how was that organized?
20        A     When I became vice-president, I was
21    responsible for all of IBM's IP attorneys, as well as
22    all of our licensing people, as well as those people
23    responsible for standards.
24        Q     And when you say "those people responsible for
25    standards," what do you mean?
```

13

```
 1        A    I had a team of people at the corporate

 2   headquarters who had overall responsibility for

 3   licensing for the corporation -- for standards for the

 4   corporation, but we also had responsibility over the

 5   hundreds of people who were the various standards

 6   organizations to coordinate with them what their

 7   responsibilities were when they met within the standards

 8   organizations.

 9        Q    So in your time at IBM, how many patent

10   licenses would you estimate you were involved in

11   negotiating?

12        A    Oh, over a thousand probably.

13        Q    When was the first time you became actively

14   involved with standards organizations in your licensing

15   work at IBM?

16        A    When I came back in 1991 as director of

17   licensing, I was responsible for reviewing and

18   recommending to the vice-president what positions we

19   should take with regard to patents and standards

20   organizations.

21        Q    Can you explain the IBM standards group, how

22   it was organized?

23        A    Yeah.  We had a central standards group that

24   was responsible for putting out the policies and

25   practices within IBM and educate -- we ran education
```

14

```
1    sessions for all of the people who were in the
2    development divisions who attended the standards
3    meetings so that they would know what their
4    responsibilities were and what their roles were.
5         Q    Okay.  What type of employees at IBM carried
6    out the participation work on the ground, so to speak?
7         A    They were mostly development people who were
8    intimately involved with the technologies for the
9    standards that they were involved with.
10        Q    Okay.  And then you had -- the standards group
11   was essentially how they organized the data and their
12   responsibilities?
13        A    Correct.
14        Q    Did this group have any responsibility for
15   approving IBM's participation in setting new standards
16   of the organization?
17        A    Absolutely.  When we joined a standards
18   organization, we had to understand what the policies and
19   practices were and what IBM's responsibilities would be
20   to that standards organization, so our department
21   reviewed that and made a determination of whether or not
22   it met within our guidelines.
23        Q    Are you familiar with the term LOA?
24        A    I am.
25        Q    What does it mean?
```

```
 1        A     Letter of assurance.

 2        Q     When IBM was in the position of considering

 3   whether to give a letter of assurance, did your group

 4   have responsibility for that consideration?

 5        A     As I said, from the time I became

 6   vice-president in '99, the standards organization

 7   reported to me, so again I had direct responsibility.

 8              From '91 through '99 when we met to make that

 9   determination, I looked at the -- at the patents that

10   were involved and made a recommendation to the

11   vice-president on whether or not we should issue an LOA.

12        Q     What training was involved that you

13   supervised?

14        A     We trained our people to be sure that they

15   understood that they were not to make any commitments to

16   a standards organization without approval from corporate

17   headquarters, and also that once they were involved in a

18   standards group, that they were incurring an obligation

19   on IBM's part to disclose any patents that we might have

20   that would be relevant to the standard.

21        Q     That is make the disclosures for IBM to those

22   organizations?

23        A     Correct.

24        Q     So what was your role with the standards group

25   during the time as director of licensing?
```

1    A    At that time since I was responsible for all

2    IBM's licensing activities, I would make a

3    recommendation once we understood what was involved,

4    what we might get involved, what commitments we might

5    have to make, I would recommend to the vice-president

6    whether or not we should make those commitments, and he

7    always accepted my recommendations.

8    Q    And how many RAND licensing agreements did you

9    negotiate as director of licensing?

10    A    As I said, I didn't negotiate them personally

11    when I was director of licensing, but I was responsible

12    for reviewing probably dozens during that time period.

13    Q    So you had to be briefed to make the final

14    approval?

15    A    I did.  I had to make final recommendations.

16    Q    How did your role in the standards group

17    change -- strike that.

18         What was your responsibility with respect to

19    the standards setting organizations themselves, is it

20    any different than what you described?

21    A    No, it is not.

22    Q    How did that group change over time?  You said

23    the revenue changed, the size of the company changed.

24    A    Well, as technology changed and the internet

25    grew and new standards organizations came into being

1    with lots of different rules and policies and what they

2    were doing, it was natural that my group had to grow as

3    the areas of software in the internet became much more

4    important to us.

5         Q    Did the emergence of standards groups grow

6    during this period of time?

7         A    Absolutely, both formal and informal standards

8    groups.

9         Q    Did the concept of interoperability, as it

10   relates to standards setting organizations, come more

11   into play over time?

12        A    Absolutely.  And the internet is probably the

13   best example of that about the requirements for

14   interoperability.

15        Q    What's the relationship between a standard

16   setting organization and the need for interoperability?

17        A    Well, if technology is going to be adopted and

18   widely used, then interoperability becomes an important

19   requirement.

20             And in that light, setting the standards so

21   that all manufacturers of products related to that

22   technology can operate.  And then as you look at the

23   telephone telecommunications technology, we wouldn't

24   have what we have today, and especially with regard to

25   the internet, if we didn't have interoperability in

18

1    standards.

2         Q    As the emergence of standard setting

3    organizations proliferated, was your department required

4    to hire some more people?

5         A    Certainly supervise more people.  I was always

6    -- at the corporate we always -- we kept the people

7    down, but within the product and development divisions

8    it certainly grew.

9         Q    Did the time committed from your group

10   increase?

11        A    Certainly.  As time went on, the issue of

12   standards interoperability became more and more

13   important.  It took up more and more of my time.

14        Q    Which standards group do you recall being

15   involved in?

16        A    Oh, I was involved in the IEEE, I was involved

17   in ISO, I was involved in ITF, I was involved in ANSI, I

18   was involved in probably dozens of them.  I can't

19   recollect all of them.

20        Q    Okay.  Now, the licensing that we've been

21   discussing, was that limited to for-profit companies?

22        A    No, certainly not.  We did license agreements

23   with universities, government agencies, as well as

24   for-profit companies.

25        Q    Did you have an opportunity to observe how

Case 6:06-cv-00550-LED   Document 726   Filed 08/18/09   Page 19 of 96 PageID #: 23905

```
 1     IBM's licensing practices compared to other companies in

 2     the same standard setting organizations?

 3         A    IBM, we did a lot of benchmarking with other

 4     companies in our area and other areas, people who want

 5     to understand how we ran our business, and so we

 6     regularly ran benchmarking meetings to talk about how

 7     each company ran its business and what we could learn

 8     from each other.

 9         Q    What do you mean by "benchmarking"?

10         A    Well, we'd get together for a day, talk about

11     our operations and the policies and practices and how we

12     ran our business and how it was organized, and other

13     companies would do the same, so that we could basically

14     share the public information that would enable us to run

15     our businesses better.

16         Q    Thank you.  Do you have other non-IBM patent

17     licensing experience?

18         A    I do.  When I retired from IBM in 2005, I was

19     asked to head up a company called the invention network,

20     which was a consortium of five and then six companies

21     that -- my responsibility was to buy patents on the open

22     market that would enable us to build a portfolio where

23     that we would be able to use to defend Linux.  We

24     licensed those patents royalty free to any comer who

25     would agree not to use its patents against Linux.
```

1        Q    What is Linux?

2        A    Linux is an operating system, much like

3   Microsoft's operating system, but it's a free operating

4   system that anybody can use.

5        Q    What is the need to defend Linux and create

6   this --

7        A    Well, there were threats against Linux by

8   various patentholders that they might want to sue Linux

9   assume.  And since Linux was sort of this amorphous

10  being that didn't own patents on its own, we basically

11  became the de facto patent portfolio for Linux.

12       Q    What was the goal of that activity?

13       A    Purely defensive.  We were only building the

14  portfolio to use it -- thank goodness we did not have to

15  use it during my tenure -- to bring suit against anybody

16  who sued Linux for patent infringement.

17       Q    Did it have a broader goal of making

18  technology affordable?

19       A    Well, it made it free, because basically we

20  licensed our patents royalty free to anybody who would

21  agree not to use their own patents against Linux.

22       Q    Thank you.  Now, any other experience with

23  patent licensing and any you're doing currently?

24       A    I'm doing some consulting right now.

25       Q    Okay.  Are you currently the head of the

```
 1     patent pool for Blue Ray?
 2          A    Well, the patent pool hasn't been formed yet,
 3     but I've been announced if and when we form the patent
 4     pool, they've asked me to be the CEO of it.
 5          Q    So there's the genesis, foundational
 6     activities are going on?
 7          A    It's still in the foundational stage.  Very
 8     well put.
 9          Q    What is Blue Ray?
10          A    Blue Ray is a technology that people who are
11     looking at movies, I guess, today that's moved up from
12     the normal DVD movies to the next level of movies, and
13     it's a technology that enhances the movie experience.
14          Q    Okay.  So basically Blue Ray is to DVD what
15     DVD was to VHS tape?
16          A    It's the next level, takes DVD to the next
17     level.
18          Q    Do you review any cases or legal treatises in
19     preparation for your expert testimony?
20          A    I'm sorry.  Can you repeat -- did I review --
21          Q    Any legal treatises or cases.
22          A    I read -- I read a number of documents in
23     preparation.
24          Q    Are those referenced in your expert report?
25          A    They are.
```

1      Q     What are standard setting organizations and

2   what's their purpose?

3      A     The purpose of standard setting organizations,

4   as you said earlier, is to establish standards so that

5   people can build products that are interoperable with

6   one another, that enables commerce to move forward.  And

7   we talked about the telephone, telecommunications, the

8   internet.  Those are all examples where progress would

9   not have been made without standards being set that

10  people could operate against.

11     Q     And what the benefit to be public of SSOs or

12  standard settings organizations?

13     A     Well, the benefit is that now you have

14  competition out there that people can build products

15  that compete with one another, and that brings the price

16  of those products down and makes the consumer, first of

17  all, much more accessible to the technology, and

18  secondly, the cost of that technology is much less to

19  the consumer because of the competition.

20     Q     Does it enhance consumer choice as well?

21     A     Well, that's what I said.  It makes more

22  choices available, brings more competition.

23     Q     Thank you.  What type of technology do SSOs

24  adopt for their standards?  In other words, are they

25  always focused on the highest performance as their goal?

1      A      No.  It's usually a trade-off between cost and

2  performance.  What you want to do is make the product

3  accessible to the consumer at a low cost, so you're

4  always looking at cost versus performance in determining

5  what technologies to adopt.

6      Q      Is obtaining a RAND commitment from

7  patentholders important to picking the right technology

8  alternative?

9      A      It's certainly one of the important factors,

10  because that goes directly to what the ultimate cost of

11  the product would be to the consumer.

12      Q      Thank you.  What is patent holdup?

13      A      Patent holdup means --

14          MR. FURNISS:  Objection to this question,

15  Your Honor.  There is no defined terms "patent hold" up.

16  It's a pejorative term as well.

17          THE COURT:  Overruled.

18      Q      (By Mr. Vasquez) You may answer.

19      A      Patent holdup is when a patentholder, in my

20  opinion, has a patent and that it potentially reads on a

21  standard, and they're trying to get what I would call

22  exorbitant rates of -- of income for their patent to

23  make the -- the cost to the consumer and everybody else

24  much more expensive.

25      Q      Is that an understood term that heard

1    throughout your career involving standard setting

2    organizations and in your benchmarking meetings with

3    other companies?

4         A    It's certainly a term that was used.

5         Q    And how does patent holdup occur?

6         A    Patent holdup occurs in two ways.  One, when a

7    company does not make its patent available to a

8    standards organization, waits for the technology to

9    become widely used and widely accepted and then goes

10   around trying to collect royalties for its patent.  The

11   second is when they are involved in the organization,

12   but nevertheless charge unreasonable royalties.

13        Q    In the second situation, are you assuming that

14   they submitted an LOA and then they break it?

15        A    They could have either submitted an LOA or

16   just been involved in discussions.

17        Q    Okay.  How does an SSO deal with the problem

18   that you described with a patent holdup?

19        A    Well, it tries to avoid it by getting

20   companies who are involved to sign LOAs when it's aware

21   that it may have a patent that reads on the standard --

22        Q    Okay.

23        A    -- or the proposed standard anyway.

24        Q    Thank you.  I'd like to direct your attention

25   to Exhibit 412, which will come up on screen.  It's the

April 17, 2009

```
 1     IEEE's standard patent policy.  Have you read that
 2     before?
 3          A    I have.
 4          Q    What is the IEEE's patent policy?
 5          A    That it -- in terms of what you're talking
 6     about here, in terms of letters of assurance, it seeks
 7     letters of assurance for companies who are involved in
 8     the standards negotiations and discussions, that they
 9     will make their patents available at RAND rates.
10          Q    Are there basically two components, disclosure
11     and the RAND letter?
12          A    That's correct.
13          Q    Is that consistent with the other standards
14     organizations that you've been involved in and you
15     testified about?
16          A    It is.  Some of the standards organization
17     I've involved with have even gone further, which demand
18     that you make your patents available royalty free.
19          Q    So this is not something that just affects the
20     IEEE, it effects all of those organizations that you
21     talked about?
22          A    All of the ones that I've been involved with,
23     yes.
24          Q    All right.  So the basic duty of disclosure,
25     how does that work for a member of the organization?
```

```
1        A      They're asked if they have a patent they
2   believe reads on the standard, to submit a letter of
3   assurance, which sets forth their RAND obligations.
4        Q      What if the members know about third-party
5   patentholders that may have a patent which bears on the
6   standard?
7        A      They would ask them for a letter of assurance.
8        Q      So are the members encouraged to disclose the
9   third parties they know about?
10       A      Only those they know about.
11       Q      Right.  Once a patent is identified as
12  potentially bearing on a particular standard, that's
13  when the LOA goes out?
14       A      That's currently the request for the LOA, yes.
15       Q      What is the patentholder basically being
16  requested to do once they receive a request for an LOA?
17       A      Either provide a RAND license royalty free,
18  RAND license under reasonable and nondiscriminatory
19  rates, or say that they will not participate.
20       Q      Do you know if the IEEE analyzes whether a
21  disclosed patent, one that comes in response to a
22  request, is either valid or whether the standard or
23  product which practices the standard would infringe?
24       A      The IEEE, nor any other standards organization
25  to my knowledge, does any investigations.
```

1        Q    At this time, I direct your attention to

2    Exhibit 874, please.  That's up on your screen.

3             It's a December 4, 1998, letter signed by

4    Dennis N. Cooper of CSIRO.  Do you have that in front of

5    you, sir?

6        A    I do.

7        Q    Have you seen this?

8        A    I have.

9        Q    Does CSIRO state in this letter that its

10   patent is essential to the 802.11a standards?

11       A    They say in the event the standards adopted

12   and cannot be practiced without using the patent, that

13   they will make it available at RAND rates.

14       Q    Okay.  So basically they say it may be

15   essential, correct?

16       A    They do.

17       Q    In your experience, when IBM provided the IEEE

18   or other SSOs with an LOA, had IBM made a determination

19   that its patents were essential to the proposed

20   standard?

21       A    No.  Generally if we had patents within the

22   technology area that may or may not have been

23   applicable, we would submit a letter.

24       Q    Okay.  Is that industry practice, based upon

25   your benchmarking experience?

```
 1        A    Yeah.  Most of the companies that I talk with

 2   generally did not do any prior investigations, other

 3   than to say we have patents within the general

 4   technology area, and if we do, we'll make them

 5   available.

 6        Q    Sort of the abundance of caution standard?

 7        A    That's a good way to put it.

 8        Q    What's your experience in terms of how long an

 9   LOA remains in effect after the letter is sent?

10        A    In my experience, it's -- it's irrevocable.

11   You've made it, and it's committed to all versions and

12   amendments to the standard whenever they're issued.

13        Q    Okay.  Is that the policy today?

14        A    I don't believe IBM has changed its practice

15   since I retired.

16        Q    Has that always been the policy?

17        A    It was always the policy while I was at IBM.

18        Q    What is your experience in terms of whether an

19   LOA carries forward to subsequent amendments to a

20   standard?

21        A    I think I've already answered that.  The

22   answer is in our opinion it does, because basically what

23   you're talking about is when standards are amended,

24   generally they carry the earlier technology forward and

25   make enhancements to it.  So if you did not provide that
```

1    assurance for later versions, basically you would be

2    killing the standard in later versions.

3          Q    Is that the policy today at the IEEE?

4          A    It's my understanding that it is.

5          Q    Has this always been the policy for the IEEE?

6          A    My understanding that it was.

7          Q    What is the impact of that policy on CSIRO's

8    RAND commitment that it made in 874?

9          A    I believe CSIRO, when they made that

10   commitment, made it to all versions of 802.11.

11         Q    You're referring to 802.11g?

12         A    Whatever versions there are that go forward

13   that continue to use the same technology that's

14   enhanced.

15         Q    And you're familiar that 802.11n is under

16   consideration, but hasn't been finalized?

17         A    I'm aware of that.

18         Q    And would the LOA apply to that also?

19         A    Assuming the technology stays the same and

20   it's just an enhancement to the earlier versions of that

21   technology, I believe that commitment is still binding.

22         Q    In your experience, why is this an important

23   policy?

24         A    Well, if it wasn't, what you'd then experience

25   is later versions, you end up with patent holdup because

CSIRO v. Intel, et al. - Jury and RAND Trials                    April 17, 2009

1    somebody's technology is part of the earlier version,

2    it's now carried forward to the later versions, and all

3    of a sudden, we say, well, he we're not going to do it,

4    and now you're in a holdup position because the

5    technology is in that and you're saying you're no longer

6    committed.

7        Q    Okay.  Thank you.  Is that applicable to the

8    CSIRO situation with this letter that was initially

9    issued in 1998 at the time of the 802.11a?

10       A    I believe it is.

11       Q    Would you explain how the holdup problem --

12       A    Well, the holdup problem is, as you mentioned,

13   "g" and then the proposed "n" just carry forward the "a"

14   technology.

15            So, if in fact, somebody were allowed not

16   to -- to withdraw their commitment at this point in

17   time, basically they could say, okay, now we're going to

18   go charge whatever royalty rates we want because we're

19   no longer committed.  But the technology is now built

20   into product, going all the way back from "a" right

21   through "g" right through "n", and that would create a

22   situation that's untenable.

23       Q    Are you aware that CSIRO contends that it does

24   doesn't have the RAND commitment for 802.11g or "n"

25   because it didn't send in a new letter?

1        A    I'm aware that it has not sent a letter.  I

2   don't know that it has not committed to "g".  I

3   understand that they have offered a license to "g".

4        Q    If CSIRO took the position that because it

5   didn't send a letter to the committee on "g" or "n", it

6   doesn't owe an LOA RAND commitment for those standards,

7   would they be right or wrong?

8        A    They're wrong.

9        Q    Why is that?

10       A    Because, in fact, as I stated earlier, when

11  you make the commitment, you makes it to all later

12  versions.  Otherwise, you could create -- nobody would

13  put patents in or the standard would become meaningless,

14  and that would be untenable.

15       Q    Should CSIRO have told the committee that it

16  didn't intend to offer RAND terms on "g" and "n"?

17       A    It doesn't matter whether it told it or not,

18  in my opinion.

19       Q    Okay.  What is royalty stacking?

20       A    Royalty stacking is when -- when a company A

21  charges a royalty and then B charges another royalty and

22  C charges a third royalty, and before you know it,

23  you've built a royalty that's probably more than the

24  cost of building the product.

25       Q    Does that have a result on the standard?

```
 1        A    Well, sure it has a result, because then it

 2   makes the price of the standard so expensive that nobody

 3   is going to adopt the standard and nobody is going to

 4   build products to that standard.

 5        Q    Okay.  Is that what RAND commitments are

 6   supposed to address?

 7        A    That's exactly what RAND commitments are

 8   supposed to address.

 9        Q    Now, in your deposition, you stated that you

10   believe there's a theoretical royalty stacking

11   problem -- you use that term -- because there are so

12   many patents disclosed to the 802.11 standards.  Can you

13   explain.

14        A    Well, there's -- there's probably hundreds of

15   patents there.  And if everybody were able to charge

16   a -- a significant royalty, it would well exceed the

17   cost of the product.

18        Q    Okay.  At the time of your deposition, you had

19   no specific knowledge about the status of whether those

20   LOA writers actually amend the royalties, correct?

21        A    I would be looking at the companies that I

22   looked at, my guess is very few of them charge.

23        Q    Okay.  Have you talked to -- the original

24   order of witnesses was going to be Mr. Olson.  But did

25   you get a chance to talk to Mr. Olson from Netgear about
```

1        Netgear's situation?

2            A    I -- I understood and read some documents and

3        understand that Netgear now has been sued by five or six

4        companies for patent infringement for the standard.  And

5        that's just clearly an example that I talked about of

6        royalty stacking.

7            Q    Okay.  Now, you're not suggesting that it's

8        wrong for the companies who send in an LOA citing a RAND

9        commitment to collect royalties on their patents, are

10       you?

11           A    I am not.

12           Q    Okay.  What is your experience regarding what

13       constitutes a reasonable loyalty under a RAND commitment

14       in an LOA to an SSO?

15           A    Well, based on my experience, as I said, it's

16       either nothing or a very low rate.

17           Q    When you say nothing, is there a term for the

18       nothing?

19           A    It's -- it's called RAND zero, I believe.

20           Q    Or RAND Z?

21           A    RAND Z.  But some companies do charge minimal

22       rates.  At IBM, generally our rates were somewhere in

23       the range of five to twenty thousand.  Basically the

24       cost of preparing and sending out a contract.

25           Q    Okay.  Why would any patentholder agree to a

1    RAND commitment with a low reasonable royalty?

2         A    Because they want the technology adopting the

3    standard.  If the technology is not part of the

4    standard, it may have zero value.  If the technology

5    becomes part of the standard and the standard becomes

6    widely used, then they're collecting a very small amount

7    on each device.  Cumulatively, they could be collecting

8    a very large sum of money.

9         Q    So the markets are larger for standardized

10   products?

11        A    The markets generally are much larger for

12   standardized products.

13        Q    And so it's acceptable to take a lower

14   royalty?

15        A    That is generally why.  You want your

16   technology in the standard, so the standard gets widely

17   adopted.  So many devices are built, and so they collect

18   a significant royalty.

19        Q    Now, what about for a research institution

20   like CSIRO that doesn't recoup its research cost through

21   the product sales.  Is the RAND commitment that's

22   reasonable and, in your opinion, low, fair to them?

23        A    Well, again, yes, because if -- if, in fact,

24   their technology was not in the standard, what they made

25   inventions for would have no value.  So by being part of

1    the standard, by the standard becoming widely adopted

2    with hopefully millions and millions of units sold, they

3    would still be collecting significant royalties, even

4    though the -- the royalty rate on each box was very low.

5         Q    Were you here for Mr. Kawaguchi's testimony

6    here yesterday?

7         A    I was.

8         Q    Did you hear him mention that this is a

9    billion unit market?

10        A    I heard him say it was a billion unit market.

11   So I think he even said a penny a box in a billion unit

12   market is a lost of money.

13        Q    Thank you.  In your experience, when is a

14   reasonable royalty rate determined?

15        A    It's determined at the time the standard's

16   adopted, before the standard's adopted so, that the

17   standards may be -- organization understands what the

18   ultimate costs would be.

19        Q    Okay.  Is there something crucial about that

20   time period from the perspective of the committee?

21        A    Well, sure.  After the fact, when the standard

22   becomes adopted and widely used, people then can

23   determine what they want to charge, now we end up with a

24   patent holdup situation.

25        Q    What's the most common type of RAND royalty

1    that you've seen?

2         A    Well, as I said in my experience, it's either

3    been zero or very low fixed payment royalties, sometimes

4    very low percentage, but mostly fixed payment.

5         Q    What other type of RAND royalty rates have you

6    seen?  Any in this case?

7         A    In this case, I heard Mr. Kawaguchi's

8    testimony where, I guess, Mr. Farrara (phonetics) came

9    forward with a rate of ten cents, and it was rejected as

10   being too high.  Lucent came forward with some rates.

11   There was much discussion there, and that turned out to

12   be just for implementation of technology and, therefore,

13   not necessary to be used, and, of course, then there's

14   the Radiata example where they're charging five percent

15   down to a half percent.

16        Q    Did you hear the testimony about the RAC WEP

17   license?

18        A    I did.  That was a fixed rate, as I recollect,

19   and as the volumes grew, the rates went up slightly.

20   And I think the maximum rate for building millions and

21   millions of units was just $125,000.

22        Q    Okay.  Was the -- the evidence consistent with

23   your experience and your opinion that a reasonable

24   RAND -- not a RAND Z royalty -- is low?

25        A    Yes.  I would think that would be reasonable.

```
 1          Q    Okay.  Directing your attention at this time

 2     to Exhibit 254.

 3               And if you look at the front page, this is

 4     Radiata agreement with CSIRO.

 5          A    Yeah.  I see that.

 6          Q    You've looked at this?

 7          A    I have.

 8          Q    Directing your attention to Page 126 the

 9     document, which is the royalty rate schedule.

10          A    I see that.

11          Q    Looking at this rate table on the last page,

12     are these rates consistent with what you observed as a

13     reasonable royalty under the RAND?

14          A    They're probably a little higher than what

15     I've generally seen, but I would say that -- that the

16     high end of the acceptable range, especially when you

17     get to the high volume numbers.

18          Q    So in this particular license for 3 million

19     and over on the derivative chip, it's one-half of one

20     percent of the chip rate.  Do you see that?

21          A    I do.

22          Q    You heard Mr. Kawaguchi's testimony yesterday,

23     correct?

24          A    I did.

25          Q    He testified the target that was being looked
```

```
 1    at by the committee that adopted 802.11a was
 2    approximately a five to ten dollar chipset.  Do you
 3    recall that?
 4         A    I do.
 5         Q    Would this one-half of one percent in volumes
 6    of three million be applied to a five to ten dollar chip
 7    price?
 8         A    I believe it would.
 9         Q    And if that were the circumstance, if that
10    were the royalty rate, is that within RAND?
11         A    I believe that would be at the high end of the
12    RAND range.
13         Q    Okay.  Now, I'd like you to take a look at
14    Exhibit 246, please.
15              Now, this is where CSIRO extended the Radiata
16    licensing rate to Cisco after Cisco acquired Radiata.
17    Did you look at this?
18         A    I did.
19         Q    What rate did Cisco get under this extension?
20         A    I believe they got the same rates that Radiata
21    had in their original agreement.  It was passed on to
22    them.
23         Q    So they would get half of the percent of chip
24    price and units --
25         A    Of 3 million and above, that's correct.
```

```
 1        Q    Did you get to review any Cisco royalty
 2   reports that show the sums paid by Cisco to CSIRO under
 3   that extension?
 4        A    I believe I saw a report from a year or two
 5   ago where they were paying 11 cents a chip.
 6        Q    And was that at the one-percent level where
 7   you were between a million and three million or was that
 8   at the half-percent level?
 9        A    I think that was still at the one percent
10   level.
11        Q    Can you infer what the rate would be at a half
12   percent --
13        A    It would be five cents.
14        Q    Five cents?
15        A    Yeah.
16        Q    Five cents for selling a Cisco box and
17   retaining a Radiata chip, correct?
18        A    That's correct.
19        Q    Was this agreement extended further beyond
20   Cisco?
21        A    I believe it was extended to some of Cisco's
22   suppliers like Marvell and a few others.  I don't
23   remember all the other names.
24        Q    I direct your attention at this time to
25   Exhibit 184.  This is a document of September 2, 2003,
```

CSIRO v. Intel, et al. - Jury and RAND Trials                      April 17, 2009

1   and it appears to be an extension.  Is this what you

2   reviewed?

3         A    It is.

4         Q    And is this where CSIRO extended the licensing

5   rate that you just testified about to cover chips made

6   by Marvell and sold to additional companies besides

7   Cisco?

8         A    It is.

9         Q    So what additional companies had the benefit

10  of this rate?

11        A    I believe all of Cisco's suppliers.

12        Q    Okay.  So all of -- well, are they

13  specifically enumerated here in the license?

14        A    Yeah, they mention Marvell, they mention

15  Cirrus Logic and Sharp and SkyPilot Networks.

16        Q    So which companies are getting the benefit of

17  the five-cents-per-box rate by virtue of these

18  extensions?

19        A    I believe all of them are.

20        Q    Now, have you seen any evidence in the case,

21  either from the plaintiff or the defendant, that does

22  not support your opinion on what constitutes a RAND

23  royalty?

24        A    Yeah, I saw a couple of the plaintiff's expert

25  witness reports that talked about higher royalties.

1        Q     To the extent those reports talked about $4

2    being a reasonable rate, do you agree or disagree with

3    that?

4        A     I totally disagree with that.  For a 5 to $10

5    piece of equipment to charge 4 to $5 would make the

6    technology untenable.

7        Q     Let's switch topics to the "D" in RAND,

8    discriminatory.  In your experience at IBM, in what

9    situations did you offer different or distinct RAND

10   royalty rates to different and distinct licensees?

11       A     We never offered different rates.  Everybody

12   received the same rates.

13       Q     And why is that?

14       A     Because we wanted to be sure that it was

15   nondiscriminatory and that the marketplace could fairly

16   compete using our patents on an equal footing.

17       Q     What does that mean for this situation, this

18   case where you see the evidence of what happened with

19   the rate being given to Cisco and its suppliers versus

20   the $4 rate?

21       A     It says to me that everybody needs to get the

22   same rate, the Cisco rate, in order for it to be

23   nondiscriminatory.

24       Q     Thank you.

25             Why is the no discrimination limitation

42

1    important?

2         A    Because otherwise you could end up with one

3    company having an unfair advantage in the marketplace,

4    being able to price its products lower than others, and

5    basically creating a monopoly situation for themselves.

6         Q    Is the situation particularly enhanced when

7    you have a market leader like Cisco getting the

8    advantage of the low rate?

9         A    Absolutely, it just gives the market leader a

10   further advantage on price that makes competition not

11   viable.

12        Q    Would the allowance of these discriminatory

13   scenarios have any long-term impact on standards

14   organizations and the participation by the members?

15        A    Yeah, eventually it would create a situation

16   where nobody would be joining standard organizations and

17   submitting their patents to that because you have no way

18   to determine how to compete in the marketplace.

19        Q    Do you believe that the five-cent rate that

20   you testified about, the half percent on unit sells of

21   3 million or more in the Radiata and Cisco, is that

22   within the RAND for this case?

23        A    It's probably at the high end from my

24   experience.

25        Q    Would CSIRO still earn money in a billion-unit

```
 1    market using five cents?
 2         A    A billion units is a lot of units and at that
 3    rate they would probably be earning fifty million to a
 4    hundred-million dollars, so that's a lots of money, in
 5    my opinion.
 6         Q    Thank you very much, sir.
 7                   MR. VASQUEZ:  No further questions.  Pass
 8    the witness.
 9                   THE COURT:  All right.  How long do you
10    expect on cross?
11                   MR. FURNISS:  About a half hour.
12                   THE COURT:  We're going to take about a
13    ten-minute recess.
14                   (Recess.)
15                   THE COURT:  Please be seated.
16                   Before you start, Mr. Furniss.
17    Mr. Vasquez, you mentioned several exhibits.  Were you
18    going to offer those?
19                   MR. VASQUEZ:  Your Honor, yes, we've
20    stipulated to those.  Is that correct, counsel?
21                   MR. FURNISS:  Correct.
22                   THE COURT:  What are they?
23                   MR. VASQUEZ:  Sure.
24                   UNIDENTIFIED COUNSEL:  Exhibit 412, 874,
25    254, 246, and 184.
```

```
 1                    THE COURT:  Any objection?

 2                    MR. FURNISS:  No, Your Honor.

 3                    THE COURT:  Admitted.

 4                    With regard to exhibits, too, both sides

 5       Monday morning I want to -- I want both sides to stand

 6       up and offer whatever exhibits they're going to offer

 7       and I'll admit them or not.

 8                    MR. MIKE JONES:  Yes, Your Honor.

 9                         CROSS-EXAMINATION

10       BY MR. FURNISS

11            Q    Good morning, Mr. Rosenthal.

12            A    Good morning.

13            Q    We've met before.  I'm Dan Furniss.  I

14       represent CSIRO?

15            A    We have met before.

16            Q    Now, I would like to ask you, first of all,

17       about the -- your testimony regarding the Radiata

18       agreement.  Do you recall that?

19            A    I do.

20            Q    And let's use the same number, Defendants'

21       Exhibit 254.  And are you familiar with this agreement?

22            A    Yes, I've seen it.

23            Q    And you're familiar with its terms?

24            A    I've read them.

25            Q    Yes.  Isn't it true that this only provided in
```

45

1    the license limited to the specific designs that Radiata

2    provided to Cisco?

3         A    I believe it provided the circuitry necessary

4    to what's now performed in the standard.

5         Q    Let's look, if we can, to the schedule.

6              If we can blow up the definition of standard

7    chip.  Can you read that?

8         A    I have.

9         Q    And it says, "Standard chip means a chip

10   developed by the licensee based on the current design of

11   the 16-point FFT with 9 bit internal arithmetic,

12   differential QPSK modulator or demodulator and a rate

13   one-half convolutional code with constraint length of 5

14   and either with or without a Parrot Mac processor."

15        A    I do.

16        Q    The next says, "A derivative chip means a chip

17   developed by the licensee with parameters other than

18   those contained in the standard chip."

19        A    I see that.

20        Q    Now, were you here yesterday when Mr. Rossi

21   testified on behalf of Cisco?

22        A    I was not.

23        Q    Are you aware that there was testimony that

24   Cisco was no longer using -- that the Radiata design was

25   a failure and they were buying their chips from Atheros?

1        A      I did not hear that.

2        Q      Would it change your opinion if that in fact

3    were the case?

4        A      No.

5        Q      Why not?

6        A      Because the fact that they're talking about

7    these chips and the chips that are related and CSIRO

8    made a commitment to the standards organization.

9        Q      Well, I'm talking about this license.  You've

10   relied on this license to conclude that CSIRO's demands

11   are unreasonable?

12       A      But they didn't pass this license and allowed

13   both Cisco and eventually Marvell and others to use this

14   license to make chips and then Cisco in fact has been

15   paying royalties based on this license which CSIRO, I

16   understand, has accepted.

17       Q      Are you aware that Cisco is only paying on a

18   small percentage of its production and not on its

19   Linksys subsidiary?

20       A      I'm aware that Cisco is paying royalties, I'm

21   not aware of exactly whatever all the products that

22   they're paying.  But they're paying the royalties they

23   believe are necessary under these -- under this

24   agreement.

25       Q      Are you aware that Cisco has never paid

1    royalties until last August when it checked for six

2    years on any of its Linksys subsidiary products?

3        A    I'm not sure when they bought Linksys and when

4    it was necessary, but they are paying royalties and

5    those royalties are being accepted.

6        Q    Assume that in fact the Linksys subsidiary of

7    Cisco has not paid royalties nor have those royalties

8    been accepted, would that change your opinion?

9        A    It depends what those products are supposed to

10   cover and what those royalties would be for.

11       Q    So you haven't read any of the Cisco

12   witnesses' testimony on this issue; is that right?

13       A    I have not read the Cisco witnesses'

14   testimony.

15       Q    And you've only looked at the royalty report?

16       A    I've looked at the royalty report.

17       Q    Did you compare the number of units on the

18   royalty report with Linksys' sales?

19       A    I have not.

20       Q    If in fact Cisco is only paying on a small

21   percentage of its commercial products and not for

22   Linksys subsidiaries, wouldn't that indicate that Cisco

23   does not believe it's covered by this license agreement?

24       A    No, it would indicate that the Cisco doesn't

25   believe that the patent covers what Linksys is building

```
 1    and therefore there's no need for them to pay royalties.
 2         Q    Now, if you look at page 4 of the technology
 3    license agreement.  If you can zero in on the 4.1 at the
 4    top there.  Let me back up.
 5              You understand that this agreement was not
 6    simply a patent license, that it was a technology
 7    transfer?
 8         A    I do.
 9         Q    And that pursuant to that CSIRO agreement with
10    Radiata was designs and tests and a lot of data that was
11    used by Radiata to work on the chip?
12         A    I do.
13         Q    And if you look at paragraph 4.1, do you see
14    there that it requires Radiata to, in subdivision 4.1b,
15    use its best efforts to exploit the technology?
16         A    I do.
17         Q    Do you recognize that that would be a value to
18    CSIRO in addition to any patent workings it might
19    obtain?
20         A    It would just mean that they've asked them to
21    make the best efforts to build a chip themselves.
22         Q    If you go to the next 4.1c, do you see there
23    that it also requires Radiata to meet minimum
24    performance obligations?
25         A    I do.
```

1        Q    And were you aware of what that meant?

2        A    Whatever those obligations are that they

3    discussed.

4        Q    Are you aware that they had to ship 10,000

5    units by December 31 of 2001?

6        A    I believe I remember that was in the

7    agreement.

8        Q    And that would be beneficial value to CSIRO as

9    well, would it not?

10       A    It would be a value.

11       Q    And so in addition to the fact that it was a

12   technology transfer license, there was an obligation to

13   use best efforts to exploit the technology and that it

14   had to meet minimum performance obligations, this

15   agreement requires more than a patent license would

16   require in a situation where a patent applies to the

17   other products; isn't that right?

18       A    It might.  I'm not sure there's any relevance

19   to that.

20       Q    Well, in terms of establishing what price

21   CSIRO was willing to obtain at this point, isn't it

22   relevant to what they thought the fair value was at this

23   point in time?

24       A    So that might indicate that in fact the rates

25   that Radiata was paying for the patent piece were even

1    less than are listed.

2        Q    Don't you have to value -- you have to value

3    the entire package to establish its value; isn't that

4    true?

5        A    You have to look at all the elements.

6        Q    And if you were getting things in addition to

7    royalties, that would increase the value to CSIRO, would

8    it not?

9        A    It might.  I'm not sure that it would or it

10   wouldn't.

11       Q    Well, in this situation, you've said you're

12   experienced in this field, isn't it true that if there

13   were these additional obligations to actually take the

14   technology to market, it would be more valuable than a

15   bare patent license?

16       A    Not necessarily.

17       Q    Now, if you would, I've put in front of you a

18   book there.  The black book has a copy of your

19   deposition, in case you need it.  And let me ask you

20   about some of your testimony in your deposition.

21            First of all, were you able to find any court

22   case that considered or defined the meaning of RAND?

23       A    No.  In fact, you asked me that in my

24   deposition, and I agree that I have not.

25       Q    So there's no legal guidance in the record as

1    to what a RAND commitment would mean?

2         A    No, it's more custom and practice.

3         Q    And there's no written guidelines by the IEEE

4    either; isn't that true?

5         A    Again, it's custom and practice.

6         Q    Well, is the custom and practice the same?  In

7    fact, you testified in your deposition that you knew how

8    IBM and some other companies treated it, but you didn't

9    know how all companies treated it.

10        A    I said based on my understanding and over 20

11   years experience working with both IBM and other

12   companies, that the custom and practice was as I said in

13   my deposition.

14        Q    And you said it -- I'll quote from page 34, at

15   line 13.

16        A    I want to be sure I'm on the same page as you.

17   34, line 13?

18        Q    Yes.  And the question was, quote:  "So is it

19   your belief that there was some body of industry

20   practice that was, in effect, incorporated into a RAND

21   commitment?"

22        A    I'm not sure I'm on the same page 34 as you

23   are.

24        Q    We have it on the screen.  Perhaps that's

25   easier.

```
 1         A    Oh.
 2         Q    It says, "So is it your belief that there was
 3    some body in the industry practice that was, in effect,
 4    incorporated in the RAND commitment?"
 5              And your answer was, quote:  "I don't know.
 6    No, I wouldn't use the word practice."
 7              Do you see that?
 8         A    I do.  I said each company would make its own
 9    judgments and then that's the judgments that became
10    custom.
11         Q    And it was different from company to company,
12    wasn't it?
13         A    It could be.  As I told you, I spoke from my
14    experience, my experience in dealing with IBM and other
15    companies in the industry who aren't as familiar.
16         Q    Like you weren't familiar with an industry
17    practice as such, were you?
18         A    There was not any specific industry practice,
19    more what individual companies did, and in toto most of
20    those companies that I dealt with did what we did.
21         Q    So how would a third party such as CSIRO
22    determine what your custom and practice was of all these
23    companies, call them all up?
24         A    They would certainly call up some of them, I
25    would think, before they sent in such a letter.  I would
```

1   think they would consult with their lawyers before you

2   write a letter and find out what you're committing to

3   and what other people are doing so that you have some

4   familiarity with what's going to be expected of you.

5       Q    Now, the letter that was sent by the IEEE by

6   Mr. Hayes included pre-forms; isn't that right?

7       A    Do I have that in front of me?

8       Q    Well, let's look at the CSIRO letter.  And

9   that was Defendants' Exhibit 874.

10           Can you see that on the screen?

11      A    I do.

12      Q    Second paragraph.

13           Now, do you recognize that as the same form

14  that was suggested by the IEEE to CSIRO?

15      A    I do.

16      Q    And it says -- it uses the term "reasonable"

17  and "nondiscriminatory"; isn't that right?

18      A    It does.

19      Q    It doesn't say very, very low or zero, does

20  it?

21      A    It says reasonable and nondiscriminatory, and

22  the question was what do I consider reasonable and

23  nondiscriminatory.

24      Q    Well, do you have any explanation for why the

25  letter from the IEEE didn't say what you say is the

54

1    industry practice?

2       A   Because that's the way they wrote their

3    letters as reasonable and nondiscriminatory.  They were

4    not looking for somebody to say that it was either going

5    to be zero or a low rate, they just said reasonable and

6    nondiscriminatory.  But everybody who was on the

7    committee as Mr. Kawaguchi testified yesterday had a

8    clear understanding of what that meant as they evaluated

9    patents to put into the standard.

10     Q   Well, Mr. Hayes who wrote CSIRO initially was

11    the chairman of the committee; isn't that right?

12     A   That's correct.

13     Q   And if there wasn't an understanding, a

14    practice that reasonable meant very, very low or zero,

15    Mr. Hayes would have known that, right?

16     A   It was -- what the form letter said, that

17    everybody who practiced it understood what reasonable

18    and nondiscriminatory was.

19     Q   Well, why wasn't that disclosed to CSIRO?

20     A   I have no idea.

21     Q   In fact, the IEEE has never taken the position

22    that reasonable means very, very low or zero, has it?

23     A   Well, if you look at Mr. Kawaguchi's testimony

24    yesterday, clearly it has, as it meets in committees to

25    determine what patents to include in the standard.

```
 1        Q    But it's never written that down anywhere?
 2        A    That's fine.
 3        Q    Isn't it true that in 2008 the IEEE
 4   specifically stated that it took no position on the
 5   meaning of reasonable?
 6        A    It took no formal position, but the individual
 7   committee members in determining that there was going to
 8   be a standard that it was going to allow in there, it
 9   was clear in his testimony yesterday that it did do that
10   on a regular basis in evaluating one technology over
11   another.
12        Q    Those were in the cases where the proponent
13   identified a patent in the context of a proposal?
14        A    It was identified in the letter submitted,
15   yes.
16        Q    In this case there was no evidence that CSIRO
17   attempted to get the committee to adopt its particular
18   patented technology; isn't that true?
19        A    No, but it did submit an LOA.
20        Q    Right, that said reasonable and
21   nondiscriminatory?
22        A    That said reasonable and nondiscriminatory.
23        Q    Now, in your report you made reference to a
24   number of learned treatises in this area, did you not?
25        A    I did.
```

 1      Q    For example, the treatise by Professor Lemley.

 2    Do you recall that?

 3      A    I do.

 4      Q    And in that article -- I misspoke, it wasn't a

 5    treatise.

 6           In that article, Lemley said there is no

 7    attempted definition of reasonable; isn't that right?

 8      A    If you go further down, a couple lines down in

 9    that thing, he clearly says that at the end of the day

10    this will be determined by the judge based on custom and

11    practice, as I recollect.

12      Q    Didn't he say by the Court?

13      A    I said by the judge and the Court.

14           THE COURT:  Mr. Furniss, let me ask if

15    you can clarify or the witness can.  You've made

16    reference in Defendants' Exhibit 887, which is the IEEE

17    letter to CSIRO, that there were some form letters

18    attached; is that correct?

19           MR. FURNISS:  Yes, Your Honor.

20           THE COURT:  And the letter that CSIRO

21    wrote back, which is Plaintiff's Exhibit 86, is that

22    wording -- I mean is that identical?  In other words,

23    who drafted the language of the letter that CSIRO sent?

24    Is that word-for-word copied from the IEEE's option

25    letter or was it paraphrased?

CSIRO v. Intel, et al. - Jury and RAND Trials                              April 17, 2009

57

```
 1              MR. FURNISS:  We will present evidence on
 2     this if the Court needs it, but perhaps we can establish
 3     this by stipulation.  Other than putting in the patent
 4     name and the name of CSIRO, it's word-for-word from the
 5     IEEE.
 6              THE COURT:  Do defendants agree with
 7     that?
 8              MR. VASQUEZ:  Yes.
 9              THE COURT:  So it was drafted -- the
10     draftsman of the letter was the IEEE, then, in essence;
11     is that correct?
12              MR. VASQUEZ:  I wouldn't say the
13     draftsman of the letter was IEEE, but they used the
14     language that was suggested.
15              THE COURT:  The exact language, right?
16              MR. VASQUEZ:  Yes.
17              THE COURT:  Okay.
18     Q    (By Mr. Furniss) Now, Mr. Rosenthal, you used
19     the term "patent holdup."  Do you recall that?
20     A    I do.
21     Q    Isn't the term "patent holdup" designed for
22     situations -- or refers to situations where the
23     patentholder fails to identify the patent prior to the
24     ratification of the standard?
25     A    Not always.
```

```
 1        Q    Well, in this particular case, the committee
 2   was aware of CSIRO's patent before -- well before it
 3   ratified the standard; isn't that right?
 4        A    Certainly before, I don't know how well
 5   before.
 6        Q    This letter dated in -- the letter that is --
 7   been looking at, which is Defendants' Exhibit 874, is
 8   dated on December 4th, 1998.  Do you recall that?
 9        A    It says so in the letter.
10        Q    Okay.  And isn't it true that the standard was
11   ratified not till the following summer?
12        A    The following summer.
13        Q    So the committee, including its chairman, was
14   aware of the CSIRO patent well before the standard was
15   ratified; isn't that true?
16        A    That's correct.
17        Q    And there was no effort made of any kind to
18   contact CSIRO and ask them what royalty rate they might
19   want to charge for that patent; isn't that right?
20        A    That's correct.  My guess is because they
21   believe that CSIRO understood what RAND meant in terms
22   of -- in the context of what the committee was doing.
23        Q    Well, if someone weren't on the committee and
24   participating in the committee, how would they know
25   that?
```

59

1      A    Because they -- you assume that as CSIRO is an

2    organization, it's part of the Australian government,

3    that they would have done their due diligence before

4    they submitted such a letter to find out what they were

5    committing to.

6      Q    The only way you could do that due diligence

7    would be to call up the committee members; isn't that

8    right?

9      A    Call up people who are involved in the

10   standards organization and understood what those people

11   believed the RAND term meant.  And I would believe in

12   due diligence, that's a responsibility they had.

13     Q    Isn't it true that the RAND committee members,

14   of the 802.11 committee members, were prohibited from

15   collectively discussing price?

16     A    Collectively discussing price.  But they

17   certainly were able to discuss relative costs -- what it

18   ultimately costs to build such a product, including what

19   the royalties might be.

20     Q    Well, when you're talking about a royalty for

21   intellectual property, is there any distinction at all

22   between cost and price?

23     A    Well, price is the ultimate price that the

24   product's going to sell for.  Costs are the various

25   elements that would go into a cost, such as

60

```
 1    manufacturing costs and sales costs as well as patent

 2    costs.

 3         Q    But in terms of IP cost, the cost and the

 4    price would be exactly the same; isn't that true?

 5         A    The cost is the cost that the IP would cost,

 6    and clearly as Mr. Kawaguchi testified yesterday, they

 7    did discuss that, because they discussed Mr. Farrara's

 8    proposed cost as well as others.  As well as RSA's costs

 9    when they submitted part of their proposal.

10         Q    If you would look at Exhibit Number 2794.

11              Have you seen this document before, Mr.

12    Rosenthal?

13              MR. VASQUEZ:  Your Honor, I would object

14    to this document -- and we put them on notice.  If I

15    could address the Court?

16              THE COURT:  All right.

17              MR. VASQUEZ:  This is not a document

18    authored by the witness.  It appears to be an internet

19    posting.  It wasn't produced by --

20              THE COURT:  An internet what?

21              MR. VASQUEZ:  An internet posting, the

22    equivalent of someone writing on the wall, except they

23    do it on the internet.

24              The purported author, if you read this,

25    is an individual who is now deceased named Jeff Fromm.
```

1    There has been no deposition of Mr. Fromm.  HP is not in

2    this case.  There's really no basis to utilize this as a

3    piece of evidence in this case.  It shouldn't be

4    admitted.

5                    THE COURT:  Who was Mr. Fromm?

6                    MR. FURNISS:  He was IP counsel for

7    Hewlett-Packard, Your Honor.  This is an IEEE-sponsored

8    website that -- and we're not offering it for the truth.

9    We're offering it for the fact that it appears on the

10   IEEE website in terms of defining what the term "RAND"

11   means.

12                   THE COURT:  All right.  The objection's

13   overruled.

14                   MR. FURNISS:  If we can focus in on the

15   first paragraph.

16       Q    (By Mr. Furniss) Now, are you aware that the

17   IEEE hosts a discussion site on the issue of RAND?

18       A    You brought that up during my deposition.

19       Q    And did you go look at it?

20       A    I did not.

21       Q    Why not?

22       A    It's just a discussion chat amongst people

23   discussing things that -- it's hard to tell whether the

24   people even who say they're submitting it are the people

25   putting it on.

```
 1              I mean, when you have stuff on the internet,
 2    goodness knows what could be there and who put it and
 3    who is authoring it, and so I don't put much relevance
 4    in it.
 5         Q    This is an IEEE website that you can --
 6         A    But it doesn't prohibit anybody from
 7    submitting notes on it, and they just put things on.
 8    They're not -- they're not edited.  There's nothing done
 9    with them, so I don't put much value in it at all.
10         Q    Well, if it said, as it does, that RAND is a
11    term without meaning, you would disagree with that,
12    wouldn't you?
13         A    I would disagree with that.  But as I said,
14    these are just people discussing things.  It to me has
15    no relevance.
16         Q    And if there were many other posts to the same
17    effect, you'd take the same view of that?
18         A    Absolutely.  Things that are posted on the
19    internet in chat rooms and stuff like that just could be
20    who knows what specious documents are there.
21              THE COURT:  Was Mr. Fromm a member of the
22    IEEE?
23              MR. FURNISS:  Yes, he was, Your Honor.  I
24    believe he was.
25              THE COURT:  The witness agree with that?
```

1              THE WITNESS:  I have no idea, your Honor,

2    whether he was or he wasn't or that he even posted this

3    himself.

4         Q    (By Mr. Furniss) As Mr. Gilchrist reminds me,

5    this is a website of what's called PatCom.  Have you

6    heard of the PatCom of IEEE?

7         A    I have not.

8         Q    Let me represent to you that this is the

9    patent committee of the IEEE and that's what this

10   website is.

11        A    But, again, anybody could submit things on it,

12   and it's hard to tell whether the people submitting it

13   and what they're saying and who they are and what the

14   relevance, if any, is.  These are just people discussing

15   things.  As we all know, unfortunately, too much junk

16   gets on the internet, people discussing things that are

17   harmful to others and who knows where they came from.

18        Q    Well, if you look at the second page of this

19   document, you see it's listed as Jeffrey Fromm, Vice

20   President, Deputy General Counsel and Director of

21   Intellectual Property, Hewlett-Packard Company.  Do you

22   see that?

23        A    I see that.  But, again, there's no

24   corroboration that he did that or that he did do it or

25   who he was or what his role was.  I know a lot of people

1    at Hewlett-Packard.  I did not know Mr. Fromm.

2        Q    If we could call up Plaintiff's Exhibit 2069,

3    please.

4                MR. VASQUEZ:  Your Honor, just for a

5    moment.  I made an error.  When you asked whether or not

6    the language in the CSIRO written letter was the same as

7    the form.  We've compared it and that statement was in

8    error and they're not the same.  I urge Your Honor to

9    compare them.

10               THE COURT:  Would you bring up the form

11   that was -- the form that was sent from the IEEE to

12   CSIRO.

13               MR. FURNISS:  Pull up Plaintiff's

14   Exhibit 3387.

15               THE WITNESS:  I'm sorry?

16               MR. FURNISS:  We attempted to get a

17   stipulation.

18               MR. VASQUEZ:  We can take it up after the

19   witness, Your Honor.

20               THE COURT:  All right.

21               MR. FURNISS:  Zoom in on the content of

22   letter.  This is Plaintiff's Exhibit 3387.

23               MR. VASQUEZ:  Thank you.

24       Q    (By Mr. Furniss) Do you see that on the

25   screen?

1           And isn't it true that the only things that

2     are contained on this letter where it says -- the form

3     letter says, "In response to your letter of date," the

4     term "20 October" has been added.  Is that right?

5                     THE COURT:  Who is this letter from and

6     to?

7                     MR. FURNISS:  This is a letter -- this is

8     one of the form letters that was included with

9     Mr. Hayes' letter to CSIRO in October of 1998.  And

10    it's --

11                    THE COURT:  Why is it addressed to

12    Lucent?

13                    MR. FURNISS:  Mr. Hayes was the chairman

14    of the IEEE 802.11 committee.

15                    THE COURT:  So this is one of the actual

16    form letters that was submitted with the IEEE letter,

17    Exhibit Number 887?

18                    MR. FURNISS:  Yes, Your Honor.

19                    THE COURT:  Okay.  But the marks -- the

20    handwritten marks were not on it; is that direct?

21                    MR. FURNISS:  No.  They filled in the

22    blanks on this letter.

23                    THE COURT:  Who did?  Who is "they"?

24                    MR. FURNISS:  CSIRO did, Your Honor.

25                    THE COURT:  Okay.

```
 1                   MR. VASQUEZ:  Your Honor, with this
 2    clarification -- we were handed Exhibit 2665 to make a
 3    comparison.  This is the comparison, the appropriate
 4    one.  So we would agree that this is their --
 5                   MR. FURNISS:  Pardon me?
 6                   MR. VASQUEZ:  That 3387 is the template
 7    that seems to match the CSIRO letter.
 8                   THE COURT:  That matches the --
 9                   MR. VASQUEZ:  The CSIRO letter that was
10    sent in.
11                   THE COURT:  Sent by the IEEE?
12                   MR. VASQUEZ:  Yes, as distinct from 2665.
13                   THE COURT:  The one on the screen now is
14    a match, absent the handwriting.
15                   MR. VASQUEZ:  Yes, sir.
16                   THE COURT:  All right.
17                   MR. FURNISS:  So that's established now?
18                   MR. VASQUEZ:  Yes.
19         Q    (By Mr. Furniss) Now, Mr. Rosenthal, you said
20    that the -- the parties had to reply on the courts to
21    establish a reasonable royalty?
22         A    That's what was -- you had referenced the
23    Lemley article, and I said that Lemley at the bottom of
24    his article, beyond where you were quoting, said that.
25         Q    And do you have any reason to believe that a
```

1    jury cannot decide what a reasonable royalty is?

2         A    In terms -- once they understand the testimony

3    talking about how an SSO views RAND, in the context of

4    an SSO, I would assume they can make that determination.

5         Q    Isn't there an established test under the law

6    for establishing what a reasonable royalty is, the

7    Georgia-Pacific test?

8         A    The Georgia-Pacific test is a general test for

9    determining RAND.  But in this case, we're talking about

10   RAND in the context of SSOs and commitments made for the

11   SSOs.  So that's just another factor that needs to be

12   considered.

13        Q    And, in fact, defendants' experts in this case

14   have considered that and have opined on that matter,

15   have they not?

16        A    I assume so.

17        Q    So if the jury is unable to consider that,

18   then is there any problem with a jury deciding what a

19   reasonable royalty is?

20        A    If the jury is able to consider it.  I don't

21   believe the jury was here when Mr. Kawaguchi testified

22   yesterday.

23        Q    But in their -- this is -- there's a damage

24   trial scheduled for later, are you aware of that?

25        A    I am.

```
 1         Q    And the damages are not at issue here.

 2         A    I understand.

 3         Q    So if, in fact, there is a damage trial, is

 4    there any reason why a jury cannot apply the

 5    Georgia-Pacific test, consider the SSO, and make a

 6    reasonable decision?

 7         A    I would assume that's the case.

 8         Q    So is it your view that CSIRO has given up its

 9    rights to a reasonable royalty under the patent statute

10    because it's given a reasonable and nondiscriminatory

11    letter to the IEEE?

12         A    It's given up its rights in the sense that it

13    made another commitment to the SSO, the IEEE, that

14    further limits those RAND rights.

15         Q    Isn't it true that the language of the IEEE

16    letter and the language of the patent statute both talk

17    about a reasonable royalty?

18         A    That's correct.  But then as I mentioned in

19    the -- when they're determining what is a reasonable

20    royalty before the technology's adopted into the

21    standard, then they consider what the -- the relative

22    costs might be, and as Mr. Kawaguchi testified

23    yesterday, those cost clearly were an element in making

24    that determination.

25         Q    Now, are you aware that the draft 11n
```

1    standard, that the defendants have agreed that those
2    products also infringe the CSIRO patent?
3        A    There is no standard yet, so it's hard to
4    determine what would be in the standard and whether or
5    not it will be infringed.
6        Q    Well, isn't it true that parties are already
7    selling "n" products?
8        A    They're selling products based on the proposed
9    standard.  It's not yet a standard.
10       Q    But those products are interoperable with each
11   other, are they not?
12       A    In the sense of what was in "a" is now in "n",
13   lifted up, because what happens is they've amended it
14   and they've made sure that the prior technologies are in
15   there so that they're backward compatible.
16       Q    And the members of the IEEE are -- strike
17   that.
18            The companies that are now selling draft "n"
19   products were aware of CSIRO's royalty requests well
20   prior to selling -- designing and selling those
21   products; isn't that --
22       A    Because of the backward compatible necessity,
23   that was in the proposed standard and at the present
24   time.
25       Q    Isn't it true that they could have changed the

April 17, 2009

1    forward-looking use of the standard and maintained

2    backward compatibility if they had wanted to?

3         A    And, in fact, they may well do that, because

4    they've not yet established that "n" will be a standard

5    with the CSIRO technology in it.

6         Q    To date they haven't done that, have they?

7         A    No.  But I understand that that's one of the

8    reasons that they're holding up approving the "n"

9    standard.

10        Q    Isn't it true that CSIRO wrote a letter to the

11   IEEE on the "n" standard saying it would be reasonable

12   and nondiscriminatory?

13        A    But I also understand that the IEEE is

14   concerned about what their meaning of reasonable and

15   nondiscriminatory in terms of the RAND standard is, and

16   therefore, has not approved the new in "n" standard.

17   But in this case, it really doesn't matter, in my

18   opinion, because once CSIRO made its commitment, it goes

19   forward to all future amendments to the -- to the -- to

20   the "a" 11 standard.

21        Q    Why then did the IEEE 802.11 committee send

22   CSIRO another letter with regard to the "n" standard?

23        A    I can't speak for the IEEE, but my guess would

24   be, if I were asked, is they want to make -- that they

25   understand that there's this litigation going on, and

1    they want to understand exactly what CSIRO's position is

2    as they go forward.  But, in fact, the belief is that it

3    is incorporated.

4         Q    What is incorporated?

5         A    That if the CSIRO -- that their prior

6    commitment to a reasonable and nondiscriminatory rate,

7    within the meaning of what the IEEE understands is

8    reasonable, is incorporated as we move forward to later

9    versions.

10        Q    Are you aware of any of the history of the

11   negotiations between CSIRO and the defendants in this

12   case?

13        A    I am not.

14        Q    Is it reasonable for the industry to decide

15   that an appropriate royalty is zero on -- without

16   negotiation?

17        A    I don't know whether -- what the -- you ask me

18   whether they do negotiations.  They have not committed

19   to a RAND zero rate.  They committed to just a RAND rate

20   within the meaning of the IEEE's understanding of what a

21   RAND rate is for an SSO.  So that's where they are.

22        Q    And that could be negotiated, could it not?

23        A    It certainly could be negotiated.

24        Q    Do you know whether that's occurred at all?

25        A    I have no idea.  That wasn't what I was asked

CSIRO v. Intel, et al. - Jury and RAND Trials                        April 17, 2009

```
 1    to testify about.
 2         Q    If you would look at -- I believe Mr. Vasquez
 3    showed you what's been marked as DTX412.
 4              And we can go down to the bottom of the page
 5    and establish that these are guidelines that were
 6    promulgated on -- the right-hand corner there.
 7              These were promulgated on October 14th of
 8    2008; isn't that right?
 9         A    That's what it says.
10         Q    So this is ten years after the CSIRO letter
11    was given to the IEEE, right?
12         A    Yes.
13         Q    And these guidelines were not available at
14    that time; these are different guidelines than were in
15    effect in 1998, are they not?
16         A    The letter is dated 2008, so I guess that's
17    what that says.
18         Q    Well, is there any indication in the
19    guidelines that existed at the time that reasonable
20    meant very, very low or zero?
21         A    No.  But certainly the committees were given
22    the opportunity during their discussions to determine
23    relative costs in determining which technology to
24    determine is the standard, as I keep testifying to, the
25    same thing over and over, and that the testimony of
```

 1   people who are on the committee have testified what

 2   their understanding of RAND was in terms of what they

 3   were willing to accept as -- as a reasonable royalty.

 4        Q    Now, do you know how much Cisco paid for

 5   Radiata?

 6        A    I don't recollect the exact number.

 7        Q    Does the number of $295 million sound correct?

 8        A    Sounds about right.

 9        Q    Wouldn't it be reasonable to consider that as

10   well in evaluating how much Cisco paid for the patent

11   rights?

12        A    Absolutely not.  In my experience, when I

13   worked for IBM and other companies, basically you're

14   paying for the people; you're not paying for the

15   specific technologies of the patents related to them.

16   So my guess is the overwhelming majority of that money

17   went for acquiring Radiata's people.

18        Q    Do you know how long those people remained

19   with Cisco?

20        A    I have not.  It doesn't matter really.  Once

21   you get them, you understand what their capabilities

22   are, and they pass on the knowledge that they've got,

23   you have you've gotten most of the value from them.

24   If -- I've bought many companies, and that was always

25   the case.  The value of the patents was always a de

```
 1    minimus value in our calculations.
 2         Q    If, in fact -- assume for a moment that --
 3    that within one year all of those people were gone,
 4    wouldn't that suggest that the people were not key to
 5    the situation?
 6         A    No.  Wouldn't suggest that at all.  Other
 7    opportunities arise.  They may have been paid out --
 8    been given large payouts.  There's a whole bunch of
 9    factors on why people leave.  But as long as they hung
10    around for -- within that year, my guess is they
11    transferred most of the relevant knowledge to the Cisco
12    people.
13         Q    And since CSIRO's relevant knowledge had been
14    transferred to Radiata, that Cisco was acquiring in part
15    CSIRO's work right?
16         A    Knowledge.
17         Q    Knowledge.
18         A    Experience of the people, what they had
19    learned and what they were doing, so they could pass it
20    along to the Cisco people.
21         Q    And that would include things like test
22    results and modeling and studies and those sorts of
23    things?
24         A    Whatever was allowed that was considered, you
25    know, under whatever confidentiality agreements existed.
```

1        Q     Now, did IBM, when you were there, charge

2    royalties on finished products?

3        A     It depended on what the patents covered.  Most

4    of the royalties charged, we tried to go to the lowest

5    level element.  So basically we charged on the chip if

6    we believed the patent covered the chip.

7        Q     My question was, did IBM charge royalties on

8    finished products?

9        A     Only if we had a patent that covered a system.

10   And that was all elements of the system were covered by

11   what was being built by the box manufacturer.  So it was

12   really relevant to how far along the chain the patent

13   covered.

14       Q     If the patent covered the method that

15   practiced the invention, it would be appropriate to

16   charge a royalty on a finished product, would it not?

17       A     It depended, again, on the language of the

18   patent, and method patents were always problematical, so

19   we tried not to rely very heavily on method patents.

20       Q     That was IBM's practice.

21       A     That was IBM's practice.  You asked me about

22   it.

23       Q     Yes.  But that wasn't the practice of the

24   entire industry, was it?

25       A     I have no idea of the entire industry.  I do

```
 1    know in lots of negotiations that I had with probably
 2    hundreds, if not many more companies, that was generally
 3    the case that both sides agreed to during the
 4    negotiations.
 5         Q    Isn't it true that IBM charged royalties on
 6    DRAM products when their patents covered only portions
 7    or circuits of in those products?
 8         A    If the patent covered the DRAM, we only
 9    charged for the circuitry of the DRAM.
10         Q    Didn't IBM charge percentages of the sales
11    price of the DRAM?
12         A    Of the DRAM, that's correct.  Not of the
13    product that the DRAM went into.
14         Q    But not just on the cost or the value of the
15    particular circuit?
16         A    We had many patents that covered many elements
17    of the DRAM, so in composite, the number of patents that
18    we had that covered the majority of the -- of what was
19    in a DRAM.
20         Q    You testified that -- let me put it another
21    way.  Isn't it true that a letter of assurance is -- the
22    principle behind is that it creates a contract?
23         A    I think I testified that there's a letter
24    sent, and there's reliance on that letter.  So I'm not
25    giving a legal opinion, because I wasn't asked to
```

1    provide a legal opinion.  I would say that a -- a

2    contract has been formed between the parties in the

3    sense of the parties putting forth an agreement and the

4    other party acting in reliance on it.

5        Q    And in this case, if you look at the CSIRO

6    letter, which again is Exhibit 874, it says, in the

7    second paragraph -- in the second paragraph, it says --

8    it says, "In the event that a proposed standard is

9    adopted and the standard cannot be practiced without the

10   use of the patent referenced above, CSIRO agrees upon

11   written request to grant a nonexclusive license under

12   such patent on a nondiscriminatory basis and on

13   reasonable terms and conditions, including its

14   then-current royalty rates."

15             Do you see that?

16       A    I do.

17       Q    Now, do you know, did any of the parties or

18   defendants in this case make a written request to CSIRO

19   for a license?

20       A    I have no idea whether they did or didn't.

21       Q    Well, the company agreement says that upon

22   written request, CSIRO will do something.  That's a

23   condition precedent, isn't it?

24       A    It just says at some point, if the defendant

25   believes it needs a license, it will make a request.  It

1  doesn't say what order or when that written request has

2  to come.

3       Q    Well, it goes on to say, its then current

4  royalty rates.  Doesn't that refer to the time when the

5  written request is made?

6       A    Then current is -- once the rates are

7  established, those are two separate points.  It just

8  says that it will make a written request, and it says

9  then current royalty rates.  It doesn't talk about what

10 those royalty rates are.  As I said, those royalty

11 rates, I believe, have already been established.

12      Q    Wasn't the Radiata agreement before the date

13 of this letter?

14      A    It is the stepping into of it Cisco and the

15 following stepping into of it Marvell.  To me, the

16 written request thing is something that whenever it's

17 made, it's made, and it doesn't really -- the material

18 thing is which -- in my experience, whether we went to a

19 company and told them they had to take a license or they

20 wrote us a letter with regard to a standard, it didn't

21 really make a difference.  That was just the language in

22 there.  To my experience, it was never an important

23 element of the determination.

24      Q    Well, doesn't the term "written request" and

25 "then-current royalty rates," they're in the same

1    sentence, they mean the same thing -- the same event,

2    don't they?  Doesn't it mean when you request a license,

3    we'll give you our then-current royalty rates?

4         A    That's what it says.  As I said, to me the

5    written request thing was not the important thing.  If

6    CSIRO came first and -- and asked them to take a

7    license, it was then current royalty rates, they were

8    similarly bound by it.

9         Q    In that situation --

10        A    That's based on my experience.

11        Q    In that situation, is there an obligation --

12   isn't there an obligation on the part of the other party

13   to attempt to negotiate a reasonable royalty?

14        A    If they believe they have a need for a patent.

15        Q    Well, if you don't have a need for a patent,

16   then you don't need the RAND letter; is that right?

17        A    If you don't have a need for the patent, then

18   that's maybe why they haven't sent letters yet.

19        Q    And that's the position that the defendants

20   are taking here, that they don't need a license for the

21   patent because it's invalid, right?

22        A    That's my understanding.

23        Q    Now, you asked about royalty -- or you

24   testified about royalty stacking.

25             Do you see that -- or do you remember that?

1      A     I do.

2      Q     Do you know whether any of the defendants are

3  paying any royalties on any of their 802.11 products?

4      A     I do not.

5      Q     And so your concern about royalty stacking at

6  this point, at least, is theoretical, isn't it?

7      A     Except as I think I mentioned, Netgear, I

8  understand, has been sued on multiple patents related to

9  the standard.

10      Q     That doesn't mean they're going to have to pay

11  any royalties, though, does it?

12      A     Not unless the Court determines whether or not

13  there's a problem.

14      Q     Now, you testified that you think that the

15  royalty rate of five cents would be at the high range of

16  the royalty?

17      A     Based on my experience, that would be at the

18  high end of the range.

19      Q     Do you know what five cents would be as a

20  percentage of the finished product that including WiFi,

21  or the 802.11g functionality?

22      A     I think it was testified that the product was

23  going to be in the five to ten dollar range.

24      Q     I'm not talking about the chip.  I'm talking

25  about the finished product, such as an access point.

1        A      I do not.

2        Q      The patent law allows a patentholder to seek a

3    royalty base at any point in the chain, does it not?

4        A      Patent law does, but we're talking about what

5    the commitment was with regard to the standard.

6        Q      And the commitment that CSIRO makes said

7    nothing about that it would charge a royalty on a chip

8    price, did it?

9        A      No, but it talked about extend current rates

10    which was the rates that they had put forth in the

11    Radiata license agreement which they then passed on to

12    Cisco and onto Marvell and others.

13        Q      In the Marvell license, is there a royalty

14    rate stated?

15        A      I don't know if there's a royalty rate stated,

16    but I do know that Cisco asked for and obtained an

17    agreement from CSIRO that Marvell could build those

18    chips under the rates that Cisco was paying.

19        Q      Do you know whether that agreement with

20    Marvell was that they could or could not sell it to the

21    outside world, other than selling it to Radiata?

22        A      I believe it limited them to selling it to

23    Cisco.

24        Q      They were limited to selling it to Radiata?

25        A      Which was part of Cisco.

1        Q    Isn't it true that Cisco never exercised the

2    option to use the license for its Linksys subsidiary but

3    instead with Atheros chips?

4        A    I have no idea whether they did or didn't.

5        Q    Well, assume that Mr. Rossi testified about

6    that yesterday, in that case, if only a small percentage

7    of Cisco's production were licensed under the agreement,

8    there would not be any unlawful discrimination or any

9    improper discrimination; isn't that true?

10       A    As I said, I have no idea whether the patent

11   covers the Linksys products or whatever.  That was

12   outside of what I was asked to testify about, so I have

13   no knowledge of that.

14       Q    Well, it's relevant to the issue of the

15   technology license, isn't it?

16       A    It's relevant only if in fact the technology

17   is covered -- the patent is covered in the technology,

18   and I have no knowledge of that.  I wasn't asked to

19   opine about that.

20       Q    Have you ever attended any RAND committee

21   meeting?

22       A    No, but my people did and many people at IBM

23   who reported to me did and reported to me back about

24   what they had learned there.

25                MR. FURNISS:  I'll pass the witness, Your

```
 1   Honor.
 2              THE COURT:  All right.  Redirect?
 3              MR. VASQUEZ:  Briefly, Your Honor.
 4                  REDIRECT EXAMINATION
 5   BY MR. VASQUEZ
 6       Q    Mr. Rosenthal, is it discriminatory to agree
 7   to license to one chip vendor for five cents and not
 8   agree to license to the five-cent percipient
 9   competitors?
10       A    I believe that's discriminatory based on my
11   experience and what would promote fair competition in
12   the industry.
13       Q    If CSIRO refused to license to all of
14   Radiata's chip competitors, the main suppliers to the
15   defendants in this case at all, would that be
16   discriminatory?
17       A    Absolutely.
18       Q    Okay.  If CSIRO uses the excuse that it wanted
19   to get a higher royalty by licensing for -- at the
20   box-maker level, would that be an excuse for this
21   discrimination?
22       A    I believe it would.
23       Q    It would not?
24       A    I believe it would be discriminatory.
25       Q    Right.
```

```
 1              Is it discriminatory for CSIRO to refuse to
 2    give Cisco's router competitors to people like Netgear
 3    and Belkin and Accton and 3Com, is it discriminatory to
 4    refuse to give them the five-cent rate that Cisco was
 5    paying and CSIRO has accepted?
 6         A    I believe it would be discriminatory.
 7                   THE COURT:  Mr. Vasquez, what was the
 8    date of the Cisco license agreement?
 9                   MR. VASQUEZ:  I was just about to ask him
10    some questions on that.  If you listen, I think it will
11    be in context for you.
12    Q    (By Mr. Vasquez) What was the rate given to Radiata
13    -- the Radiata license came in in what year, sir?
14         A    I believe it was --
15         Q    '98, right?
16         A    Right.
17         Q    What was the rate there for more than
18    3 million?
19         A    I believe it was a half a percent.
20         Q    A half a percent.
21              What was the rate at 2001 when the Cisco
22    extension was granted by CSIRO?
23         A    I believe that Cisco just stepped into that
24    agreement, so the rate would be the same.
25         Q    What was the rate in 2003 when CSIRO agreed to
```

CSIRO v. Intel, et al. - Jury and RAND Trials                                April 17, 2009

1    extend the rate to Cisco's suppliers, the chip

2    companies, and then the router maker, SkyPilot, and

3    television maker, Sharp?

4         A    My answer would be the same, that they just

5    kept stepping into the agreement with no change in the

6    agreement, so it would still be the half percent.

7         Q    So it was the then current rate offered by

8    CSIRO any different in 1998, 2001 or 2003?

9         A    I believe it was the same.

10             MR. VASQUEZ:  Your Honor, does that

11    address the issue?

12             THE COURT:  Yes.

13             MR. VASQUEZ:  Thank you.

14    Q    (By Mr. Vasquez) Do licenses get taken by IBM when

15    IBM has validity and infringement concerns, in other

16    words, do they license anyone?

17         A    Take a license or give a license?

18         Q    Do they take a license?

19         A    No.  When somebody brought a patent to IBM, we

20    would study the patent.  If we determined that the

21    patent was either invalid or not infringed, we would not

22    take a license, we would give arguments back on why it

23    was not valid and noninfringed and hopefully the

24    discussions would move on from there.

25         Q    Based on your experience in the industry and

CSIRO v. Intel, et al. - Jury and RAND Trials                    April 17, 2009

 1    custom, does the RAND commitment evaporate because a

 2    discussion ensues between the prospective licensee and

 3    the licensor about the validity of the patent or whether

 4    the patent infringes?

 5         A    No.  I mean, RAND is a separate element.  Once

 6    you determine you have a need for the patent, then

 7    you're expected to be able to take a license to it under

 8    RAND rates.

 9         Q    And it doesn't forfeit because you contest the

10    patent?

11         A    Not in my experience.

12         Q    Okay.  Now, Mr. Furniss told you that Cisco

13    paid $300 million for Radiata and you said that didn't

14    affect your opinion.  Would it assist you in resolving

15    that question if you knew that CSIRO obtained a report

16    from a Big four accounting firm, PWC, that said the

17    total value of the patent, assuming that the A standard

18    was ratified, if that report said that the value of the

19    patent was between $5 million, would that have any

20    impact on your opinion about these rates?

21         A    No.  As I mentioned earlier to Mr. Furniss, I

22    think that when you buy a company, at least in my

23    experience, and we bought many companies at IBM, we were

24    buying the people and what was in their heads more than

25    what we were buying what was on paper.  That we knew

1    about already, it was what was in their heads that we

2    were interested in, and we were able to transfer that

3    knowledge in a relatively short period of time.

4        Q    Would it be consistent with your experience if

5    you saw evidence that Cisco's auditing team had assigned

6    value of 5 million to all intellectual property as

7    amongst the 300 million?

8        A    It would just substantiate what I said was

9    that basically they were buying the people.

10       Q    Now, you were asked about a 2008 policy versus

11   the policy in the '90s.  Does the 2008 policy that you

12   testified about here today, is it any different on the

13   important topics of discrimination and reasonableness

14   than you recall in the '90s?

15       A    No, I believe it was pretty much the same.

16       Q    You were asked how CSIRO should know about the

17   reasonable understanding that you testified here to

18   today.  Were you aware that the licensor, Radiata, that

19   its president who negotiated that license with CSIRO's

20   licensing people was an IEEE member?

21       A    I was not aware of that.

22       Q    Assuming that he was an IEEE member and that

23   they had discussions, would you want to know if CSIRO

24   actually knew about the IEEE policy that reasonable

25   meant low?

1       A     It would certainly be helpful.  But as I said,

2    CSIRO, they were part of the Australian government,

3    there were lawyers there who -- in my experience, this

4    is not a small operation without the ability to get

5    opinions of their own lawyers to determine what RAND

6    meant before you write a letter that committed to

7    something.

8       Q     Now, does the definition of what a reasonable

9    royalty is, is it different when you're not locked into

10   a standard and you have to compete on the merits of your

11   technology versus when you are locked into a standard

12   and everyone is mandated to follow your patent?

13      A     Sure.

14      Q     How does that happen?

15      A     Well, clearly, I mean, if the patent you have

16   is not related to a standard, then -- you know, then

17   it's between you and the other party because there's no

18   indication that other than the company you're dealing

19   with is going to actually be selling product.

20           In this case once there was a standard,

21   there's going to be many companies selling the product

22   and there's going to be billions of products built, and

23   so there was a huge difference here.

24      Q     Now, you testified that you dealt with a lot

25   of standards organizations besides the IEEE.  In your

1    experience, was it the norm to get a special letter that

2    says we've received your RAND letter, what's your price,

3    did that letter come out?

4         A    No, they all were pretty much similar to the

5    IEEE.

6         Q    The last thing I wanted to go into is the

7    simple concept of custom and practice.  In your

8    deposition you were asked about practice and you said

9    each company had its own practice; is that correct?

10        A    That's correct.

11        Q    And you testified here today that you're

12   familiar with many companies' practices from your

13   benchmarking experience and from your participation; is

14   that correct?

15        A    That's correct.

16        Q    From that experience, were you able to discern

17   a custom where if you look at the blended norms?

18        A    Well, as I said, you know, many, many

19   companies charge zero, many companies didn't even get

20   involved, they just said my patents will be there and

21   never even followed up with it.  And then some companies

22   like we did, we basically charged the cost of writing up

23   an agreement and submitting it, and somewhere between 5

24   and $20,000 depending on the agreement.  So it was

25   always in that way.

CSIRO v. Intel, et al. - Jury and RAND Trials                    April 17, 2009

1      Q     And so your testimony here today is based upon

2   your observation of the totality of the custom that

3   emerged from viewing all these practices and

4   participating, correct?

5      A     From what I saw both within my company and

6   other companies that I talked with.

7                  MR. VASQUEZ:  No further questions.

8   Thank you.

9                  THE COURT:  Any recross?

10                  MR. FURNISS:  Just a little bit, Your

11   Honor.  Pull up Plaintiff's Exhibit 1022 to page 3634.

12                       RECROSS-EXAMINATION

13   BY MR. FURNISS

14      Q     I had asked you before about the Marvell

15   license.  And do you see there that it called for a ten

16   percent royalty on the -- strike that.

17            It called for a ten percent royalty on net

18   revenue derived from the sale?

19      A     Revenue from Marvell to Cisco, that has

20   nothing to do, in my opinion, with what the Cisco

21   agreement and what was extended by CSIRO to Marvell had

22   to do.  This is just an internal royalties between

23   Marvell and Cisco, as I see it.  I'm just looking at

24   this exhibit.  I have no idea what the total agreement

25   is even about.

```
 1         Q    Wouldn't that indicate a value at the time,

 2   however, of the hypothetical negotiation?

 3         A    No, I have no idea what the business

 4   relationship between Marvell and Cisco that talked about

 5   this was and what it was in relation to.

 6         Q    Are you aware that the Marvell license was

 7   subsequently altered to provide that Marvell could not

 8   sell to third parties?

 9         A    I have no idea.  I have not seen that

10   agreement.

11         Q    Well, you rely upon the Marvell license.

12         A    I just relied upon the fact that Cisco asked

13   to be extended to Marvell and it was allowed to be

14   extended to Marvell.

15         Q    You didn't look at the modification of that

16   license?

17         A    I don't remember whether I have or not.

18         Q    Are you aware that CSIRO contends that that

19   license -- well, strike that.

20              Are you aware that Cisco needed CSIRO's

21   consent for the Marvell license and didn't get it?

22         A    I believe I thought -- my understanding was

23   that they had that agreement, that they could extend it

24   to their suppliers and that Marvell was one of them.

25         Q    Let's look at Plaintiff's Exhibit Number 2070,
```

 1    slide 6.

 2              And it says there at the top, "Inappropriate

 3    Topics for IEEE WG Meetings."

 4              WG is working group, right?

 5        A    Uh-huh.

 6        Q    And the first one says "don't discuss

 7    licensing terms or conditions."  Isn't that true?

 8        A    That's what it says.

 9        Q    So it would have been inappropriate for the

10    members of the IEEE to collectively consider what the

11    royalty rates were for any particular patent?

12        A    As I said, they were able to discuss costs,

13    which they did, and which was testified to by members of

14    the committee and how that cost would effect the

15    ultimate price of the product in terms of competing

16    standards that they were looking at incorporating.  And

17    my understanding is that that's certainly allowed to be

18    done in determining what to establish as a standard.

19        Q    Well, again, I ask you again, isn't it true

20    that with regard to IP rights, cost and price are

21    exactly the same thing?

22        A    No.  The cost are all the elements that go

23    into building the product, not what the price of the

24    product sold is.

25        Q    So if you're talking about just intellectual

1    property rights, just intellectual property rights, do
2    you have to ask that cost?
3         A    That's what cost is.  Isn't doesn't -- that
4    cost then gets multiplied many times once it's built
5    into the product as it goes down the channel, so what
6    the ultimate pricing, the selling price of the product
7    is which is affected by a penny or two pennies cost
8    could end up being a dollar or more.
9              So no, so there's big differences here.
10        Q    And that's your opinion based on IBM?
11        A    That's my opinion based on IBM and discussions
12   with other companies.
13        Q    And was there a universal agreement on that?
14        A    I have no idea what universal agreement is, I
15   only have the knowledge of the universe that I dealt
16   with which was many companies.
17        Q    Thank you.
18              MR. FURNISS:  I'll pass the witness.
19              MR. VASQUEZ:  No further questions, Your
20   Honor.
21              THE COURT:  All right.  Very well.  May
22   this witness be excused?
23              MR. VASQUEZ:  Yes.
24              MR. FURNISS:  Yes.
25              THE COURT:  Very well.

CSIRO v. Intel, et al. - Jury and RAND Trials                    April 17, 2009

94

```
 1                    And Mr. Furniss, did you intend to offer
 2     any exhibits with regard to this witness?
 3                    MR. VASQUEZ:  Yes, Your Honor.
 4                    THE COURT:  What exhibits are those?
 5                    MR. FURNISS:  2794, 2069, 3387.
 6     Defendants' 412 is already in.  Plaintiff's 1022 and
 7     2070.
 8                    THE COURT:  Okay.  Any objection?
 9                    MR. VASQUEZ:  Just to the from internet
10     posting, Your Honor.
11                    THE COURT:  Just to what?
12                    MR. VASQUEZ:  The one document -- 3387 is
13     the unattributed without foundation e-mail.
14                    THE COURT:  You noted your objection to
15     that and I've ruled on that.
16                    MR. VASQUEZ:  Right.  That was the only
17     one.
18                    THE COURT:  Your objection is noted.  No
19     other objections?
20                    MR. VASQUEZ:  No other.
21                    THE COURT:  All right.  Those will be
22     admitted.
23                    Anything further?
24                    MR. FURNISS:  No, Your Honor.
25                    THE COURT:  Okay.  Anything further from
```

CSIRO v. Intel, et al. - Jury and RAND Trials                          April 17, 2009

1    either party before we recess until Monday?

2              MR. MIKE JONES:  Your Honor, could we get

3    a time total?

4              THE COURT:  Yes.  Plaintiff has used ten

5    hours and 55 minutes, defendant has used eleven hours

6    and 45 minutes, according to the Court's clock.

7              MR. MIKE JONES:  Thank you, Your Honor.

8              THE COURT:  All right.  We'll be in

9    recess.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CSIRO v. Intel, et al. - Jury and RAND Trials**                                    **April 17, 2009**

1                          REPORTER'S CERTIFICATE

2          We certify that the foregoing is a correct

3     transcript from the record of proceedings in the

4     above-entitled matter.  Dated at Tyler, Texas, this the

5     17th day of April, 2009.

6

7                          _____

8                          D. KEITH JOHNSON, RDR, CRR

9                          _____

10                         KIMBERLY J. JULIAN, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25